**Michael RYAN, Petitioner,**

v.

**Harold W. CLARKE, Director of the Nebraska Department of Correctional Services, Respondent.**

**No. 4:99CV3318.**

United States District Court, D. Nebraska.

Sept. 11, 2003.

Michael A. Nelsen, Hillman, Forman Law Firm, Omaha, NE, Steven E. Achelpohl, Omaha, NE, for Petitioner.

J. Kirk Brown, Attorney General's Office Nebraska, Lincoln, NE, Jon C. Bruning, Attorney General's Office Nebraska, Kimberly A. Klein, Attorney General's Office Nebraska, Lincoln, NE, for Respondent.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This is a death penalty habeas corpus case. It involves the most horrendous torture and sickening murder imaginable. There is not the slightest doubt about the petitioner's guilt. If any man deserves to be put to death, that man is Michael Ryan.

Michael Ryan (Ryan or the petitioner) was sentenced to death for torturing and then killing James Thimm. Ostensibly in the name of his God, and over a period of two days, Ryan and others at his direction tied and chained Thimm in a hog confinement shed; on several occasions sodomized Thimm with a shovel handle or a pick handle to the point that the man's guts ruptured; whipped and beat Thimm; shot off some of the victim's finger tips; partially skinned Thimm alive; and caused the man's bones to be broken, once using a piece of lumber and a block of wood to complete the fracture of a leg with one blow. After that, Ryan stomped Thimm to death. Although a five-year-old child, Luke Stice, was also killed a month or so earlier as the events culminating in Thimm's death boiled up, Ryan did not receive the death penalty for that crime.[1]

Pending before me is the 93–page final report and recommendation of Magistrate Judge Piester (Filing 202).[2] Following a thorough and extensive review, including an independent mental evaluation of the petitioner at a Federal Medical Center and an evidentiary hearing on the petitioner's competency, Judge Piester recommends that I deny the petition for a writ of habeas corpus.

1. After his conviction for the Thimm murder, he entered a plea of "no contest" to the Stice murder and was sentenced to life in prison.

2. Filed in 1999, this case was originally styled *Ryan v. Hopkins*, but Warden Hopkins was removed from the case in 2000 and Warden Kenney was substituted. Warden Kenney was removed from the case in 2002 and Director Clarke was substituted. At this time (but see below), there are ten boxes of exhibits and records pertinent to this case. Boxes 1–8 contain the state court records. Box 9 contains the documents regarding Ryan's competency evaluations and related hearing in this court. Box 10 contains the court file in Ryan's voluntarily dismissed 1995 habeas proceeding in this court, styled *Ryan v. Hopkins*, 4:95CV3391. For ease of location, and changing the citing convention of Judge Piester, when a specific reference to one of these documents is necessary, the box number will first be identified. In addition, references to filing numbers (as in "Filing-") refer to documents contained in the court file in this case. In the event of an appeal, the Clerk shall place the remaining portions of the court file and exhibits in a box and number it 11.

After de novo review, I agree with Judge Piester. Given the excellent quality of his work, I fully adopt the report and recommendation. In the interests of judicial economy, I will not discuss Judge Piester's careful exposition of most of the facts and the law. I only add the following to clarify and amplify my views.

## I. BACKGROUND

### A. The Crime for Which the Death Penalty was Imposed

With only a few exceptions, the facts of how Ryan killed James Thimm and Luke Stice are not disputed even by Ryan. Although excruciating, a careful reading of the details of Ryan's crime is fundamental to the proper resolution of this case.

Before doing so, however, it is important to understand the defense at trial. The evidence against Ryan was overwhelming. With Thimm's mutilated body located and the subject of a thorough autopsy, testimony from cooperating eye witnesses, and physical evidence derived from a raid conducted by federal and state law enforcement agents, the prosecution's case was very strong.

While always personally contending that he was sane, Ryan's defense at trial included a claim of insanity. His two lawyers, one of whom had a lot of experience in defending first-degree murder cases,[3] decided, with Ryan's agreement, that the best, and perhaps only, way for Ryan to avoid the death penalty was to minimize Ryan's involvement in the final act that killed Thimm and, at the same time, present the defense of insanity. Ryan and the lawyers agreed that the best way to do that was to have him testify. Essentially, the defense was this: Buttressed by the testimony of the petitioner and mental health experts, Ryan did not do the specific act that killed Thimm, and, besides, no sane man could have done what Ryan was alleged to have done; even though he claimed to be sane, Ryan's own testimony and bizarre beliefs would prove him otherwise.

I next quote from the full, fair, and accurate summary of the facts presented at Ryan's jury trial for the Thimm murder as set forth by the Nebraska Supreme Court. While the quotation is very long, every word is important to the discussion which will follow:

> The record shows the following. Defendant was described as the leader of a group, characterized at trial as both a religious cult and a band of criminals, living on a farm outside of Rulo, in Richardson County, Nebraska. The cult largely developed out of the teachings of Rev. James Wickstrom, the self-proclaimed leader of a group which called itself the "Posse Comitatus." *See Williams v. State,* 253 Ark. 973, 490 S.W.2d 117 (1973). Defendant met Wickstrom at a Bible lecture in Hiawatha, Kansas.
>
> Wickstrom's teachings centered around Anglo Saxon supremacy, the unconstitutionality of income taxes, and the coming Battle of Armageddon. Although Ryan did not agree with all of Wickstrom's teachings, particularly with regard to tax matters, Wickstrom's ideology was the catalyst that formed the Rulo cult's belief system. As a result of his involvement with the Posse Comitatus, defendant met James Haverkamp, John David Andreas, Ora Richard (Rick)

---

3. With another lawyer, Richard Goos was appointed to defend Ryan. Goos was "loaned" from the Lancaster County Public Defender's office in Lincoln, Nebraska. Goos had been a defender since 1971. By the time of the Ryan case, he had defended nine first-degree murder cases, including two for which the State sought the death penalty. *State v. Ryan,* 248 Neb. 405, 534 N.W.2d 766, 774 (1995) (*Ryan II* ).

Stice, and James Thimm during 1982 and 1983. In June of 1983, Ryan and some of the other members of the group met with Wickstrom at a large meeting of the Posse Comitatus in Wisconsin.

During the Hiawatha meeting, Wickstrom showed Ryan what was known as the arm test. That test was described as follows. Defendant would face a group member, who would extend his right arm out at approximately a 90 degree angle from his or her body. Defendant would then place his left hand on the member's right shoulder and place his right hand on the member's right wrist. After asking Yahweh (the name used by defendant and his group for God) a question, defendant would apply pressure to the person's right arm. If the arm dropped, the answer to the question being asked of Yahweh was "no"; if the person's arm stayed up, the answer was "yes." As time went on, others in the group used this arm test, and after awhile every aspect of the lives of the Rulo group was controlled by the use of the arm test.

Sometime in 1983, defendant began telephoning the individuals who later constituted the Rulo group with "orders from headquarters." Defendant would tell the person he called that he (defendant) had "talked to Yahweh and [the men were] supposed to go out and do some stealing. . . ." If any of the men refused to go on these stealing raids, defendant would remind them that their families would not be safe if they angered Yahweh.

The men, in keeping with the group's plans to build a "base camp," converted the spoils of these thefts into weapons, ammunition, and clothing and began to stockpile those items in preparation for the Battle of Armageddon. These stealing raids were conducted in the states of Kansas, Missouri, and Nebraska. The thefts involved the stealing of cattle,

hogs, and various large items of farm machinery and construction equipment. Many of those items, including all the stolen livestock, were sold, and the proceeds financed the stockpiling mentioned above. At the time of defendant's arrest, officers recovered stolen property with a value in excess of $120,000 at the Rulo farm.

By the summer of 1983, it was determined, through the arm test, that defendant had the spirit of the Archangel Michael. Defendant also told the group that he could communicate directly with Yahweh through his mind.

The group began to meet each Saturday to study the Bible. These meetings were conducted by defendant and were usually attended by James Haverkamp; his sisters Cheryl Gibson and Lisa Haverkamp; his mother, Maxine Haverkamp; defendant's wife, Ruth; and defendant's three children. James Haverkamp's younger brother and father would also attend, as did Thimm, Andreas, Rick Stice, Stice's children, and Stice's girlfriend.

During these meetings, defendant would read and interpret various verses of the Bible. He told the group that "the Jews added" any passages that disagreed with his teachings. During these meetings, verses of the Bible were rewritten to conform to the group's beliefs. At the conclusion of these meetings, the group would smoke marijuana.

At one of these meetings, held in Kansas, where defendant and his family then lived, defendant took Cheryl Gibson aside and told her that Yahweh wanted her to leave her husband. Defendant used the arm test to determine that in Yahweh's eyes Gibson was not married to her husband, who was "on Satan's side." Defendant also told her that if she did not stay with defendant and

Ruth Ryan, her husband and children would be killed in an automobile accident.

Gibson eventually left her husband, and for a time she and her children lived with Michael and Ruth Ryan. In May of 1984, a cult service was held, with Rick Stice officiating, where defendant and Gibson were married in Yahweh's eyes.

In June of 1984, defendant told his wife, Ruth, and Gibson that Yahweh wanted them to get better acquainted by going to the Rick Stice farm outside of Rulo. During the summer of 1984, defendant, Ruth Ryan, the three Ryan children (including Dennis), Rick Stice and his three children, Cheryl Gibson and her five children, James Haverkamp, Lisa Haverkamp, and James Thimm moved to the Rulo farm. In August 1984, John David Andreas and, in October, Timothy Haverkamp, a cousin of the Haverkamps, moved to the farm. This group of 7 adult men (including Dennis Ryan), 3 adult women (Ruth Ryan, Gibson, and 15 year old Lisa Haverkamp), and 10 young children constituted the basic Rulo group. Maxine Haverkamp was a regular visitor.

In the meantime, in June of 1984, defendant officiated at the cult wedding of Rick Stice and Lisa Haverkamp, and, in August of 1984, defendant took his second cult wife by marrying Cheryl Gibson's mother, Maxine Haverkamp.

The Rulo farmstead included two trailer houses. Rick Stice was determined to be the high priest of the group, and he and Lisa Haverkamp shared a bed in the south trailer. During this period, the remainder of the group lived in the north trailer. The men slept in a large room known as the barracks, and the women and children slept in various other rooms of the north trailer.

By August of 1984, daily life on the farm was established. The women would consult Yahweh through the arm test in order to determine meal plans, including how long to boil water, and Ryan would use the arm test to find out if any members of the group needed to fast or do penance that day.

Defendant acted as the leader of the group. He would assign tasks for the day and then spend most of his time watching television. During the evenings, defendant would direct the men on stealing raids. Apparently, defendant himself did not participate in the raids.

The group believed that the Battle of Armageddon would take place in the Rulo area, since the Battle of Armageddon was also known as the "Battle of the Wheat Fields." Defendant had observed that there were several wheat fields in the area, and concluded from this that the final battle would be waged near Rulo.

Defendant gave each of the men a military title, and within a few months all of the men were generals, some having attained five star general status, with the exception of Rick Stice, the owner of the farm, who was a six star general and the high priest.

By the fall of 1984, the group had acquired over 75,000 rounds of ammunition and dozens of weapons, including several that were fully automatic. The group also stockpiled seed, charcoal, and enough food to fill a room 20 feet wide by 35 feet long.

During the later part of 1984, Stice lost the Rulo farm due to financial difficulties. The farm was purchased by James Haverkamp and Lynn Thiele, partially with money stolen from James Haverkamp's father. During this same period, defendant determined that Yahweh was angry with Rick Stice; that Stice had raped Stice's cult wife, Lisa Haverkamp; and that Stice was having

"bad thoughts." It would appear that one of Stice's more serious transgressions was losing the farm. Defendant demoted Stice and moved Lisa to the north trailer, where she shared a bed with Ruth Ryan and Cheryl Gibson.

In December of 1984, defendant took Lisa Haverkamp as his third cult wife, and on June 25, 1985, Ryan took his fourth cult wife by marrying Debra Thiele, the sister of Cheryl and Lisa. By this time, defendant was considered married to Cheryl, Lisa, and Debra and to their mother, Maxine Haverkamp, and Ruth Ryan, whom he married in a conventional ceremony in about November of 1967. Maxine did not live on the farm, but would come to the farm twice a month, apparently to perform her conjugal activities.

In December of 1984, defendant announced that Lisa Haverkamp was the queen of Israel. On New Year's Eve, defendant told the group that he and Lisa had spoken to Yahweh, and Yahweh had said that there were going to be changes on the farm. After the group smoked marijuana, defendant informed them that unless the jealousy stopped the law would come and that the children would be taken away. Defendant told the group that each individual had to make a decision on whether to remain or leave the farm; that Yahweh had indicated that anyone who elected to leave would "burn in hell"; and that if an individual elected to stay, he or she would have to stay with the group forever. Defendant said that if anyone decided to stay and then left, he would "hunt [them] down and kill [them]."

During a Saturday Bible meeting, James Thimm stated that he was not sure there was a Yahweh and expressed doubts in the arm test. Rick Stice's 5 year old son, Luke Stice, also apparently had expressed doubts about Yahweh. After these incidents, in January or February of 1985, Thimm, Rick Stice, and Luke Stice were moved to the south trailer. Both Thimm and Rick Stice were demoted to "slaves," and Luke was called "dog," "mongrel," "gook," or "dogshit." During January and February, apparently as part of the changes Ryan had foretold, Rick Stice and Thimm were made responsible for most of the guard duty, washing of dishes, and care of the chickens and goats.

Evidence showed that about this time, defendant began to abuse Thimm, Rick Stice, and Luke Stice. Defendant threatened to amputate Rick Stice's penis and threatened to skin and then burn Luke Stice alive, and both Thimm and Rick Stice were forced to do calisthenics. In March, defendant instructed Thimm to have anal sex with Rick Stice, and told Thimm "to make him hurt." Defendant also forced Rick Stice to perform oral sex on his son Luke and forced Luke to perform oral sex on his father while the other men watched. Ryan told the others that Yahweh wanted these acts performed in order to humiliate Thimm and Rick and Luke Stice as punishment for their having "bad thoughts."

Luke Stice died around March 25, 1985, after defendant repeatedly shoved him, causing Luke's head to strike a cabinet. Luke was knocked unconscious the third time defendant shoved him and died sometime during the night. Luke was buried the following morning in an unmarked grave that defendant forced Rick Stice and Thimm to dig.

After Luke's death, defendant forced Rick Stice to copulate with a goat on three different occasions.

During March, defendant and Lisa Haverkamp went to Kansas City for a honeymoon. Defendant left his son Dennis and Timothy Haverkamp in charge at Rulo. While defendant was

gone, Rick Stice escaped. After defendant returned, James Thimm was kept chained to the south trailer porch.

After leaving the farm, Stice began to worry about "eternal damnation" and returned to the farm after 7 days. Upon his return, defendant had both Rick Stice and Thimm kept chained to the porch of the south trailer.

On April 4, 1985, Rick Stice escaped a second time after Timothy Haverkamp had taken Stice into town on defendant's orders, so that Stice could cash his Social Security check. Stice did not return to the farm and did not contact authorities until June 26, 1985.

After Stice's escape in April, the treatment Thimm received from defendant continued to deteriorate. Thimm was forced to sleep chained to the porch, was fed small birds the men shot, and was also forced to copulate with a goat. On April 27, 1985, after being accused of poisoning a turkey, Thimm was beaten by the men and taken to the hog confinement building, where he was kept chained for the night. At this time, the adult men present on the Rulo farm were: defendant; Dennis Ryan; Timothy Haverkamp; James Haverkamp; John David Andreas; and the victim, James Thimm. Ruth Ryan, Cheryl Gibson, and Lisa Haverkamp were the adult women there, and there were nine young children.

On April 28, 1985, defendant sent Andreas out to Thimm with a bowl of granola cereal. Defendant informed the men during breakfast that "Yahweh would be pleased if [Thimm] lasted four or five days." At about mid-morning, defendant and the rest of the adult men went to the hog confinement building. Defendant instructed Thimm to disrobe and to bend over a farrowing crate.

Defendant then told Thimm that he was going to be sexually assaulted with a shovel handle. Defendant then insert-ed a shovel handle into a grease cartridge and told the men that Thimm had not done a good enough job with the goat and that Yahweh wanted Thimm "probed." Defendant then inserted the shovel handle about 5 or 6 inches into Thimm's rectum and "probed" Thimm for about 30 seconds. When Thimm would not stop fidgeting, defendant tied Thimm's arms to the farrowing crate with baling wire.

Defendant then informed the men that Yahweh had said that he wanted the handle inserted between 8 and 10 inches and had given defendant the order in which each man was to probe Thimm. A tape measure was then used, and the shovel handle was marked. While defendant had the handle inserted in Thimm's rectum, he told Thimm, "I ought to shove this thing up to your heart." (One of the examining pathologists testified that, in fact, the shovel handle was inserted some 2 feet into Thimm.) Each of the remaining four men then took their turns probing Thimm's rectum with the shovel handle. After Thimm screamed a couple of times, defendant kicked Thimm in the head and had furnace tape put over Thimm's mouth so that the men would not have to hear Thimm's cries.

After the probing, defendant instructed Thimm to sign his car title over to Timothy Haverkamp. Thimm did so, and apparently defendant told Timothy Haverkamp that Thimm's car was his birthday present.

Each man, beginning with defendant, probed Thimm again. During this second round of probing Thimm's rectal wall was ruptured. Defendant decided that the handle was being inserted too far and that they needed an object that was bigger around. Defendant then greased the fat end of a pick handle and inserted it into Thimm's rectum about 3 inches. After this second round of prob-

ing, the men left to do some chores and left Thimm chained in the hog confinement shed.

That afternoon defendant told the men that Thimm had not been punished enough. The men returned to the hog confinement building, and Thimm was removed from the farrowing crate and bound to an overhead auger. Each of the five men then gave Thimm 15 lashes with a leather whip. Defendant began the whipping, and with each lash one of the cult members' names was called out. During this whipping Thimm said, "I'm sorry, Yahweh, please forgive me what I've done. Please stop this." Whereupon defendant said, "Well, you don't need to worry about that, because Yahweh's given up on you. You don't have any hope any more."

After this whipping Thimm was untied, given his sleeping bag, and chained up for the night.

During breakfast of the following morning (April 29, 1985), defendant told the men that Thimm had still not been punished enough. The men returned to the hog confinement building, and Thimm was again tied to an overhead auger. Beginning with defendant, each man gave Thimm 15 lashes with the leather whip.

After Thimm had received 75 lashes, defendant said that Thimm had still not received enough punishment. Thimm was forced to lie with his freshly whipped back on the floor. Thimm was then bound to a pipe, and each of the five men lashed Thimm's chest and stomach 15 times.

Defendant then had Thimm's left hand placed and bound palm up on a block of wood. Thimm began to moan, and defendant told him things would only get worse if he did not shut up. Defendant then shot one of Thimm's fingertips off with a pistol. Michael Ryan then instructed each man to shoot off one of Thimm's remaining left hand fingers and his thumb.

After the men had shot off Thimm's fingers, they returned to the north trailer for lunch. At lunch defendant told the men that Yahweh wanted Thimm dead by that afternoon. The men returned to the hog shed; defendant told Andreas to disk over the field to prepare an area to bury Thimm and told Andreas that he should go say goodbye to his friend James Thimm. When Andreas said goodbye, Thimm was still alive and able to say that he was "sorry."

Defendant then kicked and broke Thimm's arm and told Thimm that he was going to skin a part of him. Defendant put on a pair of yellow kitchen gloves and used a razor blade to make incisions in Thimm's leg, and then used a pliers to pull off strips of Thimm's skin. Thimm was still alive at the time. Defendant then told Dennis Ryan that he could break one of Thimm's legs. Dennis took a rough-cut 2 by 4 board about 7 feet long and proceeded to strike Thimm's leg in the knee area until Thimm's leg broke. Defendant told Dennis Ryan and Timothy Haverkamp that there was an easier way to break a leg. Defendant then placed a block of wood under Thimm's leg and told Timothy Haverkamp to hit Thimm's leg with the 2 by 4. Timothy Haverkamp hit the leg once and it broke.

Defendant then bent down and asked Thimm if he thought Yahweh meant business. Thimm was alive at this time. Defendant then said, "I'll cave his chest in . . . . That's sure to kill him." Defendant then proceeded to stomp on Thimm's chest with his cowboy boots.

Defendant then had James Haverkamp get Thimm's sleeping bag. Timothy Haverkamp testified that Thimm was dead before James Haverkamp returned with the sleeping bag. Defendant placed Thimm's body and clothing

into the sleeping bag. Three or four hours later, defendant told the men that Yahweh wanted the grave to be "six foot long by three foot wide and six foot deep." The men dug the grave. Thimm's body was placed in the unmarked grave, and defendant told Timothy Haverkamp to shoot Thimm's body in the head so it would look like an execution. After Thimm's body had been shot in the head, it was covered with dirt.

An autopsy of the body was conducted for the State by George Gamel, M.D., on August 19, 1985, and by William Eckert, M.D., on behalf of the defendant, on September 3, 1985. Both autopsies revealed the following injuries: The anus was markedly dilated; the left hand's fingertips had gunshot-type injuries; the left arm was broken; both legs were fractured at the thigh level; the head had a gunshot wound, which shot had shattered the left side of the skull; there were multiple rib fractures on both the left and right sides of the chest and back; a blunt object had been inserted far up into the body cavity through the anus, causing damage to the liver; the colon was torn; linear bruises were on the body; and skin had been stripped from one of the legs. The victim's wrists and ankles were still bound with baling wire. The only disagreement between Drs. Gamel and Eckert was whether the victim's penis and scrotum had been cut away or had decomposed. Both pathologists reported that the cause of death was multiple traumatic injuries. Dr. Gamel testified the tear in the colon, the "whipping-like injuries," the gunshot wound to the head, the shock from the broken legs, and the crushed chest were all capable of causing the victim's death independently.

On June 25, 1985, James Haverkamp and Andreas were apprehended while attempting to return to the Rulo farm with a sprayer rig stolen in Kansas. While incarcerated, these men gave law enforcement officials information that was used to secure a search warrant. A team of law enforcement officers composed of FBI agents, Bureau of Alcohol, Tobacco, and Firearms agents, Nebraska State Patrol officers and investigators, and Richardson County sheriff's personnel, assisted by James Haverkamp and Andreas, searched the Rulo farm on August 17 and 18, 1985. On August 18, 1985, James Thimm's nude, partially decomposed body was found, and on September 25, 1985, the defendant was charged with Thimm's murder.

The foregoing facts were testified to by each of the five men involved in the murder. James Haverkamp, Timothy Haverkamp, John David Andreas, Dennis Ryan, and defendant himself each testified, in detail, as to the specific instances of probing, whipping, shooting, kicking, and beating. There is surprising agreement in the detailed facts related by each man.

Defendant's testimony is reflected in 291 pages of the record herein.[4] He sets out his participation in the horrifying acts committed on Thimm and does not deny that the testimony of the other four criminals is generally true. In his testimony, defendant made the following points as to the testimony of the others, setting out his disagreements with the testimony of the other four. Defendant testified that James Haverkamp was the instigator of most of the thefts, that defendant did not force Andreas to go to the Rulo farm, that the victim and Andreas were not best friends, that defen-

---

4. Ryan's trial testimony is found in Box 2, Vol. XXII, Tr. 3839–3951, and Vol. XXIII, Tr. 3952–4130 (page references are to the stamped page numbers on the top right).

dant did not always lead the Bible studies, that Cheryl Gibson testified against defendant only because she was threatened by the FBI, that defendant did not want to steal, that defendant was tired of the people on the farm and wanted to leave, that Lisa Haverkamp had more power than defendant, that Rick Stice was responsible for the abuse of his son Luke, that it was not defendant's idea for Stice and Thimm to have homosexual relations, and that defendant tried to stop the homosexual activities.

The denials, of course, were as to essentially peripheral activities at the farm. As to the murder incident itself, defendant did not deny and, indeed, specifically testified to the torture itself and to Thimm's death. Defendant did testify, in contradiction to the testimony of others, as to some specific instances. Defendant testified that Yahweh, not defendant, had Thimm chained in the hog shed; that Thimm agreed to his torture; that defendant did not kick Thimm in the head; that Yahweh would not allow the group to drive Thimm off the farm; that Timothy Haverkamp "tore" Thimm open while probing him; that defendant did not stomp on Thimm's chest with his boots; that Andreas and James Haverkamp stomped on Thimm's chest, and Thimm was not breathing after this; that defendant told the group to leave Thimm alone; and that James Haverkamp had the idea of shooting Thimm's fingers off.

Defendant further testified that everyone came to the Rulo farm of their own free will and that he, the defendant, did not intend to kill Thimm.

*State v. Ryan,* 233 Neb. 74, 444 N.W.2d 610, 617–23 (1989) (*Ryan I* ).

### B. Procedural History

#### 1. Conviction, Sentencing, and Direct Appeal

● April 10, 1986. Ryan is convicted of first-degree murder for killing James Thimm.

● October 16, 1986. Ryan is sentenced to death by District Judge Robert T. Finn, who presided over Ryan's trial in the District Court of Richardson County, Nebraska.

● August 11, 1989. The Nebraska Supreme Court, after considering 60 assignments of error, affirms Ryan's conviction and sentence. *See State v. Ryan,* 233 Neb. 74, 444 N.W.2d 610 (1989) (*Ryan I* ).[5]

● February 15, 1990. The Nebraska Supreme Court denies Ryan's motion for rehearing.

---

5. In his direct appeal, Ryan assigned as error (1) the termination of one of his court-appointed attorneys; (2) the trial court's interference with counsel; (3–5) the failure to sever his trial from the trial of his son, Dennis Ryan; (6) the admission of evidence of uncharged crimes; (7) the failure to instruct on the consequences of an insanity verdict; (8) the failure to give a diminished capacity instruction; (9–10) the failure to require the state to prove Ryan's sanity beyond a reasonable doubt; (11) non-compliance with a witness sequestration order; (12) the failure to sequester the jury during the trial; (13) instructing the jury on aiding and abetting; (14) the admission of the testimony of accomplices; (15) insufficient evidence of an intent to kill; (16–17) misconduct by the trial judge (ex parte communications with victims' families and turning his back during Ryan's testimony), and his failure to disqualify himself from sentencing; (18–20) the failure to convene a three-judge sentencing panel; (21) the unconstitutionality of the sentencing statute, Neb.Rev.Stat. § 29–2522 (Reissue 1985), for its failure to have the jury make fact findings; (22–23) the failure to give Miranda-type warnings prior to Ryan's examination by the state's psychiatrist; (24–29) the use of the trial record during the sentencing phase; (30–32) the admission of deposition testimony at the sentencing hearing; (33) lack of advance notice regarding the state's claim of aggravating circumstances; (34–35) the sentencing judge's failure to make all fact findings beyond a reasonable doubt; (36) "double counting" of

• October 1, 1990. The United States Supreme Court denies Ryan's petition for writ of certiorari. *Ryan v. Nebraska,* 498 U.S. 881, 111 S.Ct. 216, 112 L.Ed.2d 176 (1990).

### 2. First Post–Conviction Relief Proceeding

• October 19, 1990. Ryan files a motion for post-conviction relief in the District Court of Richardson County, Nebraska, which subsequently is referred to retired District Judge Dewayne Wolf.[6]

• July 21, 1995. The Nebraska Supreme Court affirms Judge Wolf's denial of post-conviction relief. *State v. Ryan,* 248 Neb. 405, 534 N.W.2d 766 (1995) (*Ryan II* ).[7]

• September 27, 1995. The Nebraska Supreme Court denies Ryan's motion for rehearing.

some factors in determining aggravating circumstances; (37–38) aggravating circumstance 1(a) of Neb.Rev.Stat. § 29–2523 ("The offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity.") is vague and overbroad; (39–40) aggravating circumstance 1(d) of Neb.Rev.Stat. § 29–2523 ("The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence.") is vague and overbroad; (41) the failure to require the state to prove the absence of any mitigating circumstances; (42–46) the sentencing judge's failure to deal with non-statutory mitigating circumstances; (47–48) the non-uniform treatment of "equally culpable" participants in the crime; (49–52) the excessiveness of Ryan's sentence; (53–58) the denial of various motions relating to the death penalty; (59) the "cumulative effect" of the assigned errors; and (60) the page limitation imposed by the Nebraska Supreme Court on Ryan's brief.

6. Thirty-seven issues were raised by Ryan in this first post-conviction relief proceeding: "(1) unconstitutionality of aggravating circumstance (1)(d) as applied to Ryan, (2) unconstitutionality of aggravating circumstance (1)(a) as applied to Ryan, (3) unconstitutional reliance of aggravating circumstance (1)(a) on 'vicarious' findings, (4) proportionality review, (5) lack of standards for impaneling a three-judge panel, (6) unconstitutionality of death by electrocution, (7) trial judge's refusal to recuse himself from sentencing, (8) insufficient evidence to support aggravating circumstance (1)(d), (9) insufficient evidence to support aggravating circumstance (1)(a), (10) failure to advise on all possible defenses, (11) failure to advise on insanity defense, (12) unreasonable assertion of the insanity defense,

(13) failure to object to joint trial, (14) failure to advise on testifying at trial and sentencing, (15) deposition misconduct, (16) failure to call witnesses, (17) failure to cross-examine one of the female cult members, (18) failure to reply to false trial testimony of defense psychiatric expert regarding an army induction incident, (19) discharge of [court-appointed counsel] Ligouri, (20) failure to conduct a voir dire examination of judge regarding a three-judge sentencing panel, (21) failure to consult with Ryan in preparation for sentencing, (22) failure to develop all statutory and nonstatutory mitigating circumstances, (23) failure to meet the burden of proof on mitigating circumstances, (24) entry of a no contest plea in the Luke Stice case, (25) failure to object to sentencing evidence, (26) prosecutorial misconduct, (27) reasonable doubt instruction, (28) failure to object to the reasonable doubt instruction, (29) state of the appellate record, (30) judicial misconduct during trial, (31) judicial misconduct at sentencing, (32) judicial interference with right to counsel, (33) failure to object to a jury instruction, (34) violation of sequestration order by experts, (35) jury misconduct (juror falling asleep), (36) jury misconduct (juror reading newspaper), and (37) cumulative effect of errors." *State v. Ryan,* 248 Neb. 405, 534 N.W.2d 766, 776 (1995) (*Ryan II* ).

7. Ryan argued on appeal that "the postconviction trial court erred in (1) prohibiting the use of expert testimony to establish claims of ineffective assistance of counsel; (2) striking several of Ryan's claims; (3) failing to find that Ryan had been denied effective assistance of counsel at his trial with respect to advisement of all available defenses, the assertion of the insanity defense, the assertion of the insanity defense over Ryan's objection, the failure to object to a joint trial with Dennis Ryan, and Michael Ryan's decision to testify at trial; (4) failing to find that Ryan had

### 3. First Habeas Corpus Proceeding

• November 17, 1995. Ryan files a pro se petition for writ of habeas corpus in this court. (*Ryan v. Hopkins*, Case No. 4:CV95–3391; Box 10, Filing 1.)

• April 1, 1996. Ryan, through his court-appointed counsel, files an amended petition for writ of habeas corpus. The amended petition contains 14 counts or claims.[8] (Box 10, Filing 24.)

• May 21, 1996. Ryan, through counsel, files a motion for leave to file a second amended petition to assert a new claim that Judge Finn participated in an ex parte communication with members of James Thimm's family, thereby violating Ryan's rights under the Due Process Clause of the Fourteenth Amendment.[9] (Box 10, Filing 32.)

• July 31, 1996. Judge Piester, in considering Ryan's motion for leave to amend, finds (1) that the restrictions imposed by 28 U.S.C. § 2266(b)(3)(B)[10] do not apply because Nebraska is not in compliance with the requirements of § 2261 for appointment of counsel, (2) that the amendment is not precluded by "undue delay," (3) that although the legal basis for the proposed new claim was fairly presented to the Nebraska Supreme Court, the factual bases for the claim were not, (4) that the "arguable factual commonality" exception to the fair presentment requirement should not be applied, (5) that it is unclear whether there are any non-futile state court remedies available by which to pursue the claim, and (6) that, absent a waiver of any exhaustion requirement by the respondent, Ryan will be given the option of either withdrawing the motion for leave to amend or else dismissing the action without prejudice, so as to permit the proposed new claim to be presented to the state courts.[11] (Box 10, Filing 48.)

• August 15, 1996. The respondent states that he is not prepared to waive

---

been denied effective assistance of counsel at sentencing because counsel failed to respond to false testimony and permitted Ryan to testify at trial; (5) failing to find that Ryan had been denied effective assistance of counsel in connection with the preparation and presentation of issues at sentencing, including development of all statutory and nonstatutory mitigating circumstances, meeting statutory aggravating circumstances, making all available constitutional challenges to the death penalty, and formulating a reasonable trial strategy with respect to sentencing issues; (6) failing to find that aggravating circumstance (1)(d) of Neb.Rev.Stat. § 29–2523 (Reissue 1989) was unconstitutional on its face and as applied to Ryan; (7) failing to find that aggravating circumstance (1)(a) of § 29–2523 was unconstitutional on its face and as applied to Ryan; (8) failing to find that Ryan's constitutional rights were violated at sentencing by the lack of standards for the impaneling of a three-judge panel, the trial judge's refusal to recuse himself, and the trial judge's refusal to convene a three-judge panel; (9) failing to find that the evidence was insufficient to support the application of statutory aggravating circumstances (1)(d) and (1)(a); (10) failing to find that Ryan was denied his right to a statutory proportionality review on appeal; (11) failing to find that deposition misconduct by the prosecution deprived Ryan of his rights to due process of law; (12) failing to find that Ryan had been deprived of his right to counsel by the firing of one of his trial attorneys; (13) failing to find that the cumulative effect of all the errors in this case deprived Ryan of a fair trial; and (14) failing to grant Ryan postconviction relief." *Ryan II* at 775.

8. These claims directly correspond to Claims I and II, and V through XVI of Ryan's habeas petition in the present case.

9. The claim is included in the present habeas petition as Claim III.

10. This statutory provision, which was enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–32, 110 Stat. 1214 (AEDPA), states that "[n]o amendment to an application for a writ of habeas corpus under this chapter shall be permitted after the filing of the answer to the application, except on the grounds specified in section 2244(b)."

11. Reported as *Ryan v. Hopkins*, No. 4:CV95–3391, 1996 WL 539220 (D.Neb. July 31, 1996).

exhaustion of any of Ryan's claims, and suggests that the question of whether Ryan has any state court remedies available should be certified to the Nebraska Supreme Court. (Box 10, Filing 50.)

● September 4, 1996. The respondent states that if the court does not certify the question of availability of state court remedies, he is prepared to waive exhaustion with respect to five claims, including three claims that concern Ryan's competence, an Eighth Amendment claim concerning the length of time Ryan's death sentence has been pending, and the proposed new claim concerning the ex parte communication with James Thimm's family. It is further stated, however, that the respondent does not waive any objection regarding the propriety of a Rule 8 evidentiary hearing on such claims. (Box 10, Filing 66.)

● October 18, 1996. Judge Piester denies the respondent's request to certify to the Nebraska Supreme Court the question of availability of state court remedies, de-

nies Ryan's motion for leave to file a second amended complaint, and directs Ryan to make an election under *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), of whether to proceed on the first amended petition or to dismiss the action. (Box 10, Filing 80.)

● October 29, 1996. Ryan moves to dismiss his petition without prejudice. (Box 10, Filing 83.)

● October 31, 1996. I grant Ryan's motion to dismiss. (Box 10, Filing 85.)

### 4. Second Post–Conviction Relief Proceeding

● November 7, 1996. Ryan files a second motion for post-conviction relief in the District Court of Richardson County, Nebraska, which subsequently is referred to District Judge Gerald R. Moran.

● September 10, 1999. The Nebraska Supreme Court affirms Judge Moran's denial of post-conviction relief. *State v. Ryan,* 257 Neb. 635, 601 N.W.2d 473 (1999) (*Ryan III* ).[12]

---

**12.** Ryan's assignments of error were summarized by the Nebraska Supreme Court, as follows:

"First, Ryan contends, regarding the ex parte communication between Judge Finn and members of the Thimm family, that the district court erred in (1) its legal conclusion that the May 9, 1986, meeting between Judge Finn and members of the Thimm family did not violate *State v. Barker,* 227 Neb. 842, [420 N.W.2d 695 (1988)], or Ryan's due process rights regarding sentencing; (2) its legal conclusion that any claim arising out of the May 9 meeting was procedurally barred and that the May 9 meeting did not require that Ryan be resentenced; (3) its factual finding that Ryan and his lawyers knew about the May 9 meeting during trial and during subsequent appeals; (4) not finding that Judge Finn attempted to conceal the May 9 meeting; (5) finding that trial evidence was not discussed at the May 9 meeting and that the Thimm family did not discuss their feelings about the possible sentences to be imposed on Ryan; (6) finding that statements made by Judge Finn at the May 9 meeting did not reflect prejudice and bias on Judge Finn's part; and

(7) finding that the presumption of prejudice raised by the May 9 meeting was rebutted beyond a reasonable doubt by the State".

Regarding the cumulative effect of the ex parte conversation, Ryan contends that the trial court also erred in (8) its conclusion that the cumulative effect of Judge Finn's misconduct, in particular, turning his back on Ryan, did not violate Ryan's due process rights; (9) finding that the letter regarding the May 9, 1986, meeting was not new evidence; (10) concluding that it was not plain error for Judge Finn to turn his back on Ryan while Ryan was testifying; and (11) finding that Ryan was not prejudiced by the May 9 meeting.

Ryan also contends that the trial court erred in (12) concluding that a claim for ineffective assistance of counsel regarding the ex parte meeting was procedurally barred; (13) finding that the grounds for this claim, i.e., the letter regarding the May 9, 1986, meeting, were known or discoverable prior to 1996; (14) finding that Ryan was not prejudiced by trial counsel's failure to properly investigate the facts regarding the alleged ex

•May 1, 2000. The United States Supreme Court denies Ryan's petition for writ of certiorari. *Ryan v. Nebraska,* 529 U.S. 1100, 120 S.Ct. 1836, 146 L.Ed.2d 780 (2000).

### 5. Second Habeas Corpus Proceeding

• December 10, 1999. Ryan files his petition for writ of habeas corpus. Seventeen counts are alleged. (See discussion *infra,* at 26–33.) (Filing 1.)

• February 17, 2000. The respondent answers. It is alleged that all claims except Claim III (regarding Judge Finn's ex parte meeting with members of James Thimm's family) are barred by the applicable statute of limitations, and that procedural default bars consideration of Claims VII, VIII, and IX (regarding Ryan's competence), Claim XIV (regarding the existence of mitigating circumstance 2(g)), Claim XV (regarding proportionality review), Claim XVI (an Eighth Amendment claim regarding the lapse of time since Ryan's death sentence was imposed), and Claim XVII (an Eighth Amendment claim regarding death by electrocution). (Filing 13.)

• February 23, 2000. The respondent files the state court records. (Filing 15.)

• March 22, 2000. Ryan moves to expand the record to include all federal court records in his previous habeas corpus case, No. 4:CV95–3391, and to conduct an evidentiary hearing regarding his competence claims and his claim that death by electrocution is cruel and unusual punishment. (Filing 20.)

• March 30, 2000. Ryan moves for certain discovery regarding the issue of death by electrocution. (Filing 22.)

• May 5, 2000. Judge Piester orders, pursuant to the parties' joint stipulation, that all documents in Case No. 4:CV95–3391 shall be part of the record in this case. (Filings 28 & 29.)

• May 18, 2000. Ryan moves for a stay of proceedings pending completion of a study by the Nebraska Legislature concerning the death penalty. (Filing 32.)

---

parte meetings; and (15) failing to consider whether trial counsel's failure to investigate the ex parte conversations more fully rendered trial counsel's performance constitutionally deficient.

Regarding the issue of competency, Ryan contends that the trial court erred in (16) its legal conclusion that trial counsel's failure to request a competency hearing did not violate Ryan's right to effective assistance of counsel; (17) concluding that the issue regarding failure to request a competency hearing claim was procedurally defaulted by Ryan's failure to address this in his direct appeal or first postconviction appeal; (18) concluding that it was not plain error for trial counsel not to have requested a competency hearing; (19) finding that Ryan's psychiatrist did not timely disclose his opinion that Ryan was incompetent to stand trial, or timely disclose serious reservations about his competency to stand trial; (20) finding that trial counsel did not observe anything which would cause them to suspect Ryan's incompetence, report this to the judge, and request a competency hearing; (21) its legal conclusion that the failure of the trial judge to order a competency hearing sua sponte did not violate Ryan's due process rights; (22) its conclusion that the claim that the judge should have ordered a competency hearing was procedurally defaulted; (23) its conclusion that failure of the judge to order sua sponte a competency hearing was not plain error; (24) its conclusion that the facts as presented to Judge Finn did not establish sufficient doubt as to Ryan's competency, requiring him to order a competency hearing; (25) its conclusion that the trial of Ryan did not violate substantive due process because Ryan was not incompetent at the time of trial; (26) its conclusion that it was not plain error to allow Ryan to stand trial while incompetent; (27) its conclusion that the substantive due process claim regarding competency was procedurally defaulted; and (28) its factual finding that Ryan was in fact competent at the time of trial."
*Ryan III,* 601 N.W.2d at 482–83.

• June 2, 2000. Judge Piester denies Ryan's motion for stay of proceedings. (Filings 32 & 39.)

• July 18, 2000. On appeal by Ryan, I sustain Judge Piester's order denying a stay of proceedings. (Filings 39, 42 & 45.)

• August 22, 2000. Judge Piester enters a memorandum and order that (1) finds this case to be a continuation of the 1995 habeas corpus proceeding, such that the AEDPA's one-year statute of limitations, 28 U.S.C. § 2244(d)(1), does not apply; (2) finds six claims to be procedurally defaulted, including the competence claims for which an evidentiary hearing was requested; and (3) denies Ryan's motions for an evidentiary hearing and for discovery on the issue of death by electrocution. (Filings 20, 22 & 49.)

• September 6, 2000. Ryan moves for leave to amend his petition, following the issuance of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to include a claim that Nebraska's sentencing scheme for the death penalty is unconstitutional. (Filing 51.)

• September 11, 2000. Ryan appeals Judge Piester's findings of procedural default and denial of the evidentiary hearing and discovery. (Filings 49 & 54.)

• September 14, 2000. Judge Piester denies Ryan leave to amend, finding that the proposed amendment would be futile. (Filings 51 & 55.)

• September 25, 2000. Ryan appeals Judge Piester's denial of leave to amend. (Filings 55 & 57.)

• November 22, 2000. I deny Ryan's most recent appeal and sustain Judge Piester's order denying him leave to amend by observing that the majority opinion in *Apprendi* "does not overrule or indicate disapproval of the holding in *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), that the Constitution does not require a jury to determine the existence of aggravating and mitigating circumstances in capital cases." (parallel citations omitted).[13] (Filings 55, 57 & 68.)

• December 29, 2000. I sustain Ryan's objections with respect to Judge Piester's finding that his competence claims are barred by the procedural default doctrine, and I direct Judge Piester to prepare a report and recommendation regarding these three claims; in all other respects, I deny Ryan's appeal and affirm Judge Piester's order, including his finding that three other claims are barred by procedural default and his refusal to permit discovery or an evidentiary hearing on the issue of death by electrocution.[14] (Filings 49, 54 & 74.)

• February 13, 2001. Judge Piester informs the parties that he will defer consideration of the procedural default issues on the competence claims until he has fully considered those claims on the merits, and he directs the respondent to brief those claims and also the request for an evidentiary hearing. (Filings 20 & 81.)

• May 4, 2001. Judge Piester grants Ryan's request for an evidentiary hearing and states that, in addition to addressing whether Ryan can show "prejudice" to excuse the procedural default, he will consider whether Ryan's alleged incompetence was a "cause" of the default. (Filings 20 & 89.)

• May 17, 2001. Judge Piester clarifies that he intends to take evidence on both

---

**13.** The United States Supreme Court, of course, has since overruled *Walton. See Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**14.** Reported as *Ryan v. Kenney*, 125 F.Supp.2d 1149 (D.Neb.2000).

the "cause" and "prejudice" procedural default issues. (Filing 96.)

● August 16, 2001. Judge Piester opens the evidentiary hearing. (Filing 120.)

● November 21, 2001. Judge Piester, on his own motion, directs that Ryan shall be transported to the Federal Medical Center in Springfield, Missouri, to undergo a comprehensive psychiatric examination to determine his competency to proceed on his own behalf or to waive any claims he may have in this habeas corpus proceeding, and, to the extent possible, his competency during the acts of which he stands convicted, during the trial, and during the post-conviction proceedings. (Filing 134.)

● December 10, 2001. On an appeal by Ryan, I sustain Judge Piester's order. The appeal did not seek to prevent the court-ordered psychiatric examination, but, rather, objected to certain statements that Judge Piester made in an accompanying memorandum. (Filings 134 & 136.)

● January 18, 2002. Judge Piester clarifies his memorandum and order regarding the psychiatric examination. (Filings 134 & 146.)

● July 31—August 1, 2002. Judge Piester concludes the evidentiary hearing. (Filings 183 & 186.)

● December 13, 2002. Following briefing, Judge Piester issues his report and recommendation. (Filing 202.)

● December 20, 2002. Ryan files objections to the report and recommendation. (Filing 203.)

● February 14, 2003. Ryan files his supporting brief. (Filing 211.)

● June 27, 2003. The respondent files his opposing brief. (Filing 243.)

● August 27, 2003. Ryan files his reply brief, and the matter is deemed submitted. (Filing 247.)

## C. Ryan's Claims and Judge Piester's Recommendations Regarding Those Claims

As a preliminary matter, Judge Piester finds that Ryan is and has been competent during these federal habeas corpus proceedings. (Filing 202, at 8–31.) He also finds that Ryan was competent at the time of trial, and thus cannot demonstrate prejudice to excuse his procedural default regarding the competence claims. (Filing 202, at 34–49.) Finally, he finds that Ryan was competent during his direct appeal and during the two state court proceedings for post-conviction relief, such that it cannot be claimed that any procedural default was caused by incompetency. (Filing 202, at 49–50.) Each of Ryan's 17 claims, and Judge Piester's recommended disposition thereof, is summarized below.

### 1. Claim I (Trial Court Misconduct)

It is alleged that during much of Ryan's trial testimony Judge Finn turned his back to Ryan. Ryan claims that such conduct violated his right to a fair trial as guaranteed by the Sixth and Fourteenth Amendments.

Judge Piester recommends that Claim I be denied because the Nebraska Supreme Court determined in *Ryan I,* and reiterated in *Ryan II* and *Ryan III,* that Judge Finn's conduct was not prejudicial, and such determination is entitled to deference under 28 U.S.C. § 2254(d). (Filing 202, at 52–67.)

### 2. Claim II (Trial Court Misconduct)

It is alleged that Judge Finn, who was also the sole sentencing judge, had an ex parte communication with members of the Luke Stice family prior to sentencing Ryan to death. Ryan claims that such ex parte communication violated his right to due process under the Fourteenth Amendment.

Judge Piester recommends that Claim II be denied because Judge Moran found, and the Nebraska Supreme Court affirmed his finding in *Ryan III*, that there was no judicial bias or prejudice to Ryan. (Filing 202, at 67–78.)

### 3. Claim III (Trial Court Misconduct)

It is alleged that Judge Finn also participated in an ex parte communication with members of the James Thimm family prior to sentencing. It is again claimed that Ryan's due process rights were violated.

Judge Piester recommends that Claim III be denied, essentially for the same reasons as Claim II. (Filing 202, at 67–78.)

### 4. Claim IV (Ineffective Assistance of Counsel)

It is alleged that Ryan's trial counsel failed to investigate and to develop the record regarding Judge Finn's ex parte communications with members of the Luke Stice and James Thimm families. Ryan claims that he was thus denied effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments, and due process of law as guaranteed by the Fourteenth Amendment and by Article I, section 2, of the Nebraska Constitution.[15]

Judge Piester treats Claim IV as abandoned under NELR 39.2,[16] due to Ryan's failure to discuss the claim in his brief on the merits. (Filing 202, at 78.)

### 5. Claim v. (Trial Court Misconduct)

It is alleged that Judge Finn abused his discretion in failing to convene a three-judge sentencing panel. Ryan claims a denial of due process under the Fourteenth Amendment.

As with Claim IV, Judge Piester treats Claim V as abandoned under NELR 39.2. (Filing 202, at 78.)

### 6. Claim VI (Cumulative Trial Court Misconduct)

It is claimed that the cumulative effect of Judge Finn's alleged misconduct was to deny Ryan due process of law under the Fourteenth Amendment.

Judge Piester recommends that Claim VI be denied because the "cumulative effect" of trial errors or attorney errors is not a recognized ground for habeas relief, and because there is no merit to Ryan's further argument that he was denied a fair trial as a result of Judge Finn repeatedly disparaging his trial counsel and his defense before the jury. (Filing 202, at 79–81.)

### 7. Claim VII (Ineffective Assistance of Counsel)

It is alleged that Ryan's trial counsel failed to request an evidentiary hearing or to move for a judicial determination of his competency to stand trial. A Sixth Amendment violation is claimed.

Judge Piester recommends that Claim VII be denied because of procedural default. (Filing 202, at 49–50.)

### 8. Claim VIII (Fair Trial and Due Process)

It is alleged that Judge Finn should have ordered a competency hearing sua sponte. Ryan claims that without such a hearing he was denied a fair trial and due process under the Sixth and Fourteenth Amendments.

Judge Piester recommends that Claim VIII be denied because of procedural default. (Filing 202, at 49–50.)

---

**15.** This claim was not alleged in Ryan's first habeas petition.

**16.** This local rule provides, in relevant part, that "[w]hen a judge has set a time for submitting a brief, the failure to submit a brief or to discuss an issue in the brief submitted may be treated as an abandonment of that party's position on any issue not discussed." NELR 39.2(c).

### 9. Claim IX (Competency to Stand Trial)

It is alleged that Ryan was not competent to stand trial. This claim is made under the Sixth and Fourteenth Amendments.

Judge Piester recommends that Claim IX be denied because of procedural default. (Filing 202, at 49–50.)

### 10. Claim X (Ineffective Assistance of Counsel)

It is alleged that Ryan's trial counsel failed to advise him adequately of the adverse consequences of a joint trial with his son, Dennis Ryan, or to object to the joint trial. A Sixth Amendment claim is presented.

Judge Piester recommends that Claim X be denied because the state courts found in *Ryan II* and *Ryan III* that the performance of Ryan's trial counsel was not deficient, and because Ryan cannot claim prejudice based on the alleged failings of counsel. (Filing 202, at 81–86.)

### 11. Claim XI (Errors in Sentencing)

It is alleged that aggravating circumstance 1(d) under Neb.Rev.Stat. § 29–2523 is unconstitutionally vague and overbroad, either on its face or as applied. This claim is made under the Eighth and Fourteenth Amendments.

Judge Piester recommends that Claim XI be denied as a matter of law. (Filing 202, at 86–88.)

### 12. Claim XII (Errors in Sentencing)

It is alleged that Judge Finn's consideration of the "unconstitutional portion" of aggravating circumstance 1(d) was not harmless error.[17] This claim also is made under the Eighth and Fourteenth Amendments.

Judge Piester recommends that Claim XII be denied as a matter of law. (Filing 202, at 86–88.)

### 13. Claim XIII (Errors in Sentencing)

It is alleged that aggravating circumstance 1(a) under Neb.Rev.Stat. § 29–2523 is unconstitutionally vague and overbroad as applied to Ryan because the Nebraska Supreme Court interpreted it so as to include serious assaultive or terrorizing acts committed by others and "vicariously" imputed to Ryan. The claim is made under the Eighth and Fourteenth Amendments.

Judge Piester finds that the record supports the facts that were relied upon by the sentencing judge, and he recommends that Claim XIII be denied as a matter of law. (Filing 202, at 89–92.)

### 14. Claim XIV (Errors in Sentencing)

It is alleged that Judge Finn erred in failing to find the existence of mitigating circumstance 2(g) under Neb.Rev.Stat. § 29–2523, involving diminished capacity. Such failure is claimed to have violated Ryan's rights under the Eighth and Fourteenth Amendments.

Judge Piester recommends that Claim XIV be denied because of procedural default. (Filing 202, at 50.) Judge Piester also made a finding to this effect on August 22, 2000, which I affirmed on appeal. (Filings 49 & 74.)

### 15. Claim XV (Lack of Proportionality Review)

It is alleged that Ryan was deprived of his right to a statutorily mandated proportionality review of sentences imposed in criminal homicide cases. This claim once again is made under the Eighth and Fourteenth Amendments.

---

17. The alleged "unconstitutional portion" of aggravating circumstance 1(d) is the "exceptional depravity" prong. *See Ryan II,* 534 N.W.2d at 794 (citing *Moore v. Clarke,* 904 F.2d 1226 (8th Cir.1990)).

Judge Piester recommends that Claim XV be denied because of procedural default. (Filing 202, at 50.) Judge Piester also made a finding to this effect on August 22, 2000, which I affirmed on appeal. (Filings 49 & 74.)

### 16. Claim XVI (Cruel and Unusual Punishment)

It is alleged that Ryan has been forced to await death by electrocution since his sentencing in 1986. This circumstance is claimed to violate Ryan's rights under the Eighth Amendment.

Judge Piester recommends that Claim XVI be denied because of procedural default. (Filing 202, at 49–50.) [18] Once again, Judge Piester also made a finding to this effect on August 22, 2000, which I affirmed on appeal. (Filings 49 & 74.)

### 17. Claim XVII (Cruel and Unusual Punishment)

Finally, it is claimed that death by means of electrocution is cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments.[19]

Judge Piester treats Claim XVII as abandoned under NELR 39.2, due to Ryan's failure to discuss the claim in his brief on the merits. (Filing 202, at 93.)

## II. ANALYSIS

As noted before, I need not discuss most of Judge Piester's careful findings of fact and conclusions of law. They are correct and well stated, and except for several additional comments, it is enough that I now adopt them and the recommended decision as my own.

### A. Applying the AEDPA Standards of Review

Ryan loses many of his claims in this court because Judge Piester correctly found that we must give deference to the findings of fact and conclusions of law of the Nebraska courts, as required by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–32, 110 Stat. 1214 (AEDPA). AEDPA, effective April 24, 1996, increased the traditional deference federal courts give when reviewing the decisions of state courts in habeas corpus cases. *Weaver v. Bowersox*, 241 F.3d 1024, 1029 (8th Cir.2001) (discussing and applying the AEDPA deference standards). Ryan contends that it is both legally wrong and unfair to apply the increased AEDPA deference standards to him. On both counts, I disagree.

Under AEDPA, and for many cases, the factual findings and legal conclusions of state courts are nearly "bullet proof." For factual decisions, and subject to rebuttal by the petitioner, I must presume the factual decision is correct, *see* 28 U.S.C. § 2254(e)(1), and overturn such a factual decision only if it was unreasonable based upon the evidence presented in the state court proceedings, *see* 28 U.S.C. § 2254(d)(2). For legal decisions, the decision of the state court must stand unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States...." 28 U.S.C. § 2254(d)(1).

A state law decision is "contrary to" the law as determined by the Supreme Court if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of the Court's cases despite confronting indistin-

---

**18.** I note that the report and recommendation contains typographical errors at page 50, where Claim XVI is twice erroneously identified as Claim XIV.

**19.** This claim was not alleged in Ryan's first habeas petition.

guishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state law decision involves an "unreasonable application" of the law as determined by the Supreme Court if the state court identifies the correct governing legal principle from the Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Id.* at 407–08, 120 S.Ct. 1495.

The AEDPA standards of deference have overarching significance to Ryan. As Judge Piester fully explains in his report and recommendation, the Nebraska courts approached Ryan's claims very carefully and not unreasonably as to both questions of fact and questions of federal law. See, for example, Judge Piester's thorough discussion of this topic regarding Ryan's claim that Judge Finn, by turning his back to Ryan during some of his trial testimony, violated the Due Process Clause of the Fourteenth Amendment because that conduct allegedly denied Ryan a fair trial by a fair judge. (Filing 202, at 56 & 63.) So, even if I would otherwise find or conclude that the Nebraska courts were conceivably wrong either factually or legally (and I do not), I would still be required to deny Ryan relief since he is unable to overcome the AEDPA deference standards as to any claims reviewed by the Nebraska courts.

I now turn to Ryan's argument that he should be relieved of the AEDPA standards of deference. Initially, he argues that the law does not require application of AEDPA to his case because, despite the fact that he started this case after AEDPA, he initiated the federal habeas process in an earlier suit before AEDPA was enacted. Further, he points out that he only dismissed the earlier action for the purpose of exhausting his state court remedies. Then, he argues, much like an equitable tolling defense to a statute of limitations assertion, that Nebraska should not be able to take advantage of his efforts to exhaust all his claims and then apply AEDPA to him because he would not have needed to exhaust his claims if Judge Finn had been honest. That is, Ryan claims that application of the AEDPA standards of review to his case is unfair.

■ Regarding Ryan's legal argument, the law is squarely against him. He clearly filed this action after AEDPA even though it is true that before AEDPA he had filed a habeas petition that he dismissed without prejudice so that he could exhaust his state court remedies. The Eighth Circuit has held that the AEDPA deference standards apply in this precise situation. *Weaver*, 241 F.3d at 1029 (AEDPA standards of deference applied to habeas petition filed after its effective date even though the petitioner, before the effective date, filed a habeas petition which was dismissed without prejudice for failure to exhaust state remedies, and despite contention that the second filing constituted a mere continuation of the first filing). Despite Ryan's suggestion that a better rule has been articulated in the Ninth Circuit, I am not free to disregard my Court of Appeals' decision in *Weaver*.[20]

20. I would not even if I could. The AEDPA deference standards are consistent with, and a logical extension of, principles of federalism that have long been applied in the federal courts. Therefore, these standards of deference are unlike time deadlines or other arbitrary rules for which equitable leniency might reasonably be given. On the contrary, these rules of deference relate directly to the basic structural relationship between the central government and the state governments.

Thus, had there been any doubt (and there was none) in this case, I would have applied the AEDPA's standard of review without *Weaver*. Still further, because of the subsequent decision in *Weaver*, Judge Piester's August 22, 2000, comments (Filing 49) about this case being a "continuation" of earlier proceedings are wrong to the extent that the "continuation" language is now applied to the deference question by Ryan. Similarly, Judge

I turn next to Ryan's fairness argument. Ryan argues that he would never have had to dismiss his earlier federal suit if Judge Finn had not signed an untrue affidavit in 1993 denying that the judge had an ex parte meeting with the Thimm family. Ryan argues, and it is undisputed (as discussed more fully later), that Judge Finn gave Ryan's former lawyer an affidavit that turned out to be in error. When Ryan's counsel in this case learned of that error, they sought and were given leave to dismiss the pending federal habeas action to pursue a claim related to Judge Finn's meeting with the Thimm family. It is also true that the State of Nebraska, while agreeing to waive exhaustion of that issue in this court, would not stipulate to a federal court evidentiary hearing to make a record on Finn's conduct. Thus, Ryan argues that "[b]ut for Judge Finn's concealment and the State's litigation tactics, no claim could be made now that AEDPA governs the standard of review here." (Petr's Initial Br. (Filing 211, at 10).)

■ This "fairness" argument fails for at least three reasons. First, as I later independently find and conclude, while Judge Finn was mistaken in his affidavit, his mistake was not intentional. (*See infra* note 41.) Thus, Ryan's "fairness" argument is substantially weakened as there was no intentional concealment. Second, there is no "unfairness" in applying AEDPA deference standards to Ryan no matter the reason for Ryan's decision to dismiss his earlier case. Deference standards, of one sort or the other, have long been a principle of federal habeas corpus jurisprudence. *See, e.g., Brown v. Allen,* 344 U.S. 443, 465, 73 S.Ct. 397, 97 L.Ed. 469 (1953) ("As the state and federal courts have the same responsibilities to protect persons from violation of their constitutional rights,

we conclude that a federal district court may decline, without a rehearing of the facts, to award a writ of habeas corpus to a state prisoner where the legality of such detention has been determined, on the facts presented, by the highest state court with jurisdiction . . . .")(partially abrogated on other grounds by 28 U.S.C. § 2254(d) and *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Clearly, Ryan cannot suffer any legally cognizable prejudice by expansion of the venerable and salutary principle of deference. Thirdly, and most importantly, there is no precedent to support Ryan's argument that equitable tolling or equitable estoppel notions should be applied to AEDPA standards-of-review questions.

In summary, Judge Piester was correct in applying the AEDPA standards of review to this case. It was not unfair to do so. Judge Piester was also correct in each and every particular application of those deference standards to Ryan's claims.

### B. Independent Review of the Competency and Ex Parte Meeting Claims

Notwithstanding my agreement with Judge Piester regarding questions of procedural default and AEDPA standards of deference, I have also independently reviewed the merits of two categories of claims asserted by Ryan as if the procedural default and AEDPA rules did not apply. I have done so out of an abundance of caution because these two categories of claims are the essence of whether Ryan received the fundamental fairness that is required by the Due Process Clause of the Fourteenth Amendment.

### 1. The Competency Claims

■ Most basically, Ryan's counsel argues that the petitioner sincerely held and

Piester's previous comments about the AEDPA statute of limitations are irrelevant to the extent that Ryan uses them in support of the

appropriate standard of review. They related to an entirely different question than whether the AEDPA deference standards applied.

now holds fanatical religious beliefs, and those strange notions (like God speaking directly to him) controlled Ryan's every legal decision up to and including the legal strategy being pursued in this case. Thus, for example, "[i]t is incomprehensible how he could have made a 'rational' decision whether to testify or not, or rationally [make] other trial decisions if he thought, as his own counsel and everybody else believed he thought (except Dr. Kenney), that Yahweh [God] was dictating everything he did." (Petr's Initial Br. (Filing 211, at 48).)

To start with, the jury rejected Ryan's insanity plea and the views of his mental health experts in that regard, and Ryan has always personally claimed that he is and was competent and never insane. But assuming for the moment that Ryan truly held and now holds each and every one of the extreme beliefs attributed to him by his able counsel,[21] and further assuming that those beliefs truly controlled his legal decision-making process, Ryan was not and is not now incompetent. As repeated objective psychological testing of Ryan continually proved,[22] and world events like "9/11" starkly corroborate, the pursuit of fanatical religious beliefs—quite often at the explicit command of the true believer's God—is not the same as incompetence. *See, e.g., Ford v. Bowersox,* 256 F.3d 783, 787 (8th Cir.) (despite the fact that the evidence revealed that (1) petitioner's mother and another fellow parishioner told

him they had visions of his acquittal, (2) the petitioner also received a vision directing him to fast for 35 days and he would be delivered, (3) from these visions, the petitioner developed the theory that God's angels would assure his acquittal, and (4) in a symbolic act of devotion, the petitioner stood on his Bible in the holding area outside the courtroom, following the Bible's directive to "stand on [God's] word," the Court of Appeals declined to label petitioner's deeply held religious beliefs "preposterous," "irrational," or "bizarre," and instead held that he was competent to reject a plea agreement in a murder case), *cert. denied,* 534 U.S. 1068, 122 S.Ct. 671, 151 L.Ed.2d 584 (2001). One can be both odd and evil but not crazy or incompetent.

In particular, I fully agree with Dr. Christina A. Pietz, a highly trained and very experienced clinical psychologist at the Federal Medical Center, who is board certified in forensic psychology and truly independent of Ryan or the State of Nebraska. After having the opportunity to see Ryan in a locked ward setting for two months, she wrote: "[I]t is my opinion that there is absolutely no evidence Mr. Ryan ever suffered from any form of psychosis or any other mental illness, or that he currently suffers from one." (Box 9, Ex. 113, at 15.)

Still further, the evidence reveals that Ryan had no trouble effectively dealing with his lawyers. As one of Ryan's former lawyers said, "what delusions [Ryan] had

---

**21.** There was certainly no agreement on this by the experts. At least two of the them thought that Ryan was faking all or part of his rigid reliance upon religion.

**22.** Those tests included at least three administrations of the Minnesota Multiphasic Personality Inventory (MMPI), the "gold standard" for objective psychological testing. While some of them showed an odd personality, none of them showed a mental illness. In 1985, one such test was conducted shortly

prior to Ryan's original trial. (Box 9, Ex. 109, at 3 (quoting the 1985 classification study describing the 1985 MMPI).) During these proceedings, two others were conducted. (Box 9, Ex. 109, at 5–7 (describing Dr. Martell's 2001 administration of the MMPI); Box 9, Ex. 113, at 13 (describing Dr. Pietz's administration of the MMPI in 2002).) Over a period of about 17 years, no objective psychology testing showed that Ryan suffered from mental illness.

about Yahweh ... never seemed to interfere with our conversations or his understanding of the case or what was at stake." *Ryan III*, 601 N.W.2d at 481–82 (quoting from the testimony of defense lawyer Richard Goos) (Box 7 (Proceedings before Judge Moran), Vol. III, Tr. 542.)

Most importantly, there is every reason to believe Ryan quite rationally, but deceitfully, attempted to shift the blame to others for the act that ultimately killed Thimm. According to his son, who testified at one of the post-conviction proceedings, Ryan told the boy to lie at trial by blaming others for Ryan's conduct in stomping James Thimm to death in order that Ryan could avoid the death penalty:

> Counsel for the State: Q. As to Michael Ryan's involvement in the death of James Thimm, what did Michael Ryan tell you to do in your testimony?
>
> Dennis Ryan: Q. What did he say to lie about?
>
> Counsel: Q. Yes.
>
> Dennis Ryan: A. He said not to tell about that he was the one that was stomping, you know, doing the chest and stuff and that Jimmy and Dave did that. Just different things like that.
>
> Counsel: Q. Correct me if I am wrong, basically what it is[,] is Michael Ryan told you not to testify about certain things he had done; is that correct?
>
> Dennis Ryan: A. To blame it on somebody else.
>
> Counsel: Q. Did he ever explain to you why he wanted you to do this?
>
> Dennis Ryan: A. Because he didn't—because he didn't want to get the electric chair.

(Box 7 (Proceedings before Judge Moran), Vol. II, Tr. 380–81.)

Beyond any reasonable doubt, and regardless of the factual findings or legal conclusions of other judges, Ryan was (and is) a fanatic, but he has always been a completely competent (and deadly dangerous) one. Ryan was at all times fully able to consult with his lawyers and he had a rational understanding of both the legal process and the facts. *See, e.g., Ford*, 256 F.3d at 786 (a person is incompetent if he lacks a " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.' ") (quoting *Cooper v. Oklahoma*, 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (in turn quoting *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960))).

### 2. The Ex Parte Meeting Claims

■ It is undisputed that Judge Finn, the trial and lone sentencing judge, held conferences in his chambers at the courthouse with family members of Ryan's victims prior to imposing the death sentence on Ryan. This conduct, although motivated by a humanitarian instinct,[23] was improper under Nebraska law. *Ryan III*, 601 N.W.2d at 486 (describing a recusal rule, premised upon Nebraska Rule of Evidence 605 (concerning the testimony of a judge as a witness), that prohibits a judge from initiating or receiving an "ex parte communication"[24] concerning a "pending" or "impending" proceeding). While Judge Finn's conduct was improper under Nebraska law, it did not come close to the gravity of judicial misbehavior that is required to trigger the Due Process Clause of the

---

**23.** Finn made it a practice of allowing members of a victim's family to ask questions after a conviction and sentencing for the purpose of explaining the legal process and to "interject a little humanism" into it. (Box 7 (Proceedings before Judge Moran), Test. of Judge Finn, Vol. I, Tr. 97.)

**24.** Because it is a matter of state law, and even though Finn's meetings involved other cases and apparently took place after those cases had been resolved, I must accept the Nebraska Supreme Court's conclusion that Finn's conduct involved improper "ex parte

Fourteenth Amendment. *See, e.g., Bracy v. Gramley,* 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) (in a death penalty case, the habeas petitioner stated a claim entitling him to discovery when the judge who sentenced him to death, and who was later convicted of taking bribes in other murder cases, was alleged to have had an interest in the petitioner's conviction-that is, deflecting suspicion from the judge's illegal activities.)

"[M]ost questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard." *Id.* at 904. Therefore, the pertinent question under the Due Process Clause is not whether Judge Finn should have met with the victims' families, but, despite these meetings, whether Ryan received " 'a fair trial in a fair tribunal, ... before a judge with no actual bias against the defendant or interest in the outcome of his particular case.' " *Id.* (internal citation omitted). In that regard, the evidence falls far short of establishing that Finn had a "bias" against Ryan, or an "interest" in Ryan's case.

After Ryan had been found guilty by the jury of Thimm's murder, but prior to sentencing Ryan to death, Judge Finn had two meetings with family members of Ryan's two victims.[25] Condensed, the following is the core chronology of what happened:

- In 1986, Ryan was convicted in two separate proceedings of the murder of James Thimm and Luke Stice. A jury found him guilty of the first-degree murder of Thimm, and shortly after that, Ryan entered a "no contest" plea to the second-degree murder of Stice. His son, Dennis Ryan, was also convicted with the petitioner in a joint jury trial for the murder of Thimm.[26]

- To be specific, in April of 1986, after a jury trial, Ryan was found guilty of the first-degree murder of Thimm. As a part of the trial regarding the death of Thimm, the evidence revealed in detail how Stice died. A sentencing hearing for Ryan on the Thimm murder was set for September 15, 1986.[27]

- On May 9, 1986, a sentencing hearing was held for Dennis Ryan, Ryan's son.[28] Although a juvenile, and although he was convicted by the jury of second-degree murder, Dennis Ryan was originally sentenced to life in prison for the murder of Thimm.[29] On that same day, and in the courthouse, Judge Finn met with at least two members of the Thimm family (Daneda Heppner[30] and Karen Schmidt[31]) after he sentenced Dennis Ryan. Also

communications" because Ryan had not yet been sentenced for the murder of Thimm.

25. The lawyers and the other judges have referred to the two groups of people who met with Judge Finn as the Thimm and Stice families. I, too, follow that practice, but I note that two of the Thimm family members were not actually related by blood, marriage, or adoption to the victim.

26. *Ryan III,* 601 N.W.2d at 478–79.

27. *Id.*

28. *Id.* at 640, 601 N.W.2d 473.

29. *State v. [Dennis] Ryan,* 226 Neb. 59, 409 N.W.2d 579 (1987). Dennis Ryan later received post-conviction relief because of a change in the state law regarding the requirement that a jury must be instructed to determine "malice" before it may convict someone of second-degree murder. *State v. [Dennis] Ryan,* 249 Neb. 218, 543 N.W.2d 128 (1996).

30. For the testimony of Daneda Heppner, see Box 7 (Proceedings before Judge Moran), Vol. II, Tr. 239–326.

31. For the testimony of Karen Schmidt, see Box 7 (Proceedings before Judge Moran), Vol. II, Tr. 327–351.

accompanying them to the meeting was Garnetta Butrick, Luke Stice's grandmother.[32] These family members, and Dennis Ryan's mother, Ruth Ryan, were asked by Judge Finn's bailiff if they would like to meet with the judge to talk about any questions they might have regarding the Dennis Ryan proceedings. While Dennis Ryan's mother declined, the others took the judge up on his offer. The evidence indicates that Judge Finn and these family members discussed: (1) the high costs and lawyer fees associated with the various trials and Judge Finn's view that they were excessive; (2) Michael Ryan's power over other cult members; (3) that Thimm had not been raised to believe in the kind of things practiced by the cult; (4) why more cult members were not charged; (5) why more had not been done to protect the Stice child; (6) that Judge Finn thought that none of the defendants seemed truly sorry for their actions; (7) Judge Finn's view that a life sentence usually meant that a defendant served about 14 to 15 years before becoming eligible for parole; and (8) that someone should write a book about the case, and Judge Finn offered to make the public record available to one of the family members if she decided to write about it.

- On July 28, 1986, Ryan pled "no contest" to a charge of second-degree murder for the death of Luke Stice. About a month later, he was sentenced to life in prison for this crime.[33]

- On August 28, 1986, Ryan's sentencing hearing for Stice's murder was held. On that same date, but probably after sentencing, Judge Finn met with members of the Stice family in the courthouse. Part of the time, the prosecuting attorney was present. Essentially, the Stice family wanted to know why the Thimm murder trial preceded the resolution of the Stice murder charge since young Stice died before Thimm, and one of the participants also had a question in regard to the "no contest" plea bargain that Ryan had entered into with the State of Nebraska regarding the death of Stice.[34]

- Sentencing hearings were conducted over two days on September 15 and September 16, 1986, on the question of whether to impose the death penalty on Ryan for the Thimm murder.[35]

- Judge Finn imposed the death sentence on October 16, 1986, for the murder of Thimm.[36] Among other

32. She also attended the second meeting with Finn and other members of the Stice family on August 28, 1986. For the testimony of Garnetta Butrick, see Box 7 (Proceedings before Judge Moran), Vol. III, Tr. 460–472.

33. *Ryan III*, 257 Neb. at 639, 601 N.W.2d 473.

34. The question about the plea bargain dealt with the meaning of a "no contest" plea. Judge Finn responded to the question by stating that as a judge, he did not make the plea bargains. (Box 7 (Proceedings before Judge Moran), Test. of Judge Finn, Vol. III, Tr. 463.) He then called the prosecutor into his chambers and asked the prosecutor to explain. The prosecutor then explained that a no con-

test or nolo contendere plea had the same effect as a guilty plea, except it cannot be used as an admission in a civil proceeding. (Box 7 (Proceedings before Judge Moran), Test. of Douglas Merz, Vol. IV, Tr. 658.)

35. *Ryan III*, 257 Neb. at 639, 601 N.W.2d 473.

36. Finn had another meeting with Thimm family members, but it was *after* he sentenced Ryan. (Box 7 (Proceedings before Judge Moran), Test. of Karen Schmidt, Vol. II, Tr. 341.) Petitioner and Respondent spend little time on this meeting, and I will follow their lead. Suffice it to say that there was no discussion of Michael Ryan or his case, but only the procedures that had occurred in court. (Box

things, Finn found that (1) the Luke Stice murder could not be used as a statutory aggravator because it occurred prior to Thimm's death, but Ryan's assaultive behavior toward Luke could be considered as a statutory aggravator along with evidence of other assaults on Richard Stice, James Thimm, a teacher, a principal, and six military police officers[37]; and (2) Ryan's torture and related abusive and humiliating treatment of Thimm before Thimm's death could be used as a statutory aggravator.[38] In mitigation, the judge found Ryan, while not insane, suffered from a mental or emotional disturbance within the meaning of Neb.Rev.Stat. § 29–2523(2)(c) ("The crime was committed while the offender was under the influence of extreme mental or emotional disturbance.")[39]

• On April 27, 1993, Finn signed an affidavit prepared by one of Ryan's lawyers stating in effect that he "did not have any contacts with members of the Thimm family during the course of the proceedings involving Michael Ryan."[40] However, in 1997, Finn admitted, in testimony before Judge Moran, that such a meeting must have taken place. He explained that he continued to have no memory of the meeting, but he believed it took place because he had been shown a letter from one of the participants to the May, 1986, meeting, written contemporaneously with the meeting, in which a participant described the meeting and who was there, and part of the information contained in the letter must have come from Finn.[41]

With this background in mind, I turn to the petitioner's claims. In particular, I make three independent findings of fact or conclusions of law.

First, and independent of any of the factual findings of other judges, I find as a matter of fact, and beyond a reasonable doubt, that Judge Finn was not presented with any material information about issues pertinent to Ryan's death sentence during the Thimm or Stice family meetings that

7 (Proceedings before Judge Moran), Test. of Hilda Schmidt, Vol. II, Tr. 231.)

37. Box 8 (in "red rope" folder), "Order on Sentence," at pages 409–11.

38. Box 8 (in "red rope" folder), "Order on Sentence," at pages 413–14.

39. Box 8 (in "red rope" folder), "Order on Sentence," at pages 416–17 & 421.

40. Box 7 (Proceedings before Judge Moran), Vol. I, Tr. 65.

41. Box 7 (Proceedings before Judge Moran), Vol. I, Tr. 67 & 73. Since Finn had openly admitted meeting with the Stice family members when questioned by defense counsel immediately prior to Ryan's death sentence in 1986, Judge Moran and the Nebraska Supreme Court concluded that Finn had not intentionally lied about meeting the Thimm family when he signed the erroneous affidavit in 1993. Independently, I come to the same finding and conclusion. I, too, agree that Finn did not intentionally mislead anyone when he signed the incorrect affidavit some six years after the fact. That Finn's memory was faulty about the specific meeting, participants, and their familial relationships probably resulted from the fact that he made a common practice of meeting with interested lay people to explain the process (not the substance) of legal proceedings. (Box 7 (Proceedings before Judge Moran), Vol. I, Tr. 96–97.) Because of this practice, and recognizing that one member of the Stice family also attended a meeting with members of the Thimm family in May of 1986, its likely that the familial relationships blurred in Finn's memory. Therefore, there is no reason to infer bias from Finn's erroneous 1993 affidavit, which was given more than six years after the fact, particularly when he openly acknowledged in 1986 meeting with the Stice family. Bluntly put, there was no reason for Finn to lie about one meeting when he openly admitted the other.

had not already been presented to Judge Finn in earlier court proceedings. Those legal proceedings were: (1) Ryan's jury trial for the Thimm murder, which trial also fully disclosed the details of the Stice murder; (2) the sentencing proceedings of the petitioner's co-defendant and son, Dennis Ryan, for the murder of Thimm; and (3) the court proceedings related to Ryan's "no contest" plea to, and life sentence for, the Stice murder.

In particular, during the meeting in May, there was no discussion about the facts surrounding Ryan's murder of Thimm. (*E.g.,* Box 7 (Proceedings before Judge Moran), Vol. II, Tr. 301 (Daneda Heppner: "Q. At any time during the meeting, do you remember a discussion regarding what Michael Ryan did that caused the death of James Thimm? A. No, we didn't discuss that at all. Q. Do you remember any discussion during the meeting regarding the evidence that came out during the trial? A. No, we weren't concerned with that."); Box 7 (Proceedings before Judge Moran), Vol. II, Tr. 346 (Karen Schmidt: "Q. During the May 9th, 1986 meeting were there any discussions, to the best of your current memory, regarding the nature of the crime that had been committed by Michael Ryan? A. No.").) The same was true for the August meeting. (Box 7 (Proceedings before Judge Moran), Vol. III, Tr. 467 (Garnetta Butrick: "Q. Do you remember any discussion at all in regard to Michael Ryan and the facts surrounding the death of James Thimm? A. No.").)

In other words, what very little Finn heard at the May and August meetings with the Thimm and Stice family members that was in any way conceivably material to the question of whether Finn should impose the death penalty was no different than what Finn already knew as a result of the proper exercise of his judicial duties either as a trial or sentencing judge for

Ryan or his son. Any information relayed to Finn during these meetings was, to use the vernacular, "old news."

Second, and independent of any of the factual findings of other judges, I find as a matter of fact and beyond a reasonable doubt, that nothing was said at the meetings, either by Judge Finn or the family members, which evidences any bias on Finn's part, or attempt to bias Finn on the part of the family members, relating to the critical question of whether to impose the death penalty on Ryan.

In particular, Judge Finn was never asked to express, and never expressed, any opinion about the propriety of the death penalty for Ryan during any of these meetings with the family members. Indeed, I find beyond a reasonable doubt that Judge Finn made it very plain on at least one occasion (at the beginning of the May meeting) that he could not and would not discuss the question of Ryan's sentencing for the Thimm murder. (Box 7 (Proceedings before Judge Moran), Vol. II, Tr. 300 (Ms. Heppner: "At the very beginning of the meeting he said that he would not be able to answer any questions about Michael Ryan so he did not want us to ask any.").)

Still further, I find beyond a reasonable doubt that the Thimm and Stice family members were not asked to offer, and did not offer, an opinion on what Ryan's sentence should be for the Thimm murder. *E.g.,* Box 7 (Proceedings before Judge Moran), Vol. II, Tr. 302 (Ms. Heppner: "Q. During this meeting on May 9th of 1986, did you or any of the other people in attendance ever state your opinions or beliefs as to what would be an appropriate sentence for Michael Ryan? A. No, we did not."); Box 7 (Proceedings before Judge Moran), Vol. II, Tr. 301–302 (Ms. Heppner: "[N]o one" discussed the potential sentences for Michael Ryan; "[t]hat did not

come up."); Box 7 (Proceedings before Judge Moran), Vol. II, Tr. 346 (Ms. Schmidt: "Q. During the May 9th, 1986 meeting do you have any memory of any discussions occurring regarding what, if any, sentence should be imposed on Michael Ryan? A. No."); (Box 7 (Proceedings before Judge Moran), Vol. III, Tr. 468 (Garnetta Butrick regarding the August meeting: "Q. Do you remember any discussion at that meeting regarding the sentence that Michael Ryan should receive as a result of his participation in the death of James Thimm? A. No. Q. Do you remember anyone at that meeting expressing an opinion in regard to what they believed would be an appropriate sentence of Michael Ryan as a result of his participation in the death of James Thimm? A. No.").)

Ryan's zealous lawyers focus upon stray statements made by Judge Finn, such as the judge not believing that any of the defendants felt sorrow for their crimes. While that statement and others like it indicate Judge Finn's strong views about the culpability of all those who participated in, and who had then been found guilty of, the murders, such a "bias" did not come from an extra-judicial source (the meetings), but was derived from his judicial duties while listening to the testimony of Ryan and others as they described their ruthless behavior during the jury trial. More to the point, this statement, and others like it relied upon by Ryan, prove absolutely nothing about bias on the critical question of whether Finn thought the death sentence should be imposed on Ryan under the specific statutory limitations of Nebraska's death penalty scheme. Finn made it absolutely clear that he would not discuss that question of sentencing, and no one lobbied him to impose the death penalty.

Regarding the actual sentencing, Judge Finn's written sentencing opinion, excluding five pages of appendices, is 16 pages in length.[42] It reveals a thoughtful analysis of the elements and a full appreciation of the limitations of Nebraska's death penalty scheme and the two days of evidence that the judge had taken regarding that matter. That careful decision evidences not the slightest hint of an improper bias.

Third, I independently conclude that because of the foregoing facts, there was no federal constitutional error. To be specific, the meetings between Judge Finn and the family members of the victims established no "structural error" where bias must be presumed, and they evidenced no actual bias either. *See, e.g., United States v. Walker,* 920 F.2d 513, 516–17 (8th Cir. 1990) (no actual bias shown even though unreported assets were shown to the sentencing judge by the prosecutor prior to the sentencing in an ex parte proceeding without the knowledge or presence of the defendant or his counsel, particularly because of the "duplication" of the evidence "between the open court and ex parte viewing" and because of the "absence of any inference of prejudicial ex parte conversation"); *United States v. Earley,* 746 F.2d 412, 415–19 (8th Cir.1984) (in a prosecution for aggravated bank robbery resulting in the death of two people, ex parte submission by the government to the judge of a 55–page brief, containing the outline of the expected testimony of 120 prospective witnesses that was not revealed to defense counsel prior to trial despite a request, was an improper ex parte communication, but it was not prejudicial, particularly because the information revealed to the judge in the brief was similar to that presented to the judge during trial), *cert. denied,* 472 U.S. 1010, 105 S.Ct. 2707, 86 L.Ed.2d 723 (1985). *Cf. Dyas v. Lockhart,* 705 F.2d 993, 995–97 (8th Cir.1983) (in a capital felony murder

---

**42.** Box 8 (in "red rope" folder), "Order on Sentence," at pages 407–22.

case, there was no structural error upon which bias would be presumed even though the trial and sentencing judge was the uncle of the head prosecutor and the brother and father of the two assistant prosecutors who participated in the trial).

To reiterate and summarize, Finn learned nothing material to the death sentence at these meetings that he did not already know through the proper exercise of his judicial duties; he expressed no opinion on whether to impose a death sentence; and he was not lobbied to impose the death sentence. While the niceties of Nebraska's rules on judicial conduct were unintentionally and technically breached, there was manifestly no violation of the Due Process Clause of the Fourteenth Amendment.

### C. Other Objections to, and Further Supplementation of, the Report and Recommendation

In over 150 pages of briefing, Ryan's counsel raise numerous objections to Judge Piester's final report and recommendation that have not been previously discussed in this opinion. While I have fully considered and rejected all of the objections, I will only comment further upon their contention that Claims IV (ineffective assistance of counsel), V (trial court misconduct), and XVII (cruel and unusual punishment) should not be treated as abandoned, and that they should still be permitted to brief these claims.

The reason "[w]e did not brief these issues," counsel state, is "simply because other more pressing issues needed to be briefed at length." (Petr's Initial Br. (Filing 211, at 139).) My gentle response is that counsel have had several years to research and refine these claims (regarding the alleged ineffectiveness of Ryan's trial counsel in failing to pursue the ex parte communication issues, Judge Finn's failure to convene a three-judge sentencing panel, and the constitutionality of death by

electrocution), and, whether or not they intended to abandon these claims, they effectively did so by failing to brief them. I am confident, in any event, that none of these abandoned claims has merit.

I conclude my review of Judge Piester's report and recommendation with two additional observations. Both concern recent case law developments.

First, Judge Piester references the fact that a decision by a panel of the Eighth Circuit in *Moore v. Kinney*, 278 F.3d 774 (8th Cir.2002), was vacated for rehearing on March 28, 2002. On February 10, 2003, the Court of Appeals ruled en banc that the "exceptional depravity" aggravating circumstance, as narrowed, is constitutional. *See Moore v. Kinney*, 320 F.3d 767, 772–75 (8th Cir.), *cert. denied*, —— U.S. ——, 123 S.Ct. 2580, 156 L.Ed.2d 609 (2003). Thus, I supplement Judge Piester's report with the following: Whether narrowed by *Moore* and other earlier cases or applied as written, the "exceptional depravity" portion of the aggravating circumstance found in Neb.Rev.Stat. § 29–2523(1)(d) clearly fits Ryan even if it is treated separate and apart from the other portion of the statute dealing with murders which are "especially . . . cruel." I so find and conclude. Also, to the extent that there was no narrowing construction of "exceptional depravity" at the time Ryan was sentenced, and to the extent one assumes that "exceptional depravity" was considered, whether separately or together, at sentencing, I independently find and conclude that any such alleged error was harmless beyond any reasonable doubt. *See, e.g., Joubert v. Hopkins*, 75 F.3d 1232, 1245–47 (8th Cir.1996) (evidence established beyond a reasonable doubt that the constitutionally narrowed "especially heinous, atrocious, and cruel" part of the aggravator would have been applied to defendant even had the alleged-

ly unconstitutional vague portion regarding "exceptional depravity" not been considered). To be specific, I arrive at these decisions without giving deference to the Nebraska Supreme Court on this issue.

Second, and finally, on June 24, 2002, the United States Supreme Court ruled in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), that the Sixth Amendment requires a jury to make findings of fact regarding the applicability of aggravating circumstances in death penalty cases. Although this decision was rendered prior to submission of the claims to Judge Piester for his final report and recommendation, Ryan did not renew his request for leave to amend his petition to assert such a claim. Had such a renewed request been made, though, it would have been unavailing. Absent an express declaration by the Supreme Court that *Ring* is retroactive (and there has been none), the Eighth Circuit has held that it is not. *Moore v. Kinney*, 320 F.3d at 771 n. 3. *But see Summerlin v. Stewart*, 341 F.3d 1082 (9th Cir.2003) (applying *Ring* retroactively, despite lack of express pronouncement by the Supreme Court).

### III. THE COURT THANKS RYAN'S LAWYERS

At the beginning of the federal habeas process, and given the awful nature of the case, Judge Piester and I conferred regarding the appointment of counsel. Knowing full well the terrific burden that would be imposed on any lawyer appointed by the court, we selected Steven E. Achelpohl and Michael A. Nelsen to represent Ryan. We made the particular selection of these two men because Ryan's case demanded the absolute best the legal profession had to offer. As we expected, their service to the interests of justice, and their representation of Ryan, have been both exemplary and extraordinary. In short, Mr. Achelpohl and Mr. Nelsen have made the rest of our honorable profession proud. On behalf of the court, I thank them.

### IV. CONCLUSION

Remembering that Ryan humiliated, tortured, and stomped Thimm to death in the name of Yahweh (Jehovah), the God of the Old Testament, I conclude by pondering the following passage from that ancient text:

> And the judges shall make diligent inquisition ...
>
> Then shall ye do unto him, as he had thought to have done unto his brother: so shall thou put the evil away from among you.
>
> And those which remain shall hear, and fear, and shall henceforth commit no more any such evil among you.
>
> And thine eye shall not pity; but life shall go for life, eye for eye, tooth for tooth, hand for hand, foot for foot.

*Deuteronomy* 19:18–21 (King James version).

Accordingly,

IT IS ORDERED that:

1. The report and recommendation (Filing 202) is adopted. The petitioner's objection to the report and recommendation and appeal (Filing 203) are denied.

2. By separate document, judgement will be entered for the respondent and against the petitioner providing that the petitioner shall take nothing from the respondent, this case is dismissed with prejudice, and the stay of execution is dissolved.

### REPORT AND RECOMMENDATION

PIESTER, United States Magistrate Judge.

Before the court for consideration is the petition for writ of habeas corpus of petitioner Michael Ryan. Filing 1. After an

evidentiary hearing, and upon reviewing the merits of petitioner's claims, I conclude that habeas relief should be denied in all respects.

## BACKGROUND

On April 10, 1986, following a jury trial in the District Court for Richardson County, Nebraska,[1] petitioner Michael W. Ryan was convicted of first degree murder, in connection with the torture killing of James Thimm on a farm outside Rulo, Nebraska.[2] On October 16, 1986 the district court judge, Honorable Robert T. Finn, sentenced petitioner to death. Petitioner appealed his conviction and sentence to the Nebraska Supreme Court raising numerous grounds. The Nebraska Supreme Court affirmed both the conviction and sentence on August 11, 1989, *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989) ("*Ryan I*"), and denied petitioner's motion for rehearing on February 15, 1990. The United States Supreme Court denied a subsequent petition for writ of certiorari. *Ryan v. Nebraska*, 498 U.S. 881, 111 S.Ct. 216(Mem), 112 L.Ed.2d 176 (1990).

On October 19, 1990 petitioner filed a pro se motion for postconviction relief in the District Court for Richardson County, pursuant to Neb.Rev.Stat. § 29–3001 et seq. On December 17, 1991 petitioner, through court-appointed counsel, filed a second amended motion for postconviction relief raising numerous grounds. Following an evidentiary hearing the district court denied petitioner's motion for postconviction relief. The Nebraska Supreme Court affirmed that denial on July 21, 1995, *State v. Ryan*, 248 Neb. 405, 534 N.W.2d 766 (1995) ("*Ryan II*"), and overruled petitioner's motion for rehearing on September 27, 1995.

On October 25, 1995 the Nebraska Supreme Court ordered that execution of the sentence be carried out on December 7, 1995. Petitioner filed a pro se motion for stay of execution with the Nebraska Supreme Court on October 31, 1995, alleging that the United States Supreme Court would be unlikely to have an opportunity to grant a writ of certiorari to review the denial of his motion for postconviction relief before the scheduled December 7, 1995 execution date. *See Ryan v. Hopkins*, 4:CV95–3391, filing 3, Exhibit B. On November 1, 1995 the Nebraska Supreme Court denied the motion for a stay of execution. *See id.*, Exhibit C.

On November 17, 1995 petitioner filed in this court a pro se petition for writ of habeas corpus, *id.*, filing 1, and a motion for stay of execution, *id.*, filing 3. On November 20, 1995 the Honorable Richard G. Kopf granted petitioner's motion for stay of execution. *See id.*, filing 5. Eventually, on October 31, 1996, this court dismissed petitioner's habeas action without prejudice in order to allow him to exhaust his state remedies on certain issues. *See id.*, filing 85.

On November 7, 1996 petitioner filed his second motion for postconviction relief in the District Court of Richardson County, Nebraska. After a bench trial the district court found against the petitioner on all the issues he presented. The district court's order was affirmed by the Nebraska Supreme Court on September 10, 1999. *See State v. Ryan*, 257 Neb. 635, 601 N.W.2d 473 (1999) ("*Ryan III*").

On December 10, 1999 the petitioner filed the present petition for habeas relief. Filing 1. I entered a Memorandum and Order on August 22, 2000 in which I ad-

---

1. On petitioner's motion, the trial was actually held in Omaha, Douglas County, Nebraska.

2. Following the trial, petitioner pleaded guilty to a charge of second degree murder in connection with the death of Luke Stice. That conviction is not at issue in this case.

dressed the procedural issues of this petition. Filing 49. There I concluded that claims I through VI, X through XIII, and XVII are properly before this court, while the rest were exhausted by unexcused procedural default and, thus, barred from this court's consideration. *Id.* In that Memorandum and Order I also denied petitioner's Motion for Discovery and Motion for Evidentiary Hearing with respect to claim XVII, and a Sealed Motion. *Id.* Petitioner filed an appeal objecting to portions of my Memorandum and Order. Filing 54. Judge Kopf issued a Memorandum and Order on December 29, 2000 in which he sustained petitioner's objections with respect to my conclusions on petitioner's competence claims (claims VII, VIII, and IX), directed me to make more specific findings regarding the procedural default of those same claims, and sustained my Memorandum and Order in every other respect. *See* filing 74.

### SCOPE AND SUMMARY OF THIS REPORT AND RECOMMENDATION

Petitioner is not procedurally defaulted from raising claims I through VI, X through XIII, and XVII. (See August 22, 2000 Memorandum and Order, filing 49, sustained by Judge Kopf in his December 29, 2000 Memorandum and Order, filing 74). The merits of these claims are discussed in the latter portion of this Report and Recommendation.

I had previously concluded that petitioner had failed to show cause and prejudice sufficient to excuse his procedural default of claims XIV, XV, and XVI. I had also concluded that petitioner had failed to prove prejudice to excuse his procedural default on Claims VII, VIII, and IX ("Competence Claims"), *see* filing 49. I was directed by Judge Kopf to make more definite findings on petitioner's claim of incompetency and how that claim relates

to the procedural default issues raised by Ryan's § 2254 petition. *See* filing 74.

Judge Kopf's Memorandum and Order clarified that if petitioner was mentally incompetent at the time of his direct appeal and his first state post-conviction proceeding, that incompetence may establish "cause" sufficient to excuse his failure to raise appeal and postconviction relief claims for state court review. The Eighth Circuit has held that mental illness may constitute cause if there is a "conclusive showing that mental illness interfered with a petitioner's ability to appreciate his or her position and make rational decisions regarding his or her case at the time during which he or she should have pursued post-conviction relief." *Holt v. Bowersox*, 191 F.3d 970, 974 (8th Cir.1999)(citing *Garrett v. Groose*, 99 F.3d 283, 285 (8th Cir.1996); *Nachtigall v. Class*, 48 F.3d 1076, 1080–81 (8th Cir.1995)).

The issue of Ryan's competency during his 1986 trial was heard and ruled on in the 1997 second state post conviction proceeding. However, the issue of whether petitioner was competent during the appeal process and his first postconviction proceeding, time periods during which he failed to raise issues for state court review, has not been previously decided by any court. Mental examination reports provided to this court and issued after the 1997 hearing addressed these issues. An evidentiary hearing was necessary to determine if incompetence was the cause of petitioner's failure to raise his procedurally defaulted claims, (VII, VIII, IX, XIV, XV, and XVI) in the state courts.

The previous Memorandum and Order, filing 49, concluded that Judge Moran was presumptively correct in holding that petitioner was competent to stand trial and therefore, even absent procedural default, petitioner's competency claims were without merit. In the interest of addressing and resolving all issues in order to avoid

time-consuming remands, Judge Kopf's Memorandum and Order directed me to elaborate on this finding and my determination that petitioner could show no prejudice on claims VII, VIII, and IX.

Finally, after Judge Kopf issued the Memorandum and Order for further evidentiary analysis, the petitioner, through his counsel and the reports of mental health experts, raised the threshold issue of Ryan's competence in this federal habeas proceeding. Before reaching the petitioner's claims for habeas relief set forth in his § 2254 petition, therefore, I concluded I must resolve whether Ryan has the current capacity to appreciate his position in this proceeding, assist his counsel, and make rational decisions or whether, on the other hand, he is suffering from a mental disease, disorder, or defect which may substantially affect that capacity. *Rees v. Peyton*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966).

An evidentiary hearing was held to address Ryan's current competence, whether incompetence "caused" Ryan's procedural default of habeas claims, and whether Ryan can show "prejudice" on the competency claims raised for habeas review.[3] Filing 89. At the close of the July 31– August 1, 2002 evidentiary hearing, the parties were given leave to submit post-hearing briefs. The transcript of the evidentiary hearing was prepared and filed, and after several continuances granted at the request of both parties, the matter was

fully submitted to the court for consideration on October 16, 2002.

In accordance with Judge Kopf's Memorandum and Order, and in light of the issue regarding petitioner's current competence, this Report and Recommendation discusses the following findings:

1) Petitioner is competent and was afforded due process during these federal habeas proceedings;

2) Ryan was competent and afforded a full and fair hearing on his second motion for postconviction relief; Judge Moran's resulting decision finding that Ryan was competent to stand trial was supported by the record and is "presumptively correct,"; and Ryan therefore cannot show prejudice on Claims VII, VIII, and IX;

3) Petitioner was competent during the appeal and first state postconviction relief proceeding, and therefore incompetence did not "cause" him to waive state appellate and postconviction review of claims VII, VIII, IX, XIV, XV, and XVI; and,

4) The remainder of Petitioner's claims, I through VI, X through XIII, and XVII, should be denied on the merits.

In reaching these determinations I have considered the evidence submitted in this federal habeas proceeding, as well as the evidence and court filings from Ryan's 1986 trial (*Ryan I*), and his first and second state postconviction relief proceedings, (*Ryan II* and *Ryan III*).[4]

---

**3.** I entered a separate order on May 16, 2001 clarifying that the hearing was related to the procedural default issues on the competence claims, but added that the court would consider evidence on the substance of those claims to the extent that such evidence was related to the "prejudice" inquiry. Filing 96.

**4.** References herein to pages and line numbers within the state court bill of exceptions, and exhibit numbers therein, are consistent with the references to the Nebraska Supreme

Court opinions reviewing that evidence as follows:

- *Ryan I*—the 1986 murder trial and direct appeal (testimony and exhibits from the trial are located in green-covered volumes);
- *Ryan I* (proceedings) -the blue-covered volumes of the 1986 trial record contain the transcription of all matters other than the evidence presented before the jury, including, as it relates to this habeas petition, the argument on Ryan's motion for new trial and the sentencing hearing evidence.

## DISCUSSION

### THRESHOLD ISSUE: RYAN'S COMPETENCY DURING THESE FEDERAL HABEAS PROCEEDINGS

Just prior to the scheduled evidentiary hearing on the competency issues alleged in Ryan's § 2254 petition, counsel for petitioner raised the issue of whether petitioner was and is competent to fully participate in the habeas proceedings pending before this court. See filing 116. Counsel for both parties obtained mental health evaluations of Ryan, and the court further ordered a mental health evaluation of Ryan by the Medical Center for Federal Prisoners in Springfield, Missouri. The two-day evidentiary hearing included testimony from mental health experts concerning Mr. Ryan's competency during these federal habeas proceedings.

Mental health reports provided by the parties and reviewed by the court indicated that Ryan had expressed some doubt with pursuing his federal habeas proceedings. "Concerning post-conviction proceedings, Mr. Ryan stated he didn't like it. . . . He has no idea whether he will continue to pursue appeals but states, 'I'll cross that bridge when I come to it. I'll see what Yahweh has in mind.'" T, Exhibit 107, 2001 Logan report, at p. 15. Mr Ryan "does not agree with [his counsel's] strategy regarding putting his mental state at issue, as he believes he is not mentally ill." T, Exhibit 109, Martell report, at p.6. These references in the records placed the court on notice that Ryan, at some point during the proceedings, may request that all or parts of his petition for habeas relief be abandoned, or that his appointed counsel withdraw from the case. Had Ryan made such a request, the evidence adduced at the hearing would have been considered to determine whether he was competent to knowingly and voluntarily waive these federal proceedings for post-conviction relief.

The petitioner did not request that his federal habeas proceedings be dismissed or that his counsel withdraw. The evidence from the hearing was considered to determine Ryan's competence at the various stages of his litigation, including these habeas proceedings, as well as, to the extent applicable, the merits of his claims.

 As to the initial question of whether Ryan is and has been competent during these federal habeas proceedings, the court must determine if Ryan is suffering from a mental disease, disorder, or defect that adversely affects his ability to understand his circumstances and make rational decisions about his case. *Rees v. Peyton*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966) (examining psychiatrist's detailed report which concludes that defendant is not competent requires the court to conduct a full competency hearing); *Smith v.*

- *Ryan II*-the first state postconviction proceeding and appeal (testimony in blue-covered volumes I through III).
- *Ryan III*-the second state postconviction proceeding and appeal. (testimony and exhibits in white-covered volumes I through XII).
- The Order of Judge DeWayne Wolf on petitioner's first state postconviction relief proceeding, case number 94–207, is included within Volume I of Exhibit 1001 for the *Ryan III* proceeding. It is hereinafter referred to as *Ryan II,* Memorandum and Order.

- The Memorandum and Order setting forth Judge Gerald Moran's ruling on the second state postconviction hearing is found within the Nebraska Supreme Court, Case 97–1035 appeal transcript at Bates-stamped pages 22–97. It is referred to by its Bates-stamped pages as *Ryan III,* Memorandum and Order.
- The transcript for evidence presented in this federal proceeding is referred to as "T," followed by the page or exhibit number.

*Armontrout,* 812 F.2d 1050, 1053 (8th Cir. 1987). When a prisoner seeking habeas relief in federal court is incompetent, he must be represented by an attorney, with his interests pursued through "either a counsel of record or a 'next friend,'" to argue that he lacked the capacity to make decisions during the post-conviction proceedings. *O'Rourke v. Endell,* 153 F.3d 560, 569 (8th Cir.1998). Without such an advocate on the prisoner's behalf, the competency hearing is not full and fair, and does not comport with due process. *Id.* at 569.

For the reasons discussed more fully below, I find that Ryan has been competent during the course of these federal habeas proceedings, and although he chose not to attend the evidentiary hearing, (see filing 131, affidavit of Michael Ryan), this choice was rationally made. His interests herein were fully, fairly, and zealously advocated by highly qualified counsel, and supported with evidence offered by his mental health experts, William S. Logan, M.D., and Robert Schulman, Ph.D., who have continued to provide expert testimony on his behalf dating back to the time of his 1986 trial.[5]

To assess Ryan's current competency, both Dr. Logan and Dr. Schulman, who provided testimony in support of Ryan's insanity defense at his 1986 trial, re-evaluated Ryan's mental state prior to testifying. T, 32:1–3, 33:23–34:11, 138:2–20, Exhibits 104, 2002 Schulman report & Exhibit 107, 2001 Logan report. Ryan was also evaluated in 2001 by an expert for the State, Dr. Daniel A. Martell, Ph.D, and, pursuant to this court's order, he was independently assessed in 2002 at the Federal Medical Center in Springfield, Missouri by Dr. Christina Pietz, Ph.D. T, Exhibits 109, Martell report & 113, Pietz report. Like Dr. Logan and Dr. Schulman, these experts were highly competent and qualified to evaluate and render opinions regarding Ryan's competency.[6]

**5.** The petitioner's experts were fully qualified to evaluate the petitioner and provide testimony regarding Ryan's competency.

Dr. Schulman has been a clinical psychologist for 42 years, and has been affiliated with the Topeka Psychiatric Center since 1978. His testimony and resume reflect his experience in sanity determinations, especially from 1968 through 1975 while a staff psychologist in law and psychology for the Menninger Foundation, its Director of Forensic Psychology, and a consultant for the Medical Center for Federal Prisoners. Approximately fifteen percent of his professional work is in forensic psychology, with the remainder devoted to clinical psychology. (T, 11:1–17:9; Exhibit 101, Schulman resume).

Dr. Logan graduated from medical school in 1977, completed his three-year residency in psychiatry in 1981, and became board certified in "Psychiatry and Neurology" in 1982. From 1981 through 1984, he was employed at the Medical Center for Federal Prisoners in Springfield, Missouri, and his duties included performing competency evaluations at the request of the courts. He completed a one-year post-residency fellowship in Forensic Psychiatry through the Menninger Foundation in 1985, after which he became the Director of the Law and Psychiatry Department for the Menninger Clinic, serving in that position until 1993. In that capacity, he performed several hundred evaluations of mental competency and criminal responsibility. From 1993 to the present, he has been in the private practice of general and forensic psychiatry as the president of Logan & Peterson, P.C. He provides consultation services to the Menninger Clinic, and teaches at the Karl Menninger School of Psychiatry and Mental Health Services. Throughout the years, he has attended many post-residency conferences and has provided consulting services to many penal institutions. He has testified extensively on the issue of competency to stand trial and the defense of insanity. (T, 90:16–106:21; Exhibit 105, Logan curriculum vitae).

**6.** Dr. Martell completed a one-year internship in forensic psychology and a one-year fellowship in forensic neuropsychology through the Kirby Forensic Psychiatric Center, Bellevue Medical Center, New York University, before obtaining his Ph.D. in Clinical Psychology Research in 1989 from the University of Virginia. From 1987 through 1991, he was a

While the testimony offered in the federal habeas proceeding substantially mirrored that offered at the 1986 trial and 1997 hearing, the import of that evidence was more focused in this habeas proceeding on the credibility of Ryan's statements regarding his religious beliefs, and if those statements were credible, the distinction between religious beliefs and delusional thinking. Specifically, was Ryan feigning mental illness by professing that his actions were guided by the voice of God and if so, when is hearing the voice of God, relinquishing one's life to a higher power, and obeying its commands a competent decision, and when is it the product of an incompetent delusional and psychotic state? The mental health profession has attempted to respond in part to this issue in published commentary set forth in the DSM–IV–TR:

> A clinician who is unfamiliar with the nuances of an individual's cultural frame of reference may incorrectly judge as psychopathology those normal variations of behavior. Belief, or experience that are particular to the individual's culture. [sic] For example, certain religious practices or beliefs . . . may be misdiagnosed as manifestations of a Psychotic Disorder.

T, Exhibit 109 at p. 6 (Martell report) (quoting DSM–4–TR, p. xxxiv).

Based on their prior 1986 assessments of Ryan, and supplemented by their recent evaluations of his current mental state, Dr. Logan and Dr. Schulman each stated that Ryan is neither malingering nor feigning mental illness but truly believes that Yahweh speaks to him, commands his life, and determines his future. T, 28:4–20, 29:15–30:7, 149:24–150:20. They state that while belief in God is not irrational, Ryan's act of fully relinquishing all decisions to his deity, which he refers to as "Yahweh" or "Yahweh God," in the hope of being found worthy to enter heaven is obsessive, not the product of a rational mind, and evidence of a psychotic and incompetent mental state. T, 64:23–65:7, 77:7–11, 143:2–144:25.

According to Ryan's experts, since as early as 1983, Ryan has been delusional, with grandiose ideas that he can read other people's minds and influence their thoughts supernaturally. T, 140:11–141:14. His mental state exhibits rigidity

---

clinical instructor of psychiatry at the New York University School of Medicine, a research consultant in forensic psychiatry clinic for the Criminal and Supreme Courts in New York City, and the director of the Forensic Neuropsychology Laboratory for the Kirby Forensic Psychiatry Center. Since 1994, he has been an assistant clinical professor of psychiatry for the UCLA School of Medicine and has been affiliated with the private forensic consultation practice of Dr. Park Dietz and Associates. He has published many articles, papers and presentations on the relationship between mental illness, forensic evaluations, violent crime, and the criminal law, and also has several projects in progress on the issue of competency to stand trial and restoration of competency. T, 189:12–191:12 & Exhibit 108, Martell curriculum vitae.

Dr. Pietz received her Doctor of Philosophy in 1989, with her major in Counseling Psychology in a program approved by the American Psychological Association. She is a Diplomate in Forensic Psychology with the American Board of Professional Psychology, and a Fellow of the American Academy of Forensic Psychology. Since 1990 she has been a staff psychologist at the United States Medical Center for Federal Prisoners in Springfield, Missouri, ("FMC") with a significant portion of her work focused on forensic evaluations of competency to stand trial, criminal responsibility, and expert services to the federal courts in these areas. She estimates completing approximately 400 competency evaluations during her twelve years at the Federal Medical Center. She was the Director of Clinical Training at FMC from 1991 through 2000, and is currently the Director of Forensic Training for the Forest Institute of Psychology. T, 261:1–262:6 & Exhibit 112, Pietz curriculum vitae.

in thinking and entrenchment in his belief system, and he portrays the appearance of "being together" through his delusional thinking. T, 24:24–25:18, 29:9–14. While Ryan's reliance on scripture to guide his beliefs and conduct is not itself delusional, according to Dr. Schulman, how he executes that belief is delusional. He cannot listen to others' points of view, executes his beliefs to an extreme, and is obsessed that others must believe as he does. Ryan professes believing that Yahweh controls the course of all events, that certain things happen to certain types of people, that hell exists and some people go there, and that, on these issues, there is no room for discussion. T, 64:19–68:5 & Exhibit 104, 2002 Schulman report, at p.2.

Dr. Logan and Dr. Schulman both assert that as a result of Ryan's delusional thinking and psychosis, Ryan does not take part in any decision-making on his own behalf, but abdicates that responsibility to his attorneys. They believe that throughout the numerous stages of this litigation, including presently, Ryan has been unable to rationally make decisions because his decision-making processes are based on delusions and not reality. Ryan claims his attorneys have been sent by Yahweh, accepts what they do, and believes he has nothing to add. Ryan states that his lawyers, Dr. Logan, and Dr. Schulman were sent to him as messengers from Yahweh. For example, Ryan claims that Dr. Schulman, who is Jewish, was specially sent to Ryan so that Dr. Schulman could hear Yahweh's message and be a witness to the Jewish people. T, 32:4–22, 69:22–71:1, 89:2–6.

According to his statements to Dr. Logan and Dr. Schulman, Ryan has not agreed with his counsels' advice to assert mental illness at any stage of the litigation against him, but has acquiesced in their arguments, placing his faith in God rather than the courts, and asserting that the only reality that matters is what Yahweh wants. Ryan has told the mental health experts that the current legal proceedings are under Yahweh's control—Yahweh will protect him, whether Ryan participates in the process or not. T, 25:1–24, 28:21–29:14, 30:14–31:1, 32:25–33:22, 46:15–47:1, 64:23–65:7, 74:2–18, 85:19–86:3, 145:3–146:20, 159:17–23, 165:16–166:7, 170:22–171:8, 175:17–176:21, 348:19–350:14 & Exhibit 107, 2001 Logan report, at p. 7, 17. See also, *Ryan III,* 765:12–766:11, 770:1–771:10, 775:6–18, 780:4–780:14, 784:22–24.

When asked why Ryan continues to pursue the habeas proceedings, Dr. Logan explained that Ryan claims he has not resolved whether Yahweh would consider it suicide to stop the proceedings and not challenge his death sentence. Ryan looks to the Bible to answer this question. He also performs research in the law library. T, 159:24–160:3, 163:13–16, 171:9–173:5 & Exhibit 107, 2001 Logan report, at 14–15.

Dr. Logan and Dr. Schulman stated that Ryan describes persistent delusional thoughts that he hears Yahweh's voice. Although his claims of delusion have not changed since 1986, Ryan is now in a structured environment and is more controlled in expressing his beliefs. T, 30:14–31:19. Ryan currently denies hearing voices or ever stating that he was an archangel. T, 84:21–85:4. Dr. Logan explains this discrepancy as an act of false humility consistent with Ryan's attempt to further aggrandize himself. Ryan states that he believes he is special in Yahweh's eyes—it is others that believe he is an archangel. T, 148:7–149:23, 166:8–167:6, 168:8–169:12, 180:7–21. See also, *Ryan III,* 785:21–789:24, 790:24–791:7.

According to the experts who testified, a question raised in assessing Ryan's mental state is whether his beliefs are "delusions" or "shared sub-cultural religious beliefs espoused within the Christian Identity

Movement, and adopted by the other members of his group at the ranch." (T, Exhibit 109, Martell report, at p. 6). Both Dr. Logan and Dr. Schulman conclude that Ryan is delusional. Dr. Martell and Dr. Pietz disagree.

As explained below, I conclude that Dr. Martell and Dr. Pietz offered the more credible, scientifically based, and convincing evidence concerning Ryan's competence. The testimony of Dr. Schulman and Dr. Logan, and their opinions that Ryan has been and is incompetent, are not convincing. Dr. Schulman's current opinion is inconsistent with his own prior testimony, as well as the opinions reached by other experts, and is not based on objective and reliably scored psychological testing. Dr. Logan's current opinion that Ryan was incompetent in 1986 is contradicted by the report he authored in 1986, wherein he describes Ryan as able to appreciate his position and understand the proceedings and their consequences. Dr. Logan disregards the results of three MMPIs but accepts at face value the interview statements of Ryan. Finally, despite their current attempts to prove Ryan was not competent at trial, Dr. Schulman and Dr. Logan were Ryan's experts at that trial and did not advise the trial court or Ryan's attorneys that Ryan was incompetent. This fact significantly undermines their credibility.

Dr. Schulman states that Ryan's religious beliefs are consistent with a bizarre belief system and not a shared belief system. Although Ryan wanted his beliefs to be accepted by others on the Rulo farm, Dr. Schulman claims that this fundamental religious belief was an "extremely concrete and narrow view practiced by a few individuals and their interpretation of the Bible and how the Bible should direct ones' lives." T, 47:18–49:4, 64:24–25, Exhibit 104, 2002 Schulman report, at p.1. Dr. Schulman now believes Ryan cannot be properly diagnosed as a paranoid schizophrenic, (T, 54:25–55:9), contradicting his 1997 testimony that Ryan's diagnosis was "schizophrenia, paranoid type." *Ryan III,* 129:7–13, 135:7–18, 142:13–19. Dr. Schulman's current Axis I diagnosis for Ryan is Delusional Disorder, Grandiose Type (Religious), with an Axis II diagnosis of Paranoid Personality Disorder. T, 39:6–40:23, 47:12–14 & Exhibit 104, 2002 Schulman report, at p.3. While the symptoms of schizophrenia may wax and wane over time, even with treatment (which Ryan has not received), the disease cannot be cured. *Ryan III,* 785:21–786:3; T, 164:19–165:5 & Exhibit 107, 2001 Logan report, at p.12. (See also, testimony of Maurice Temerlin, Ph.D at *Ryan I,* 2999:15–23). Dr. Schulman offered no convincing explanation for testifying in 1997 that Ryan had schizophrenia while abandoning that diagnosis in this federal habeas proceeding.

Under the DSM–IV, Dr. Schulman's 2002 diagnosis for Ryan is inconsistent with Dr. Logan's diagnosis of schizophrenia—the diagnosis endorsed by Dr. Schulman during his 1997 testimony, and the diagnosis Dr. Logan has adhered to throughout the several stages of petitioner's litigation concerning his sanity and competency. T,54:25–55:9, 161:13–162:9, 224:21–225:15.

In addition to contradicting his former testimony and the current opinion of Dr. Logan, Dr. Schulman used psychological testing procedures that are unreliable and undermine the credibility of his opinions relying on that testing. Dr. Schulman's diagnostic impressions are based, in large part, on draw-a-person, TAT, and Rorschach psychological testing. However, according to Dr. Martell, these tests were widely used in 1986 but were later found to be subjective, unreliable, and invalid instruments for assessing psychopathology. T, 199:3–20. Specifically as applied to the

Rorschach test, Dr. Martell explained that the method of scoring was standardized by Exner in the 1970s to validate the testing and eliminate the subjective results, and that absent such scoring, the test results are not reliable. However, Dr. Schulman admitted that he did not use the Exner scoring method, and although the raw testing data still exists, Dr. Martell could not re-score Dr. Schulman's 1986 Rorschach data to arrive at a reliable score because the data collection was not consistent with Exner's requirements. T, 58:17–62:9, 199:16–200:6.

Dr. Schulman's psychological testing methods are not considered valid or reliable, and his diagnosis for Ryan has vacillated between delusional disorder and schizophrenia, without any reasonable explanation. He testified before Judge Moran in 1997 that Ryan had schizophrenia while his contemporaneous report belied that diagnosis. (Compare, T, Exhibit 102, 1996 Schulman with *Ryan III*, 129:7–13. See also, footnote 10, infra.). Dr. Schulman testified in 1997 that he formed his schizophrenia diagnosis when the testing was completed in 1986, but his 1986 testimony contradicts that statement, (*Ryan I*, 4328:2–18, 4332:5–10), as does his 1996 report. I do not find Dr. Schulman's testimony to be convincing.

Dr. Martell explained that valid and objective psychological testing provides "checks and balances" to determine the veracity of statements made during the interview portion of a mental health evaluation, (T, 194:9–195:1), thereby increasing the reliability of any mental health diagnosis reached. Without the benefit of such testing, and disregarding the 1985 MMPI testing done by the State which indicated no mental illness, Dr. Logan concluded that Ryan has candidly related his religious beliefs and has experienced delusions since before James Thimm's murder. Dr. Logan states that Ryans's beliefs are not consistent with any shared belief system, including the Christian Identity Movement, and are delusions and hallucinations arising from paranoid schizophrenia.

Prior to his arraignment for the murder of James Thimm, and before being interviewed by Dr. Logan, Ryan was incarcerated as a pretrial detainee by the Nebraska Department of Corrections on a charge of possessing automatic weapons. During this period of incarceration he completed a state-administered Minnesota Multiphasic Personality Inventory II ("MMPI") test. T, 196: 23–197:5. Dr. Martell explained that the MMPI is used by mental health providers to reveal psychopathology, including Axis I disorders, which are more acute and severe psychiatric problems and illnesses. It also discloses evidence of Axis II personality disorders, which are long-standing character pathologies, such as antisocial personality or borderline personality, that characterize a person from early adolescence through most of their life and reflect pathological ways of dealing with the world. T, 324:1–11. Dr. Martell testified that the state's 1985 testing report on Ryan revealed an MMPI "completely within normal limits. It was valid.... [T]here was no evidence of mental disorder. All the scales were within normal limits...." (T, 196:6–10).

Disregarding the 1985 MMPI testing performed only weeks before he initially interviewed Ryan, and relying primarily on Ryan's interview statements, Dr. Logan concluded that Ryan experiences daily and continuing hallucinations as a result of his paranoid schizophrenia. However, as reported by Dr. Martell, the hallucinations seen in schizophrenia typically follow a course of exacerbation and remission, which is not consistent with the daily visual and auditory experiences described by Ryan over the course of the last eighteen years. T, Exhibit 109, Martell report, at

p.6. Dr. Martell further explained that hallucinations occur when one sees or hears things from the vantage of a "blank state" or out of "whole cloth." T, 204:6–15. However, Ryan saw signs and symbols in the clouds, (*Ryan I*, 3955:3–17; 2988:14–22), and ascribed an underlying meaning to these formations and other events he experienced. Ryan admits that hearing Yahweh speak directly to him may be a product of his own conscience, or it may be wishful thinking. Contrary to Dr. Logan's assessment, (T, 109:18–113:2, 115:23–117:19), Dr. Martell explained that this "wishful thinking," (T, 204:13–15, 205:10–25), is not a schizophrenic delusion but an illusion, and, in this case, the product of a shared sub-cultural religious belief espoused by the Christian Identity Movement. T, 203:11–204:5, 217:5–22.

Although Dr. Logan testified that, unlike Ryan, members of the Christian Identity Movement do not use the arm test to make routine daily decisions; do not endorse stealing from their neighbors; do not profess receiving audible messages from God; and do not plan for immaculate births within the membership, his characterization of the Christian Identity Movement does not take into consideration the published research and the sub-cultures within that movement. According to the research performed by the FBI Behavioral Science Unit, and relied on by Dr. Martell in formulating his opinions, the cult-like behavior of isolation, manipulation, and control performed by Ryan with the Rulo group is prominent in the Christian Identity Movement and to a lesser extent, the Posse Comitatus. The Rulo group's use of theft to fund its preparation for the Battle of Armageddon is discussed in the FBI's literature and is considered acceptable within the Christian Identity Movement, especially if it targets minorities and Jewish people. T, 222:1–224:20.

Within the Rulo cell, the members had a shared religious belief that Armageddon was imminent, that they were special and chosen by Yahweh, and that they were to prepare for the upcoming battle. Dr. Martell testified that although these beliefs are unusual, they are part of a shared religious belief and, under the DSM–IV, are not to be considered evidence of psychosis. T, 203:11–204:5, 217:5–22, 222:1–224:20, 229:18–231:8.

A significant basis of Dr. Logan's diagnosis of schizophrenia rests on believing Ryan's statements while simultaneously disregarding the results of three MMPI tests finding no mental illness, as well as other reliable psychological tests which substantiate that Ryan is not incompetent. Dr. Martell reports that Ryan's initial MMPI, obtained in 1985 and only weeks before Dr. Logan's first examination of Ryan, indicated no mental illness was present. T, 196:17–198:2 & Exhibit 109, Martell report, at p.3. The experts testified that the MMPI is a significant and routinely used psychological testing instrument. If Dr. Logan and Dr. Schulman actually believed the State's 1985 testing was unreliable, Dr. Schulman could have repeated the testing in 1986 to obtain results that were reliable in assessing Ryan's sanity. Dr. Schulman never administered MMPI testing to Ryan.

Like the 1985 MMPI testing, the MMPI administered by Dr. Martell in 2001, and the MMPI testing of Ryan in 2002 by Dr. Pietz indicated that Ryan was not mentally ill. T, Exhibit 109, Martell report, at p. 6; Exhibit 113, Pietz report, at p. 13. Thus, despite the story Ryan has related to every expert who has evaluated him throughout his litigation, Ryan's objective psychological testing reveals no mental illness.

Dr. Logan stated that Ryan's mental state has not changed substantially over the last fifteen years. Yet in his 1986

report, Dr. Logan described Ryan as understanding the nature of the charges against him, the potential consequences, and the proceedings. Now, however, he states that Ryan is delusional and incapable of rational thought. His testimony is not convincing, and it is not consistent with the opinions of the experts I find to be persuasive in this case.

Dr. Martell and Dr. Pietz independently arrived at the same conclusion: Ryan is competent. Their opinions were based on interviewing Ryan and reviewing the vast historical records in this case, and also on properly scored and objective psychological testing. Dr. Schulman criticizes both these experts because "psychologists these days" fail to "actually engage the person" in favor of only "paper and pencil tests," (T, 26:19–27:3). Dr. Pietz' testimony was particularly persuasive because she not only administered testing and interviewed Ryan, but also had opportunities to observe and speak with Ryan outside the interview process, and benefitted from round-the-clock observations of Ryan by FMC staff for over two months. Although petitioner's counsel challenged the level of her background and experience, she has an extensive background in forensic psychology, greater opportunities to observe and interact with Ryan over time, and an objective perspective.

Of particular note was Dr. Pietz' observation that Ryan had been displaced from the Nebraska Department of Corrections to an admittedly chaotic and loud FMC psychiatric ward. Contrary to what psychologists anticipate when schizophrenic patients are removed from their structured environments and routines, (see testimony of Dr. Schulman, T, 35:16–37:2), Ryan did not respond by decompensating and exhibiting psychotic behavior. He showed no signs of mental illness.

The observations by Dr. Pietz and Dr. Martell are consistent with Ryan's psycho-logical testing results. The results of the MMPI testing by these witnesses were substantially consistent, with neither test providing evidence of mental illness or incompetence. Ryan's 2001 and 2002 MMPI tests also coincided with other psychological tests performed and with the MMPI testing Ryan completed over fifteen years ago. All such testing revealed no mental illness or delusional thinking.

Dr. Martell's Personality Assessment Inventory ("PAI") testing indicated that Ryan is hostile, suspicious, and resentful with poor interpersonal skills and an inability to form close relationships. According to the PAI testing, Ryan holds grudges and feels estranged and mistreated by others; may have difficulty concentrating and entertains ideas that people find unusual; is plagued by thoughts of worthlessness, hopelessness, and personal failure; and feels depressed but has relatively few physiological signs of depression. This testing provided no evidence of active psychotic symptoms, but corresponded with Ryan's MMPI configuration of a suspicious, distrustful, hypersensitive, rigid, stubborn, and angry person who blames others for his problems. According to Dr. Martell, neither the MMPI nor the PAI testing reflected an Axis I diagnosis of mental illness or, more specifically, schizophrenia. T, 211:10–213:25, 215:8–19, 219:8–220:7 & Exhibit 109, Martell report, at p. 7.

Dr. Martell's evaluation of Ryan revealed a man with a "chip on his shoulder," whose thoughts were not disorganized, but were logical, coherent, and consistently racist and right-wing. T, 194:12–20, 203:3–16. Dr. Martell concluded that Ryan is lying when he states he hears the voice of Yahweh, "[a]nd he lies for a purpose, and that purpose is to garner the mystique of special powers, a special connection to God that enables him to remain at the top of

the pecking order, to be the leader of the cult at the Rulo farm." T, 221:21–25. With this power, Ryan maintained his ability to control and manipulate those living on the farm. T, 206:1–6.

Dr. Martell concluded that Ryan has no Axis I diagnosis—no serous mental disorder involving loss of contact with reality. He has an Axis II "antisocial personality" diagnosis of Personality Disorder with Narcissistic and Schizotypal features, and he may also have a Paranoid Personality Disorder. Dr. Martell testified that these disorders are long-term and intractable without significant psychotherapy, but they rarely interfere with thinking, do not reflect a psychotic state, and did not render Ryan incompetent at trial, direct appeal, the state collateral proceedings, or presently. T, 217:23–219:7, 220:8–221:3, 225:3–227:14, 240:11–16, 244:16–247:5 & Exhibit 109, Martell report, at p. 6–7. See also, *Ryan I*, 4414:13–4415:23 (testimony of Emmet Kenney, M.D.).

The opinions of Dr. Martell are supported by the testing, observations, evaluation and opinions of Dr. Christina Pietz. Of the experts who testified, Dr. Pietz' testimony was the most persuasive because it was based on a significant depth of knowledge and experience in the area of forensic psychology; thoroughness in evaluating Ryan; neutrality in that evaluation process and in providing testimony before this court; and extensive observations of Ryan's ability to cope daily and with stressful environmental changes.

Dr. Pietz personally interacted with and witnessed Ryan on a day-to-day basis. He was housed at FMC for sixty-four days and was randomly assigned to Dr. Pietz for evaluation. During that time she informally and frequently had contact with Ryan in the hall, the prison yard and through the door of his cell. Staff nurses monitored his status at the facility, reporting their observations and opinions to Dr.

Pietz through their charted progress notes and verbal communications. (See T, Exhibit 114, FMC medical records). In addition, Dr. Pietz performed four formal clinical interviews and conducted objective psychological testing of Ryan. T, 255:15–256:19, 265:9–24, 275:4–276:21, 279:6–19.

Dr. Pietz described Ryan as initially very frustrated and angry with the overcrowding and noise at FMC, a complaint Dr. Pietz regarded as accurate, reasonable, and justified. However, overall he was very cooperative with her and the FMC staff. While the records of prior mental health providers stated that Ryan did not trust or like mental health professionals, he exhibited a significant level of trust in Dr. Pietz and the FMC staff and did not present as paranoid during the sixty-four days he spent at FMC. No signs of mental illness were seen by Dr. Pietz or reported to her by the FMC staff. T, 301:21–304:13, 305:18–20 & Exhibit 113, Pietz report.

Ryan's personal interviews were conducted in a separate interview room. Ryan appeared at ease during the interviews and readily responded to Dr. Pietz' questions, elaborating on answers and voluntarily clarifying answers provided during past interviews as appropriate. T, 277:22–279:2.

Dr. Pietz stated that Ryan takes his religious beliefs very seriously and is offended when someone labels those beliefs as crazy. He stated to her that within the Nebraska Department of Corrections, he had access to mental health care and staff, either by self-referral or through referrals from prison officials, but he had not been referred by prison staff and he did not personally want or believe he needed that assistance. Although psychotic symptoms are usually exacerbated in the stressful circumstances of incarceration, during his seventeen years in the Nebraska Depart-

ment of Corrections, Mr. Ryan reported that he had never decompensated to the point of requiring inpatient mental health care. Dr. Pietz stated that if he were genuinely psychotic, that would be highly unlikely. T, 307:8–309:14.

In addition to personal interaction with Ryan, Dr. Pietz administered the following objective testing: Shipley Institute of Living Scale; Validity Indicator Profile; and the MMPI–II. Ryan's IQ tested in the average range and he should have no difficulty understanding simple and most complex issues. The Validity Indicator Profile reflected that Ryan made a valid effort to perform well and honestly on the testing. As previously stated, his MMPI testing revealed no evidence of any mental illness. T, 250:8–255:14.

Dr. Pietz also reviewed the extensive records received from counsel for the state and for Ryan, which included Ryan's prior mental health records and evaluation reports, audio and video tapes of prior mental health interviews, transcripts of testimony, and letters and testimony related to Ryan's cooperation and advice from counsel. Dr. Pietz testified that prior videotapes of Ryan's psychological evaluations in the late 1980s reflected a younger Michael Ryan whose speech and thoughts were not disorganized and who maintained appropriate focus and eye contact. Dr. Pietz saw no evidence of hallucinations or delusions on the videotapes, and her review of Ryan's historical writings, when he was not focusing on "holding it together" for a mental health interview, did not reflect disorganized thinking, cognitive slippage, or bizarre statements. She noted that the transcripts of the testimony of Ryan's previous counsel indicated he had been able to communicate with them and understood the proceedings. T, 290:1–291:25 & Exhibit 113, Pietz report.

Dr. Pietz opines that Ryan's religious beliefs are or were shared by other members of his subculture, and that his communication with Yahweh, rigidity in thinking, and belief in the Battle of Armageddon and the "end times" are not a hallucination but the result of his cultural beliefs. Dr. Pietz explained that a belief that one can communicate with God through prayer, and receive instruction and direction for daily life is not characterized by mental health professionals as hallucinating or the sign of a mental disorder. T, 316:3–24.

Although Ryan has abdicated the decision-making in his case to his lawyers, Dr. Pietz states that this conduct is not a result of mental illness. She explained that it is not uncommon for deeply religious people to believe that those sent to assist them, such as Ryan's counsel, have been sent as messengers from God and that adherence to their advice is part of God's ultimate plan. Further, based on her extensive experience at FMC, even outside the religious context, it is not uncommon for prisoners to relinquish their appeals to the trusted skill of their lawyers. Finally, Ryan's reasons for not wanting to attend his competency hearing—including his lack of personal participation, the trust he has in his counsel, the discomfort of being restrained, and the disruption of his daily routine—provided a reasoned explanation for not attending. T, 313:24–316:24, 320:9–321:12, 328:21–25.

Dr. Pietz summarized the question posed regarding Ryan's mental health as follows:

[I]t seems that the question facing mental health professionals evaluating Mr. Ryan is whether or not certain beliefs held by Mr. Ryan are representative of symptoms of a psychotic disorder. Furthermore, if it is determined that the beliefs held by Mr. Ryan are symptoms of a mental disorder, the question then becomes whether or not those symptoms

interfere(d) with his capacity either to comprehend the nature and purpose of the proceedings or to cooperate with counsel in his own best interest.

T, Exhibit 113, Pietz report, at p. 13.

Dr. Pietz found that Ryan had no mental illness, and no Axis I diagnosis was appropriate. She believes Ryan has an Axis II diagnosis of "Personality Disorder NOS (paranoid and grandiose traits)." It is her opinion that Ryan is currently competent to participate in these habeas proceedings. Dr. Pietz states that there is absolutely no evidence that Ryan currently has any psychotic disorder or mental illness. Based on that finding, her interaction with Ryan, and her review of the previous records and recordings of his mental evaluations, Dr. Pietz also concluded that Ryan was competent at all times during the trial, appeals and collateral state court proceedings. 257:21–259:19, 295:5–21, 300:15–301:19, 319:1–15.

Not every manifestation of mental illness demonstrates mental incompetence. The petitioner must present evidence that his mental state prevented him from being able to consult with his lawyer and from having a rational understanding of the proceedings against him. *United States v. Jimenez–Villasenor*, 270 F.3d 554, 559 (8th

Cir.2001). Every expert agrees that Ryan has grandiose, self-centered, paranoid, and hostile thought processes, that he professes a rigid and unusual religious belief in Yahweh, and that he claims to receive audible messages from Yahweh which control his actions. The experts disagree on whether mental illness is the cause. I find that it is not. I further find that even assuming Ryan suffers from paranoid schizophrenia, throughout these legal proceedings he has consistently maintained an ability to communicate with his counsel, understand his circumstances, and rationally make decisions on his own behalf.

Experts acting on behalf of Ryan assert that his religious beliefs are delusional and interfere with his ability to make rational decisions. I disagree. Sincerely held religious beliefs do not equate with incompetence. See, *Ford v. Bowersox*, 256 F.3d 783, 787 (8th Cir.2001). As confirmed by the testimony of Dr. Martell and Dr. Pietz, "clinicians are very careful in characterizing religious beliefs as delusional, ... especially when the religious views are shared by others." *Id.* (internal citations omitted).[7]

Assuming the veracity of Ryan's statements regarding his religious beliefs, and recognizing that Ryan is not a member of

---

7. So are courts. In *Ford,* the court rejected a habeas petitioner's claim of incompetence to stand trial. His attorney contended that his religious beliefs "colored his judgment" and affected his ability to make a rational decision. The petitioner believed that if the case were tried, God's angels would guide the jury to an acquittal. Despite this belief, he continued to be actively involved in trial proceedings, made notes during witness testimony, and conferred with his attorney, demonstrating the continued ability to understand and assist in his defense throughout trial. He did not appear detached from reality or disruptive. Ford believed in receiving and obeying visions sent by the Lord, a belief based on the teachings of the Assembly of God denomination. He claimed he had received a vision

directing that if he fasted for thirty-five days, he would be "delivered." From this vision, he developed the belief that God's angels would assure his acquittal. The court held:

> In sum, the evidence indicates [Ford's] actions and beliefs are the result of his serious-minded adherence to a recognized religious view rather than his incompetence to stand trial. Unlike [Ford's] attorney in this habeas appeal, we decline to label [his] deeply held religious beliefs "preposterous," "irrational," and "bizarre." ... [His] trust in God as the ultimate decisionmaker and mover in the universe is a belief espoused by millions of people, though few, perhaps, would act on this trust as completely as has [Ford.]

*Ford,* 256 F.3d at 787.

a mainstream religious denomination, his acts of fully relinquishing his life to Yahweh in the hope of life eternal; constant vigilance to hear and follow Yahweh's voice and instruction; rigid adherence, as well as strict interpretation of the scriptures; and reliance on divine intervention are neither delusional nor incompetent. Many people legitimately base important decisions on religious faith, and place that faith in God rather than the legal system. *Id.* at 788. In this case Ryan perceives that his attorneys, and perhaps his mental health experts, have been sent by Yahweh to assist him. The belief that people on earth are sent by God to provide assistance is also not delusional or incompetent.

Ryan's counsel and experts claim that he exhibits incompetence by abdicating his legal decisions to his attorneys. This statement is contradicted by the fact that Ryan performs his own legal research. However, assuming he did abdicate decisions in this proceeding and his prior proceedings to his lawyers, that act does not necessitate a finding of incompetence. Completely rational people, with an understanding of their case and its consequences, choose to let their attorneys make necessary decisions without significant personal input, especially when they trust their attorneys, the matter is complex, and their own understanding and access to legal resources is limited. Ryan is mentally capable of making a rational decision to abdicate decisions about his case to his counsel. His act of doing so does not indicate incompetence.

Based on the evidence adduced at the hearing before me (which included all the prior mental competence testing and testimony, plus the parties' experts' updated review of their past work, and Dr. Pietz's testing, observations, and testimony), there is simply no credible evidence that petitioner suffers from a mental disease, disorder, or defect which has substantially affected his ability to appreciate his position in this proceeding or to make rational decisions on his own behalf. *Holt v. Bowersox,* 191 F.3d at 974.

·I therefore conclude that during the course of this federal habeas proceeding, petitioner has had the capacity to participate and assist his counsel. He has been and remains able to advise his lawyers of his choices in prosecuting this case, and equally able to rationally choose to abdicate the decision-making to his lawyers, leaving them to raise and handle any and all legal issues without his personal involvement. Therefore, this court may now proceed to address the remaining issues of his § 2254 petition for habeas relief.

## EXHAUSTION AND PROCEDURAL DEFAULT (CLAIMS VII, VIII, IX, XIV, XV, AND XVI)

 A petitioner's procedural default may be excused if he shows cause and prejudice for the default or, alternatively, actual innocence. *See Stanley v. Lockhart,* 941 F.2d 707, 710 (8th Cir.1991) (citing *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). "Mental illness prejudices a petitioner if it interferes with or impedes his or her ability to comply with state procedural requirements, such as pursuing post-conviction relief within a specific time period." *Holt,* 191 F.3d 970, 974 (8th Cir.1999) (citing *Malone v. Vasquez,* 138 F.3d 711, 719 (8th Cir.1998)). A defendant is not competent to waive post-conviction remedies if he or she is suffering from a mental disease, disorder, or defect that may substantially affect his capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation. *Id.* (citing *Anderson v. White,* 32 F.3d 320, 321 (8th Cir.1994)); *see cf. Nachtigall v. Class,* 48 F.3d at 1080–81 (finding that even where petitioner showed

he was mentally ill at the time of his conviction, he did not show cause to support review of successive and abusive habeas claims because he presented no evidence that he was incompetent to present his claims at time he brought his first two petitions); *Stanley v. Lockhart,* 941 F.2d at 708–10 (petitioner did not show cause for failing to timely appeal state trial court's denial of postconviction relief because despite psychiatrist's diagnosis of schizophrenia and statement that petitioner "might not have been able to participate effectively in his own defense or may not have been informed enough to understand the legal time frames and the limits under which he had to file his appeal," court held psychiatrist's report was not conclusive in establishing that petitioner was incompetent at the time he should have filed his appeal).

Therefore, if during the time of the appeal and the first post conviction proceeding, Ryan was not competent to make rational decisions, he lacked the ability to knowingly and voluntarily waive his right to appellate and postconviction review of not only his competency claims (VII, VIII, and IX), but also sentencing claims XIV, XV, and XVI. See, *Holt,* supra., *Smith v. Armontrout,* 865 F.2d 1502, 1506 (8th Cir. 1988). Under such circumstances, incompetence would constitute "cause" sufficient to excuse Ryan's procedural default on those claims. However, even if Ryan was incompetent during his direct appeal and postconviction proceedings, and his incompetence was a cause sufficient to excuse his procedural default, a finding of competence at the time of his 1986 murder trial would defeat any claim that he was prejudiced by the failure to raise claims VII, VIII, and IX (the competence claims) for appellate and postconviction review.

Thus, Ryan's competence at the time of trial is relevant to determining whether Ryan was prejudiced by his failure to raise

Claims VII, VIII, and IX during direct appeal and his first post-conviction proceeding and also, if considered, the merits of Claim IX. Ryan's competence during the direct appeal and first postconviction proceeding must be assessed to determine if incompetence was the cause of his procedural default on competency claims VII, VIII, and IX, and sentencing claims XIV, XV, and XVI. Ryan's competence during the 1997 second postconviction relief proceeding is relevant to determining if he was afforded due process during the hearing where his competency to be tried in 1986 was decided. In effect, since litigation by Ryan and on his behalf has been ongoing since his 1985 arraignment, the question is whether he has ever been incompetent in any of these proceedings; if so, when, and did that incompetence prejudice him so as to excuse his procedural defaults. As more fully explained hereafter, I conclude that petitioner Michael Ryan was competent and afforded due process during all state trial, appeal and postconviction proceedings.

### Ryan's Competence to be Tried in 1986

■ I previously concluded that Ryan could not show "prejudice" resulting form his failure to appropriately raise claims VII, VIII, and IX for state appeal or postconviction review, because Judge Moran's conclusion that Ryan was competent was well-reasoned, fully supported by the record, and not subject to re-litigation in the federal. Filing 49 at p. 12–13. I now amplify that conclusion.

The issue of Ryan's competence to be tried in 1986 was not litigated until the 1997 second state post-conviction proceeding, Judge Gerald Moran presiding. Judge Moran found that Ryan was competent to be tried in 1986. See, *Ryan III,* Memorandum and Order at 66.

A habeas court's review of this decision is subject to the limitations set forth in 28 U.S.C § 2254.

[A] factual determination made by the state court, after a hearing, that is 'evidenced by a reliable and adequate written indicia' generally is entitled to a presumption of correctness by the federal habeas court. ... A state court's conclusion regarding a defendant's competency is entitled to such a presumption. The presumption does not attach to the finding, however, if 'the material facts were not adequately developed at the State court hearing,' or if 'the applicant did not receive a full, fair, and adequate hearing in the State court proceeding,' or if 'the applicant was otherwise denied due process of law in the State court proceeding.' "

*O'Rourke,* 153 F.3d at 567 (quoting 28 U.S.C. § 2254(d)(3), (6), (7)) (internal citations omitted). The inquiry in this habeas action is therefore whether Judge Moran's determination that Ryan was competent to be tried was sufficiently explained in his written judgment, supported by the record, and based on adequately developed facts derived from a full and fair hearing at which Ryan was afforded due process. If these criteria have been met, Ryan is not entitled to habeas relief absent proving that this ruling arises from an unreasonable application of clearly established federal law, or presenting clear and convincing evidence that "the factual determination by the State court was erroneous." *O'Rourke,* 153 F.3d at 569.

The petitioner claims a right to habeas relief because he was incompetent to be tried in 1986, (claim IX), his counsel was constitutionally ineffective in failing to raise petitioner's competence and request a competence hearing at the time of trial, (claim VII), the trial court's violated his rights by failing to raise the competency issue sua sponte and hold a competency hearing, (claim VIII). If the petitioner was competent to be tried, claim IX fails on the merits, and the petitioner cannot show prejudice by the failure of his attorneys or the trial judge to initiate a competency hearing.

In reaching his judgment on Ryan's trial competency, Judge Moran considered and analyzed the evidence existing at the time of the 1986 murder trial as well as the testimony and evidence adduced during the six-day second state postconviction hearing. Ryan was represented by the same highly qualified counsel representing him in this federal habeas action, and presented expert and lay testimony in support of his claim of incompetence to be tried. *Ryan III,* Memorandum and Order at 74. Judge Moran's factual bases and reasoning supporting his finding of competence were set forth in great detail in his memorandum and order. See, *Ryan III,* Memorandum and Order at 41–66. Judge Moran considered not only the evidence presented at the 1997 hearing, but Ryan's past mental health evaluations and testimony to assess his past competence, his credibility, the opinions of the experts, and his mental state at the time of trial. As the following analysis of the evidence explains, the record fully supports Judge Moran's findings.[8]

In November 1985, approximately one month after Ryan was arraigned for the murder of James Thimm, Dr. Logan met

---

8. I have attempted to compartmentalize the evidence in a somewhat chronological order, but Judge Moran's determination of Ryan's competency to stand trial was based on evidence from the 1986 trial supplemented by evidence adduced during the 1997 second postconviction hearing. Therefore, where necessary, the *Ryan I* and *Ryan III* records and testimony are discussed together to provide the full context of the evidence underlying Judge Moran's decision.

with Ryan for eight hours at the request of Louie Ligouri, Ryan's counsel, to determine Ryan's competency to stand trial and sanity at the time of Thimm's murder. Dr. Logan met with Ryan again for one and one-half hours in January 1986. Because psychological testing is administered by psychologists, Dr. Logan, a psychiatrist, did not administer any such tests. *Ryan III,* 705:22–706:3–5, 738:21–740:12. See also, T, 106:22–108:1.

According to Dr. Logan, his 1985 and 1986 evaluation revealed that Mr Ryan was introduced to the teachings of the Christian Identity Movement through Reverend Gale Wickstrom in 1982. By 1983, Ryan reported forming a group of fellow believers who lived together on a farm near Rulo, Nebraska. According to the information received by Dr. Logan, Ryan professed a belief that the "end time" was near, and that he and the members of his group had been chosen by God, referred to as Yahweh, to be part of the select group of 7000 warriors who would fight Satan at the Battle of Armageddon in the wheat fields of the Midwest. Ryan described performing the "arm test" to make routine daily decisions, with others in the Rulo group asking Yahweh questions through him. Ryan claimed he was organizing the men, not to include himself, to perform thefts, the proceeds of which funded purchases of food and weapons. Ryan professed that this theft was appropriate given the group's special status as warriors for Yahweh. Ryan explained that he gave members of the group special assignments to prepare for the Battle of Armageddon. Ryan stated that in late 1983, he first heard the voice of Yahweh gently speaking directly to him, but later this voice became part of his daily routine—a running commentary of the day's events, including how to respond to Dr. Logan's examination. *Ryan III,* 742:24–748:11, 757:2–758:1, 76322–765:11. See also, T, 113:15–120:11.

Based on the explanation provided to Dr. Logan, the murder of James Thimm occurred because Ryan received a message from Yahweh that James Thimm was lacking in faith and must be punished. Yahweh had told Ryan that the Rulo farm needed to be purified to become a holy birthplace in preparation for the immaculate birth of Lisa Havercamp's child. As part of the purification process, Ryan led the group in torturing and murdering Thimm. According to Dr. Logan, Ryan believed and advised the other group members not to worry about the outcome of punishing Thimm because Yahweh did not love Thimm and whatever happens is "the will of God." (*Ryan I,* 4218:5–22; *Ryan III,* 753:14–755:12 758:16–18; T,122:1–123:8; 124:22–25; 127:3–5). (See also testimony of Michael Ryan at *Ryan I,* 4011:13–19, 4053:2–22).

Dr. Logan asked Dr. Schulman to perform psychological testing on Ryan. In February 1986, prior to the murder trial, Dr. Schulman spent 5–6 hours administering a psychological examination which included personally interviewing Ryan and the following battery of testing: Draw–a–Person test (a screening test for psychomotor skills and evaluation of intellect); Wechsler Adult Intelligence Scale Revised, ("WAIS") (an interactive intelligence testing); Wide Range Achievement Test ("WRAT") (which tests reading ability); Suicide Probability Scale; Rorschach Test (evaluates personality through projective testing); Thematic Apperception Test, ("TAT"); Story Recall (tests memory); and Word Association test. Dr. Schulman did not readminister MMPI testing in 1986, and has done no further testing on Ryan since 1986. Dr. Schulman's examination focused on psychological testing at the request of Dr. Logan, and therefore, his interview of Ryan was somewhat abbreviated. Dr. Logan performed the more extensive interview. *Ryan I,* 4319:7–

4320:17; *Ryan III*, 28:6–30:14, 34:10–19, 35:13–38:2, 130:6–19, 625:25–726:5. See also, T:17:18–19, 20:3–21:25, 63:1–13, Exhibit 102, 1996 Schulman report.

At Ryan's 1986 trial, relying on this interview history, Dr. Logan testified that Ryan experienced auditory hallucinations, delusions, and psychosis arising from his mental illness of paranoid schizophrenia.[9] *Ryan I*, 4216:19–4219:23, 4285:6–8, 4220:2–4222:25. Dr. Logan also explained to the jury that although Ryan denied being mentally ill during his own trial testimony, (see, *Ryan I*, 3898:23–3899:14), people with paranoid schizophrenia often do not recognize that they are ill. *Ryan I*, 4225:10–4226:16. Dr. Logan explained that although Ryan likely knew that the murder of James Thimm was illegal and punishable under Nebraska law, due to his mental illness and resulting psychotic experience of hearing the voice of Yahweh directing him to torture and murder James Thimm, Ryan was obeying the commands of Yahweh in killing Thimm and could not distinguish between right and wrong. *Ryan I*, 4229:4–4230:25, 4232:2–14. (See also, testimony of Ryan at 4049:15–4053:22).

The opinions of Dr. Maurice Temerlin, Ph.D., who also testified on Ryan's behalf, were substantially in accord with those of Dr. Logan, although Dr. Temerlin expressed some uncertainty with the diagnosis. *Ryan I*, 2988:1–2991:18, 2992:25–2995:7; 3000:6–21.

Dr. Logan's diagnosis and opinions were also supported by the trial testimony of Dr. Schulman. Although Dr. Schulman did not diagnose paranoid schizophrenia in 1986, he concluded that Ryan had a paranoid personality disorder and a paranoid disorder characterized by active delusional thinking. *Ryan I*, 4321:6–4322:15, 4323:9–24. While an individual with these disorders may, under stressful situations, decompensate to paranoid schizophrenia, based on his psychological testing and extensive interviewing of Ryan, Dr. Schulman did not conclude that Ryan had schizophrenia. *Ryan I*, 4326:16–4327:6, 4328:2–18, 4330:12–18, 4332:5–10. Although Dr. Schulman reached these opinions in 1986, he stated that he was not asked in 1986 to render an opinion on petitioner's competency to stand trial, and offered no such opinion to defendant's counsel or the trial court. In fact, he provided no written report of his psychological testing until the second state postconviction hearings were initiated over ten years later. *Ryan III*, 138:19–23, 142:20–144:16, 154:23–25; T, 19:14–21:25 & Exhibit 102, 1996 Schulman report.

Dr. Logan was, however, retained to conduct "[a]n evaluation in regards to [Ryan's] competency to stand trial and insanity at the time of the offense," (*Ryan III*, Exhibit 1022, February 10, 1986 deposition of Logan at 7:22–23), and he issued a written report of his findings. (*Ryan III*, Exhibit 1024) (March 31, 1986 Logan report). Like Dr. Schulman, Dr. Logan did not advise the trial court or Ryan's counsel that Ryan was incompetent to be tried.

Two months prior to the trial, Dr. Logan testified that "[o]n the issue of competency to stand trial, [Ryan] generally had an accurate understanding of what he was charged with and the complications if he were found guilty." *Ryan III*, Exhibit 1022, February 10, 1986 deposition of Logan at 59:5–7. His later testimony explained:

> Mr. Ryan appears to fit the criteria for a mental disorder, schizophrenia paranoid type as described in DSM–III, and that condition seems to be active at present

---

9. The factual history relied on by Dr. Logan at trial is substantially identical to that relied on in both the federal and 1997 state postconviction proceedings. (compare, *Ryan I*, 4195:1–4202:25, *Ryan III*, 742:24–748:11, 757:2–758:1, 763:22–765:11, and T, 113:15–120:11).

and to have existed since at least sometime in late 1983, perhaps earlier.... [H]e has major beliefs that distort his perception of the world and influenc[e] his thinking in significant ways, both as it relates to his competency to stand trial and his sanity at the time of the offense. Whether that would be significant enough to render him incompetent to stand trial would be something a judge would need to decide, but we try to describe that in fairly concrete ways in which he might be affected.

*Ryan III*, Exhibit 1022, February 10, 1986 deposition of Logan at 60:7–19. This opinion was reached before Dr. Logan was informed of Dr. Schulman's psychological testing results. *Ryan III*, Exhibit 1022, February 10, 1986 deposition of Logan at 15:4–9.

Dr. Logan finalized the report of his conclusions regarding Ryan's insanity defense and competency to stand trial on March 31, 1986, the day that Michael Ryan began testifying (see *Ryan I*, 3737:1–3, 3839:18–24), and three days prior to Dr. Logan's testimony before the jury. *Ryan I*, 4171:1–14, *Ryan III*, Exhibit 1024, March 31, 1986 Logan report. Dr. Logan stated at the 1997 second postconviction trial, (and in this federal habeas proceeding), that he believed in 1986 that Ryan was not competent to be tried. *Ryan III*, 737:8–25; T, 132:22–25. However, his 1986 written report stated:

Mr. [Ryan], despite having a mental illness, schizophrenia, has an accurate understanding of the charges against him, the available pleas and possible penalties. He was able to describe the various procedures in his case and their meaning. He also had an appreciation of the gravity of the penalty that could be imposed if convicted. His understanding of the roles of the various officers of the court was adequate. After many hours of contact, he appears to have a workable relationship with one of his attorneys, although he still distrusts the second attorney. He can provide sufficient information regarding the events which transpired to allow his attorneys to formulate a defense. It could not be predicted how he might respond in court, but at least in several prior appearances [he] has demonstrated no unmanageable behavior. He appears to have the capacity to testify to the extent of his ability.

Mr. [Ryan], however, is still delusional. He views the trial as being ultimately in the hands of Yahweh, not in fact influenced by the judge or jury. If punishment is imposed, he would view it as coming at Yahweh's indulgence. If punishment is imposed, he would view it as a trial of God or as retribution for his own group's denial of Yahweh and not as an indication of his own personal wrongdoing in the offense of murder.

Given this significant reservation, Mr. [Ryan] otherwise would appear to have capacity to understand the charges against him and the ability to cooperate with his attorneys in the preparation of a rational defense.

*Ryan III*, Exhibit 1024 (March 31, 1986 Logan report) at p. 15. Although Dr. Logan did conclude that Ryan had schizophrenia, Dr. Logan did not state in his pre-trial deposition, report issued during trial, or trial testimony that Ryan was not competent to be tried. *Ryan III*, 738:738:1–7. Further, he never stated such an opinion to Ryan's trial counsel until after the trial was over. *Ryan III*, 505:18–25; 523:4–16, 620:4–6.

Dr. Logan's diagnosis of schizophrenia was challenged at trial by Dr. Emmet Kenney, M.D., a psychiatrist who testified on behalf of the State. Dr. Kenney evaluated Ryan and concluded he was not mentally ill and was able to understand and appreciate his actions and their conse-

quences. Dr. Kenney further explained that even those with schizophrenia are often still aware of and accountable for their actions. *Ryan I*, 4408:19–4409:9. Dr. Kenney concluded that Ryan did not have any mental illness, understood the nature and extent of his actions when he murdered James Thimm, understood that what he was doing was wrong, and exhibited no evidence of psychosis. *Ryan I*, 4470:17–25, 4479:4–4483:18.

The issue of trial competence was first raised in Ryan's 1996 second state post-conviction motion for relief. Between 1986 and 1996, neither Dr. Logan nor Dr. Schulman had contact with Ryan or any counsel acting on his behalf. In preparation for the 1997 hearing on the second postconviction motion, Dr. Schulman was retained to address the issue of whether Michael Ryan was competent in 1986 to be tried. *Ryan III*, 130:6–23. His testimony at that hearing focused on the process, purpose, and results of his 1986 psychological testing of Ryan, and the meaning of those results in the context of Ryan's competency.

Based on the 1986 testing data, Dr. Schulman testified that Ryan was not competent to stand trial. *Ryan III*, 134:23–135:6. Despite this conclusion, Dr. Schul-man testified that Ryan was able to provide for his own basic human needs, respond coherently to questions, and follow directions. According to Dr. Schulman, by 1997 standards, Ryan's 1986 mental state would be treated on an outpatient basis. *Ryan III*, 145:19–146:8, 151:15–24.

Although Dr. Schulman had testified in 1986 that he could not reach a diagnosis of schizophrenia, at the 1997 hearing Dr. Schulman testified that Ryan had "schizophrenia, paranoid type," the same diagnosis reached by Dr. Logan. *Ryan I*, 4328:2–18, 4332:5–10; *Ryan III*, 129:7–13, 135:7–18, 142:13–19. Between the time of initial testing in 1986, and until offering his testimony in 1997, Dr. Schulman performed no further testing on Ryan. His change in diagnosis, and the findings of psychosis expressed in his 1997 testimony, arose from re-examining the 1986 testing material "more thoroughly and from a different perspective." *Ryan III*, 148:16–149:4.[10] While Dr. Schulman's 1997 testimony coincided with Dr. Logan's diagnosis of schizophrenia, Dr. Schulman asserted that his conclusion was derived independently of Dr. Logan's and through different evaluative techniques.

---

10. Of note, despite Dr. Schulman's definitive statement that Ryan had "schizophrenia paranoid type" when testifying before Judge Moran in 1997, this Axis I diagnosis was not stated with any certainty in Dr. Schulman's 1996 report prepared for that proceeding. T, Exhibit 102, 1996 Schulman report. Dr. Schulman testified in 1997 that he formed his schizophrenia diagnosis when the testing was completed in 1986, but his 1986 testimony contradicts that statement, (*Ryan I*, 4328:2–18, 4332:5–10), as does his 1996 report. The diagnostic impressions outlined in the 1996 report references schizophrenia as a possible diagnosis that should be "ruled out," but reaffirms the diagnosis expressed by Dr. Schulman at Ryan's trial ten years earlier by stating:

> To be ruled out at the time of the examination, is whether or not this patient is suffer-

ing from schizophrenia, paranoid type. At the present time, under present diagnostic criteria, one might think about this as being a delusional disorder.

(T, Exhibit 102, 1996 Shulman report, at p.3).

During the second post-conviction hearing, the State objected to Dr. Schulman reading his report as he testified during the trial. Dr. Schulman's psychological examination report (presumably the same report received as exhibit 102 in this habeas proceeding) was marked as exhibit 1033 and used by him extensively to "refresh his recollection" while testifying, but was not offered and received into evidence. Dr. Schulman did not read or reference in his testimony the portion of the report setting forth his diagnostic impressions. *Ryan III*, 30:2–32:3, 154:23–25.

Dr. Logan's diagnosis of schizophrenia was derived from interviewing Ryan, and performing a psychiatric evaluation of Ryan in the context of information obtained from interviewing family members and others, as well as from documentary sources of background information, all prior to the 1986 trial. No further evaluation of Ryan was performed by Dr. Logan prior to his 1997 testimony before Judge Moran. *Ryan III,* 719:5–721:22 & Exhibit 1024, March 31, 1996 Logan report, at p. 2–3. See also, T, 106:22–108:1. Dr. Logan's 1986 competency determination was discussed in his 1986 report (*Ryan III,* Exhibit 1024, March 31, 1996 Logan report—previously quoted herein at p. 21–22), and no additional report was referenced or offered during the proceedings of *Ryan III.*

In 1997 Dr. Logan testified that Ryan's paranoid schizophrenia resulted in delusional thinking that "undoubtedly" affected his perception of the trial for the murder of James Thimm. *Ryan III,* 786:4–8. Dr. Logan acknowledged that in 1986, he believed Ryan had an accurate understanding of the charges against him and the available pleas and possible penalties; had an appreciation of the gravity of the penalty that could be imposed if convicted; had a workable relationship with at least one of his attorneys; had provided sufficient information regarding the events that transpired in order to formulate a defense; and sat passively through the proceedings without interrupting the trial or demonstrating conduct that would prejudice his case. *Ryan III,* 806:23–808:22 & Exhibit 1024 (March 31, 1996 Logan report).

Nonetheless, Dr. Logan opined in 1997 that Ryan's paranoid schizophrenia, and the delusions, hallucinations, and psychosis arising from that disease, rendered Ryan not only insane at the time of the murder, but also incompetent to be tried in 1986. *Ryan III,* 790:24–791:7. According to Dr.

Logan, Ryan was experiencing active and ongoing hallucinations that God, or Yahweh, was audibly speaking to him and providing him with instructions on how to conduct his daily life, including how to respond to the issues raised during his trial. Dr. Logan concluded that Ryan was delusional in believing he could hear the voice of Yahweh directing his life, and that any punishment he received, including execution, would be for the lack of faith by those on the Rulo farm, and not for his own moral and legal culpability in killing James Thimm. *Ryan III,* 749:19–750:11, 758:24–759:138, 760:14–761:20.

In addition to testimony of experts, Judge Moran received evidence of Ryan's personal participation in his 1986 trial and the first state postconviction proceeding. That evidence supported his finding that Ryan took an active role in his defense and was able to follow the advice of his counsel.

First, Ryan's experienced counsel at trial and his first postconviction proceeding believed Ryan was competent. According to his attorneys, Ryan expressed full knowledge of the trial and proceedings, could provide detailed information, advised his counsel when he believed they or other witnesses were incorrect, and was clearly able to provide assistance to his attorneys. Ryan took copious and accurate notes during his trial, and provided those notes to his counsel at the end of each trial day. His conduct during trial was well mannered. *Ryan III,* 447:10–448:17, 472:10–473:20, 525:11–526:12, 541:13–547:19, 548:3–25, 612:25–622:6.

Second, prior to trial and after being warned that his statements were not confidential, Ryan followed the advice of his counsel by refusing to respond to questioning by the State's psychiatric expert, Dr. Kenney, about his involvement in the events surrounding the torture and death

of James Thimm. *Ryan I*, 4466:9–22, 4473:9–15; *Ryan III*, 802:2–11.

Third, Ryan attended the non-expert depositions prior to his trial, taking notes throughout. After speaking with his son and trial counsel, Ryan stated that he wanted a joint trial with his teenage son, Dennis Ryan, so he could assist his son at the trial. *Ryan III*, 376:2–381:11, 610:25–612:11.

Fourth, Ryan attempted to avoid execution by convincing Dennis Ryan to lie on the witness stand during that joint trial by refuting the testimony of others from the Rulo farm and blaming them for the acts that led to the death of James Thimm. *Ryan III*, 376:2–381:11, 610:25–612:11.

Based on the *Ryan I* and *Ryan III* records, Judge Moran found that the competency opinions offered by Dr. Logan and Dr. Schulman were not credible, especially since these opinions had not been stated by either expert in 1986 even though each expert had an opportunity to do so. *Ryan III*, Memorandum and Order at 61–65. Judge Moran further noted that the attorneys present throughout Ryan's trial, appeal, and first post-conviction proceeding believed Ryan was competent. *Ryan III*, Memorandum and Order at 61, 65–66. Finally, and most persuasive to Judge Moran, was the evidence of petitioner's attempt to avoid execution by successfully urging sixteen-year-old Dennis Ryan to lie on the witness stand and downplay his father's personal role in the death of James Thimm. (*Ryan III*, 376:2–381:11). This evidence alone was sufficient to convince Judge Moran that Michael Ryan was fully aware of the gravity of the charges against him, the possible punishment he was facing, and that he was competent and participating in the trial proceedings. *Ryan III*, Memorandum and Order at 56–58.

■ Due process prohibits the trial and conviction of a defendant who is mentally incompetent, but absent some contrary indication, trial judges may presume that defendants are competent. *Jimenez–Villasenor*, 270 F.3d at 559. The burden of persuasion rested with Ryan to show by a preponderance of the evidence that he was incompetent to stand trial, (*id.*), and the test is whether the defendant had "a sufficient present ability to consult his lawyer with a reasonable degree of rational understanding—and whether the defendant had a rational as well as factual understanding of the proceedings against him." *Id.* (citing *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)).

Consistent with the *Dusky* standard, Judge Moran considered whether Ryan was able to understand the nature and object of the proceedings, comprehend his own condition with reference to those proceedings, and assist in a rational defense. See, *Ryan III*, Memorandum and Order at 53. Judge Moran ruled that Ryan was competent to stand trial in 1986. This judgment was fully supported by the record, affirmed on appeal, (*Ryan III*, 257 Neb. 635, 601 N.W.2d 473 (1999)), and is "entitled to a presumption of correctness by the federal habeas court." *O'Rourke*, 153 F.3d at 567. Ryan has produced no "convincing evidence that the factual determination by the State court was erroneous," and has failed to rebut the presumption of correctness. *Ford*, 256 F.3d at 788; *O'Rourke*, 153 F.3d at 569.

Even absent the "presumption of correctness," the evidence elicited during the federal evidentiary hearing, including additional testimony from Dr. Logan and Dr. Schulman, serves to further support Judge Moran's finding that "the trial judge and the attorneys did not overlook the issue of [Ryan's] incompetency; there simply *was* no issue of incompetency." *Ryan III*,

(Memorandum and Order at 45) (emphasis in original).[11]

Ryan's competence claims, VII, VIII, and IX, were not raised on direct appeal or during the petitioner's first state postconviction motion. Filing 1, ¶¶ 54, 60, and 64. Since Ryan was competent to be tried in 1986, he cannot successfully assert prejudice with reference to habeas claim VII (counsel's failure to request a competency hearing), claim VIII (the court's failure to hold a competency hearing), or claim IX (being tried while incompetent). These claims are procedurally defaulted.

### Ryan's Competence on Appeal, and During the First State Postconviction Proceeding

Ryan argues that incompetence at the time of his appeal and first postconviction proceeding is sufficient to excuse his failure to raise claims VII, VIII, IX, XIV, XV, and XVI. I previously made no finding regarding whether Ryan was incompetent during these stages of his litigation.

Mental incompetency may constitute cause for Ryan's failure to raise appeal and postconviction claims if he proves that, during time periods when he could have pursued appeal or post-conviction relief, mental illness interfered with his ability to appreciate his position and make rational decisions regarding his case. *Holt,* 191 F.3d at 974.

I have concluded that Mr. Ryan was competent during these federal habeas proceedings, and based on my independent review of the record, I concur with Judge Moran's decision that he was competent in 1986. The petitioner's experts acknowledge that Ryan's mental state has remained virtually unchanged since before James Thimm's murder to the present. T, 53:21–54:6, 149:2–14. Having reviewed the evidence in this vast record, along with the additional evidence received in this proceeding, I conclude that Ryan has no mental illness or mental disorder rendering him incompetent. I further conclude that he has been competent during all stages of his litigation, from the present and dating back to his initial arraignment.

I therefore conclude that incompetency was not a cause for Ryan's procedural default of Claims VII, VIII, IX, XIV, XV, and XIV. Accordingly, petitioner has procedurally defaulted on Claims VII, VIII, IX, XIV, XV, and XIV, and those requests for habeas relief should be denied.

### MERITS OF CLAIMS I through VI, X through XIII, and XVII

#### *STANDARD OF REVIEW*

I have previously found that Ryan is not procedurally defaulted from raising claims I through VI, X through XIII, and XVII. See filing 49, August 22, 2000 Memorandum and Order. This finding was sustained by Judge Kopf. See filing 74, December 29, 2000 Memorandum and Order. The merits of these claims must therefore be reviewed in accordance with the terms of the Antiterrorism Effective Death Penalty Act ("AEDPA").

---

11. The purpose of the habeas evidentiary hearing was not to determine petitioner's competence at trial, but to determine his present competence, his competence (and its implication on his due process rights) during the 1997 second postconviction proceeding, and whether incompetence excused the procedural default of claims he failed to raise on direct appeal or in the first state motion for postconviction relief. I recognize that, assuming Ryan was competent during the 1997 hearing, permitting an expanded hearing on petitioner's competence at trial may not comport with the present provisions of Section 2254; nevertheless, since the competency claims and evidence overlapped significantly, and because it is more efficient in this type of habeas litigation to make a complete record, even if some of it must later be disregarded, I received evidence on Ryan's competence from the time of arraignment to present.

Petitioner filed his original habeas petition in this court on November 17, 1995, *see Ryan v. Hopkins*, 4:CV95–3391, filing 1, which was well before the enactment of AEDPA. Although I have concluded that the present habeas petition is merely a continuation of petitioner's first petition because the latter had not been adjudicated on the merits, *see* filing 49, that does not mean that the pre-AEDPA standards apply. The Eighth Circuit has held that the AEDPA's provisions apply to all petitions filed after the act's effective date, "even when a prisoner's original petition was filed prior to AEDPA's effective date and [was] dismissed without prejudice for failure to exhaust state remedies."[12] *Weaver v. Bowersox*, 241 F.3d 1024, 1029 (8th Cir.2001) (citing *Barrientes v. Johnson*, 221 F.3d 741, 751 (5th Cir.2000); *Mancuso v. Herbert*, 166 F.3d 97, 101 (2d Cir.1999)). Because the present petition was clearly filed after AEDPA's effective date, the new standard of review applies.[13]

Under the provisions of the AEDPA, a federal court is bound by the state courts' findings on questions of fact unless the state court made a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d)(2) (West Supp.2001). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness

by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1) (West Supp.2001).

Section 2254(d)(1) states that a federal court may not grant a writ of habeas corpus unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1). As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Id.* at 399, 120 S.Ct. 1495. I apply these standards in considering petitioner's claims.

### MERITS

#### *Claim I Trial Judge Turning His Back During Petitioner's Testimony*

In this claim petitioner argues that he was denied his due process right to a fair trial when the trial judge turned his back to him in the presence of the jury during at least one third of his seven-hour testimony. Specifically, petitioner contends that such action communicated to the jury that the court despised the petitioner, did not believe his insanity defense, and

---

**12.** Petitioner's habeas claim is not considered a second or successive petition. See, *Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (applying AEDPA, habeas petition filed after initial petition was dismissed for failure to exhaust state remedies is not a "second or successive petition.")

**13.** Petitioner argues in his brief that because I had concluded that the present habeas petition is a continuation of his first petition, the pre-AEDPA section 2254(d) "applies in its entirety to this case." While that may have

been the case at the time petitioner submitted his brief on the merits, which was December 6, 2000, in light of the *Weaver* decision, that position is incorrect. I must note, however, that my conclusion that the present petition is the continuation of the first petition, filing 49, is not affected by *Weaver*. The Eighth Circuit held in *Weaver* that " 'whether a petition' is a 'second or successive' application under the AEDPA is an entirely different question' than whether AEDPA applies to a petition filed after the Act's effective date." *Weaver*, 241 F.3d at 1029 (citations omitted).

agreed with the prosecution's argument that petitioner was faking his insanity. In respondent's answer, the State admits that petitioner raised and exhausted this claim in the state courts. Filing 13, ¶ 13. It is properly before this court for habeas review.[14]

The Due Process Clause guarantees a state criminal defendant the right to a " 'fair trial in a fair tribunal' with an impartial court." *Bracy v. Gramley,* 520 U.S. 899, 904, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997).

> There is no question that the law on judicial bias is clearly established: a criminal defendant is constitutionally required to be tried before an impartial judge, and the likelihood or appearance of bias, even in the absence of actual bias, may prevent a defendant from receiving a fair trial.

*Kinder v. Bowersox,* 272 F.3d 532, 540 (8th Cir.2001)(citing *Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974); *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)). The Supreme Court has often cautioned about the impact a trial judge may have on a jury and its fact-finding function. The Court has stated that "[t]he influence of the trial judge on the jury 'is necessarily and prop-

erly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.' " *Quercia v. United States,* 289 U.S. 466, 470, 53 S.Ct. 698, 77 L.Ed. 1321 (1933)(quoting *Starr v. United States,* 153 U.S. 614, 626, 14 S.Ct. 919, 38 L.Ed. 841 (1894)). The Eighth Circuit has recognized that by reason of the judge's role, the judge is a figure of influence whose every change in facial expression and word is attentively noted by a jury. *Rush v. Smith,* 56 F.3d 918, 922 (8th Cir.1995)(held new trial warranted on § 1983 excessive force claim where trial court's comments implied that plaintiff and witnesses testified consistently out of racial solidarity).

Federal courts, however, will not review challenges to judicial misconduct by a state judge unless it has "infringe[d] upon a specific constitutional right or [was] so prejudicial that [it] den[ied] due process." *Harris v. Lockhart,* 743 F.2d 619, 620 (8th Cir.1984)(citing *Rhodes v. Foster,* 682 F.2d 711, 714 (8th Cir.1982); *Maggitt v. Wyrick,* 533 F.2d 383, 385 (8th Cir.), *cert. denied,* 429 U.S. 898, 97 S.Ct. 264, 50 L.Ed.2d 183 (1976)). "The record must either 'disclose actual bias on the part of the trial judge or leave the reviewing court with an abiding

---

**14.** Under Nebraska rules of appellate practice, to be considered by an appellate court, a claimed prejudicial error must not only be assigned, but must be discussed in the brief of the asserting party. *Brewer v. Brewer,* 244 Neb. 731, 733, 509 N.W.2d 10, 12 (1993). A criminal conviction will not be set aside on appeal unless the defendant meets his burden of showing that the error claimed created not merely a possibility of prejudice but, rather, that it worked to his actual prejudice. *State v. Gore,* 212 Neb. 287, 290, 322 N.W.2d 438, 440 (1982).

Ryan's appellate brief merely asserted that he was denied a fair trial because the trial judge turned his back to Ryan during his testimony, thereby signaling the jury to disbelieve Ryan's defense. Neither the appellate

brief nor the trial court record, however, advised the Court that Ryan's testimony (and the significant admissions therein) was offered to prove insanity, nor how the trial judge turning his back during defendant's testimony influenced the outcome of that issue. Thus, Ryan's claim of prejudice may not have been asserted with the specificity required under Nebraska's procedural law. However, the Nebraska Court chose to discuss it, and the State has alleged that Ryan exhausted his state court remedies on this claim, (filing 13 at p.3), thereby waiving any procedural defense to reviewing the merits in this habeas action. *Travis v. Lockhart,* 925 F.2d 1095, 1097 (8th Cir.1991). Therefore, it is now properly before the court for habeas review.

impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality.' " *Warner v. Transamerica Ins. Co.*, 739 F.2d 1347, 1351 (8th Cir.1984)(quoting *United States v. Singer*, 687 F.2d 1135, 1141 n. 10 (8th Cir.1982)). A court should be slow to set aside a conviction for alleged judicial misconduct " 'unless it appears that the conduct was *intended* or *calculated* to disparage [a party] in the eyes of the jury *and to prevent* the jury from exercising an impartial judgment upon the merits.' " *Rush*, 56 F.3d at 922 (quoting *La Barge Water Well Supply Co. v. United States*, 325 F.2d 798, 802 (8th Cir.1963))(emphasis added).

The Supreme Court has noted a "judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person." *Liteky v. U.S.*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). A judge may, during the course of the trial, learn of an "obscure religious sect, and acquire[ ] a passionate hatred for all its adherents." *Liteky*, 510 U.S. 540, 550, 114 S.Ct. 1147 (1994). However, the judge is not deemed partial and thereby incapable of administering a fair trial because he or she, on the basis of the evidence, forms an opinion, unless the judge "displays a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555, 114 S.Ct. 1147.

> [J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a

high degree of favoritism or antagonism as to make fair judgment impossible. *Id.*

■ Therefore, in determining the prejudicial effect of a judge's conduct or comments, the court must balance the nature and seriousness of the alleged misconduct against the context in which it occurred to determine whether the conduct or comments "adversely affected the overall fairness of the trial." *Kinder*, 272 F.3d at 538 (citing *Walker v. Bishop*, 408 F.2d 1378, 1382 (8th Cir.1969); *United States v. Bland*, 697 F.2d 262, 265 (8th Cir.1983)). On Ryan's direct appeal of his conviction and sentence, the Nebraska Supreme Court held that Ryan had not been prejudiced by the trial judge's conduct of turning his back to the jury. *Ryan I*, 233 Neb. at 122, 444 N.W.2d at 641. This decision provided the basis for that Court's denial of state postconviction relief in *Ryan II* and *Ryan III*. See, *Ryan II*, 248 Neb. at 460, 534 N.W.2d at 800; *Ryan III*, 257 Neb. at 658, 601 N.W.2d at 491.

■ Under the facts developed in this case I conclude that the decisions of the Nebraska Supreme Court do not constitute an "unreasonable application" of clearly established federal law as determined by the United States Supreme Court, nor that its decisions were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

First, none of the Nebraska Supreme Court's rulings in *Ryan I*, *Ryan II*, or *Ryan III* "directly contradicts Supreme Court precedent" or "reaches a result opposite to a result reached by the Supreme Court on 'materially indistinguishable' facts." *Kinder*, 272 F.3d at 538. An "unreasonable application" of the law is not the same as an incorrect application. *Kinder*, 272 F.3d at 538 (citing *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 150

L.Ed.2d 9 (2001)). Under AEDPA, "[t]he state court's application might be erroneous, in our 'independent judgment,' yet not 'unreasonable.'" *Id.* (quoting *Williams v. Taylor,* 529 U.S. at 411, 120 S.Ct. 1495).

Petitioner argues that the Nebraska court's harmless error analysis incorrectly focused on the evidence of his participation in the murder of James Thimm when the real issue was his insanity.[15] He states that trial counsel did not put him on the stand to refute his participation in the events leading to the murder. In fact, adds the petitioner, he, for the most part, admitted his participation in such events during his testimony. Petitioner argues that the only reason his attorney asked him to testify was to give the jury "a first-hand impression of his mental illness" and that by turning his back, the trial judge put into question the credibility of his testimony and ratified the State's position that he was feigning insanity.

Ryan testified at trial for two reasons: 1)his counsel believed the testimony would be persuasive on the insanity defense; and, 2) to support a claim that someone else killed James Thimm, that is, others who testified had lied about Ryan's involvement in James Thimm's death. *Ryan II,* 203:10–19, 339:18–341:7. Ryan's counsel thought Ryan's fervent belief that Yahweh was telling him to do everything on the Rulo farm "was something that ought to be conveyed to the jury," and was totally consistent with the testimony of his mental health experts. *Ryan II,* 205:4–25. In addition, Ryan had presented his counsel with extensive notes taking exception to the trial testimony of other witnesses and expressing his desire to "get the truth out" to the jury. *Ryan II,* 2071–10.

Ryan's testimony was consistent with these stated purposes. Much of Ryan's testimony was devoted to stating that he was not personally involved in the acts which led to James Thimm's death, and that others had lied to the jury in blaming him for those acts. He explained his religious beliefs and how those beliefs arose to the jury. As he explained the details of the torture inflicted on James Thimm, he testified that acts he witnessed, committed, and permitted others to commit were approved by Yahweh, with Yahweh's approval conveyed to Ryan through the arm test. *Ryan I,* 3960:13–4108:17. This belief was consistent with the testimony of Ryan's mental health experts who stated that Ryan was delusional, psychotic, and legally insane when the murder occurred.

The record establishes that the trial judge did turn his back to Ryan during the particularly graphic portions of Ryan's testimony. *Ryan I,* 1332:21–1333:5; *Ryan III,* 83:14–84:10. No objection was made to this conduct at the trial. At the close of the evidence, the jurors were instructed that they were the "sole judges of the credibility of the witnesses and the weight to be given to their testimony." *Ryan I,* transcript at p. 282. The jury was also instructed:

> You must not construe any statements, *actions* or rulings of the Court in the trial of these cases, nor any of the inflections of the voice in reading these instructions, as reflecting an opinion of the Court as to how this case should be decided.

> .　　.　　.　　.　　.

> The law does not permit me to comment on the evidence, and I have not intentionally done so. If it appears to you that I have so commented, either during the trial or the giving of these instruc-

---

15. I note that this alleged mis-focus by the Nebraska Supreme Court can be attributed to the ambiguity of Ryan's brief on direct appeal. See footnote 14.

tions, you must disregard such comment entirely.

*Ryan I*, transcript at p. 252 (emphasis added). During deliberations, the jury requested the transcribed testimony of *all* the psychologists and psychiatrists who testified, and an opportunity to again hear the cross-examination of Dennis and Michael Ryan. *Ryan I*, transcript at p. 287, 294 (emphasis in original). These requests were fully accommodated. *Ryan I*, transcript at p. at 291–92, 2940.

Following the guilty verdict and sentencing, at the motion for new trial, Ryan's primary trial counsel, Richard Goos, raised for the first time a claim that Ryan was denied a fair trial because the trial judge turned his back to Ryan while testifying. Mr. Goos stated that he did not object because he "wasn't paying that much attention," but was informed by others that it occurred and, at the time of the motion for new trial, estimated that it occurred for fifty percent of Ryan's testimony. The prosecuting attorney responded by noting that this conduct by the trial judge occurred with reference to prosecution witnesses, but could not recall seeing the judge turn his back during Ryan's testimony. *Ryan I* (proceedings) [16], 1332:6–20, 1333:6–1334:5.

When this issue was raised to the Nebraska Supreme Court on direct appeal, petitioner argued that, by virtue of the trial judge turning his back to Ryan while he testified, the jury was "told not to believe Defendant's testimony, rendering

his trial fundamentally unfair...." *Ryan II*, Exhibit 3, appellate brief of Michael Ryan at p. 59. The Nebraska Supreme Court held:

> The fact that the trial judge turned away from the defendant in an attempt to hide his expressions from the jury while the defendant described, in detail, the atrocities of his crime was inappropriate, but does not constitute prejudicial error in this case. There are cases when such conduct by a judge might constitute prejudicial error in a criminal trial, but in this case, where the evidence of defendant's guilt is so overwhelming,[17] we hold that the trial judge's actions did not constitute reversible error. It would have been better had the judge observed all witnesses while they testified about the sickening events, as the jury was required to do, but the judge's conduct does not constitute prejudicial error in this case. If it be considered that defendant is attacking the judge's conduct as affecting the guilt-innocence portion of the trial, there are separate reasons why that conduct does not require reversal of this cause on that issue.

*Ryan I*, 233 Neb. at 122, 444 N.W.2d at 641.

Ryan filed a motion for state postconviction relief which alleged ineffective assistance of counsel in that his trial attorney did not timely object to the trial judge's conduct of turning his back to the jury during Ryan's testimony. During the first

---

**16.** The arguments at the motion for new trial cited herein are located in Volume VI of the blue-covered "proceedings" volumes of *Ryan I.*

**17.** The wording of this phrase is unfortunately puzzling, for it is not clear whether the Court intended "guilt" to refer to the evidence of petitioner's factual involvement in the acts causing the victim's death, or on the other hand, to refer to a legal interpretation of

"guilt" which would include rejection of petitioner's insanity defense. The evidence using the former interpretation was truly "overwhelming." The evidence using the latter interpretation, however, in my opinion, was not. This ambiguity therefore raises the question of whether the Nebraska Supreme Court did in fact limit its consideration of this issue to only an assessment of the evidence of petitioner's involvement in the murderous acts.

postconviction motion hearing, which occurred seven years after the trial, Mr. Goos testified that Judge Finn turned his back to Ryan "for about one-third of the man's testimony and he did it to no other witness, and it was very graphic and it was deliberate." *Ryan II*, 480:4–16. During the trial Ryan was seated to the left of the judge, and immediately in front of the jury. His counsel was seated in a position "towards the end of the row" and could observe the jurors through the course of the trial. According to Mr. Goos, when the judge turned his chair to the window, Ryan was silhouetted against the high back of the chair. *Ryan II*, 283:13–20, 480:20–481:2. Mr. Goos stated he "was quite aware of it" when this conduct occurred, and that others in the courtroom asked him why the judge was doing this. Mr. Goos acknowledged that he did not make a record of how often, for how long, or during what portions of the testimony this conduct occurred. *Ryan II*, 481:8–15.

Judge DeWayne Wolf, who presided over this proceeding, held:

> Defendant's counsel raised this issue on motion for new trial and the judge explained that he turned away from the jury so the jury would not see his reaction to the testimony about the defendant forcing a shovel handle up the victim's rectum.
>
> The Nebraska Supreme Court addressed this complaint on direct appeal. That court said "there are cases where such conduct by a judge might constitute prejudicial error, but in this case, where the evidence of defendant's guilt is so overwhelming, we hold that the trial judge's actions do not constitute reversible error."
>
> Unless it would reasonably appear the appellate decision would have been different had the objection been made earlier, there is no basis for the claim of ineffective assistance of counsel on this ground.

*Ryan II*, Memorandum and Order at p. 74.

On appeal from that order, Ryan did not articulate that the judge's conduct prejudicially impacted the defendant's insanity defense. Citing Goos' testimony, Ryan argued that the judge's conduct told the jury that the presiding judge was biased and could not "stand" or "stomach" Ryan. See, *State of Nebraska v. Ryan*, Case No. 94–207, appellant's brief at pp. 108–118. The Nebraska Supreme Court noted that it had already, on direct appeal, considered the issue of whether the trial judge's conduct of turning away from the defendant during his testimony denied Ryan's right to a fair trial. Having previously held that the judge's conduct did not constitute prejudicial error, the Supreme Court denied Ryan's motion for postconviction relief alleging that defendant's counsel was ineffective for not objecting to the conduct. *Ryan II*, 248 Neb. at 460, 534 N.W.2d at 800.

In Ryan's second state postconviction motion, he attempted to re-define the claim by asserting that the judge's conduct of turning his back to Ryan was part of the cumulative judicial misconduct that denied Ryan a fair trial on the insanity defense. The second postconviction hearing provided no further information of the extent or timing of Judge Finn's conduct. Judge Randall Rehmeier, who at the time of the 1986 trial was one of the prosecutors for the state, testified that he recalled the trial judge, Judge Finn, "turning at an angle away from Mr. Ryan" during his testimony. *Ryan III*, 697:23–698:3. Judge Finn testified that this probably occurred to some extent with every witness, but he had no recollection of it occurring during one-third to one-half of Ryan's testimony. *Ryan III*, 84:6–10, 84:24–85:4.

Ryan argued that "[d]ue to the conflicting expert testimony presented at trial, Mr. Ryan's trial counsel determined that the best evidence to support the insanity defense was the testimony of Ryan himself." *State of Nebraska v. Ryan,* Case No. 97–1035, appellant's brief at p. 36. "Throughout this crucial testimony, when the jury had its first real opportunity to examine Mr. Ryan to determine whether Mr. Ryan was insane, Judge Finn turned his back to Mr. Ryan." *Id.* This claim was denied.

On appeal of this second postconviction determination, the Nebraska Supreme Court did not reconsider the prejudicial impact of the judge's conduct as it related specifically to Ryan's insanity defense. The Court held:

> Ryan cannot raise the issues that counsel litigated on direct appeal concerning the impact of Judge Finn's turning his back during Ryan's testimony simply by rephrasing this as being cumulative judicial misconduct.

*Ryan III,* 257 Neb. at 658, 601 N.W.2d at 491.

The Nebraska Supreme Court held on direct appeal that the record overwhelming supported the jury's conclusion that Ryan had committed acts leading to James Thimm's death, and the judge's alleged conduct did not prejudice Ryan's right to a fair trial on the issues of guilt or innocence. *Ryan I,* 233 Neb. at 122, 444 N.W.2d at 641. The court further held that, on the "guilt-innocence portion of the trial, there are separate reasons why that conduct does not require reversal of this cause on that issue." *Id.* The Court did not explain the "separate reasons" it considered in affirming Ryan's conviction.

Ryan bears the burden of proving by clear and convincing evidence that the state courts' decisions were contrary to clearly established federal law or were based on an unreasonable factual determi-nation. 28 U.S.C. § 2254(d) & (e)(1). He has not met this burden.

Ryan was constitutionally entitled to a jury determination of his insanity defense unaffected by prejudicial judicial misconduct. However, determining what constitutes judicial misconduct sufficient to prejudice the defendant's rights requires closely analyzing the seriousness of the court's conduct; the weight of the evidence in support of the jury's verdict; and the trial court's instructions or other attempts to cure any prejudice. See, e.g., discussion and cases cited in *Nature and Determination of Prejudice Caused by Remarks or Acts of Federal Trial Judge Criticizing, Rebuking, or Punishing Defense Counsel in Criminal Case as Requiring New Trial or Reversal,* 178 A.L.R. Fed. 381 (2002); *Gestures, facial expressions, or other nonverbal communication of trial judge in criminal case as ground for relief,* 45 A.L.R. 5th 531 (1997). "[E]ach case of allegedly prejudicial comments made by the trial judge 'must turn on its own circumstances.'" *Rush,* 56 F.3d at 922 (quoting *United States v. Singer,* 710 F.2d 431, 436 (8th Cir.1983)(en banc)).

The Nebraska Supreme Court's determination that Ryan was not denied a fair trial by the trial judge turning his back to Ryan, while perhaps ambiguous, does not directly contradict Supreme Court precedent. The determination is also not inconsistent with a result reached by the Supreme Court or the circuits on materially indistinguishable facts. *Kinder,* 272 F.3d at 538 (citing 28 U.S.C § 2254(d)(1)).

Further, Ryan has failed to show that the Nebraska Court's decisions were "based on an unreasonable determination of the facts in light of the evidence presented" in the state courts. 28 U.S.C § 2254(d)(2), for three reasons.

First, the record contains no specific and credible evidence to assess the severity of the trial judge's conduct. After the trial and during the motion for new trial, defendant's counsel admitted he was not "paying attention" but was reporting what others had noticed, and stated that Judge Finn turned his back to Ryan during half of his testimony. The prosecutor did not recall seeing this conduct. *Ryan I* (proceedings)[18], 1332:6–20, 1333:6–1334:5. Ryan has not explained how the conduct of a trial judge turning his back to the defendant's testimony could deliver a clearly prejudicial message to the jury, while the same conduct did not capture the attention of either the defendant's counsel or the prosecutor during the trial.

By the time of the first state postconviction proceeding seven years later, defendant's counsel testified that he was "quite aware of" this "very graphic" and "deliberate" conduct by the trial judge during one-third of Ryan's testimony, that others had also brought it to his attention during the trial, and that he nonetheless failed to object. *Ryan II*, 480:4–16. At the second state postconviction proceeding, the prosecutor recalled that Judge Finn turned at an angle to Ryan during his testimony, and Judge Finn admitted turning his back to witnesses (not just Ryan), but the severity of this conduct remained in dispute. *Ryan III*, 84:6–10, 84:24–85:4, 697:23–698:3.

This record presents insufficient factual support for a claim of judicial misconduct warranting habeas relief. Ryan was seated immediately to the left of the trial judge while being questioned by the prosecutor and defense counsel. Ryan's counsel, Mr. Goos, is the source of information concerning the extent of Judge Finn's conduct in turning his back to Ryan while testifying. Mr. Goos' statements at the motion for new trial raise serious doubts as to whether he testified in *Ryan II* on the basis of his personal observation of Judge Finn's conduct (rather than relying on what others had told him), and whether he could accurately recall the extent and impact of this conduct. Under such circumstances, the Nebraska courts would not be unreasonable in concluding that Ryan had failed to prove prejudicial misconduct by Judge Finn.

Second, the jury specifically requested an opportunity to review the testimony of the mental health experts. This confirms that it did not overlook its obligation to consider the evidence submitted on the insanity defense in deciding the case.

Third, the jury was instructed that it was the sole judge of the credibility of the witnesses and to disregard any conduct or comment by the judge in performing that function. "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton v. U.S.*, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). However, absent such circumstances or direct evidence to the contrary, it is presumed that jurors have followed court's instructions and determined the case on the evidence properly before it. *Tunstall v. Hopkins*, 306 F.3d 601, 609 (8th Cir. 2002) (citing *Jones v. United States*, 527 U.S. 373, 394, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999)) (denying habeas claim of unfair trial where juror was seen reading newspaper during trial, but jury had been admonished to avoid exposure to media coverage regarding the case).

The jurors for Ryan's trial were instructed on their obligation to decide the

---

18. The arguments at the motion for new trial cited herein are located in Volume VI of the blue-covered "proceedings" volumes of *Ryan I.*

facts of the case without regard to any conduct or comment made by the judge. Ryan has presented no evidence that this instruction was ignored, or that Judge Finn's conduct was of such a severe and disparaging nature that a curative instruction would be disregarded by a jury. Based on the evidence, the jury concluded that Ryan was guilty of murdering James Thimm. Although Judge Finn's conduct in turning his back to Ryan during Ryan's testimony was improper, the evidence does not support finding that Ryan was thereby unconstitutionally denied a fair trial. See, *Louisell v. Director of Iowa Dept. of Corrections,* 178 F.3d 1019, 1024 (8th Cir.1999) (denying habeas relief where, although prosecutor made improper remarks to jury, considering the strength of the state's evidence and the curative instructions provided by the trial court, defendant not denied a fair trial).

Ryan has failed to prove that the Nebraska Supreme Court's denial of appellate or postconviction relief on Claim I was contrary to clearly established Supreme Court law, or the result of an unreasonable factual determination. Claim I of his motion for habeas relief should therefore be denied.

### Claims II and III Ex-parte Meetings with the Stice and Thimm Families

In claims II and III petitioner argues that the trial judge's ex-parte communications with the Stice and Thimm families, respectively, after his conviction for first-degree murder of James Thimm and before his sentencing hearing, deprived him of his right to Due Process of law as guaranteed by the Fourteenth Amendment. In more specific terms, petitioner contends that the judge's comments during the ex parte communications reflect the judge's bias, and that he should have disqualified himself after receiving information and arguments from family members relevant to his sentencing decision. These claims were raised and exhausted in the state courts, (see, filing 13, State Answer, ¶¶ 20, 21, 24, 25), and they are properly before this court for habeas review.

■ A trial before a biased judge is considered "presumptively unfair" and such unfairness is reason enough to grant habeas relief. *Walker v. Lockhart,* 763 F.2d 942, 960 (8th Cir.1985).

There is no question that the law on judicial bias is clearly established: a criminal defendant is constitutionally required to be tried before an impartial judge, and the likelihood or appearance of bias, even in the absence of actual bias, may prevent a defendant from receiving a fair trial.

*Kinder,* 272 F.3d at 540.

However, "most questions concerning a judge's qualifications to hear a case are not constitutional ones." The Due Process Clause establishes a constitutional floor, not a uniform standard, and "these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar." *Bracy,* 520 U.S. at 904, 117 S.Ct. 1793. The Supreme Court has, however, recognized two main instances that merit a conclusive presumption of actual bias because they carry such a high probability of judicial bias: first, where the judge has a pecuniary interest in the outcome of a trial; and second, where the judge has been "the target of personal abuse or criticism from the party before him." *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

Petitioner has not established that Judge Finn had "a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case." *Tumey v. Ohio,* 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927). While the comments made by the judge during his meeting with James Thimm's family regarding

his opposition to the defense attorneys' fees is arguably evidence of some pecuniary interest, (Ryan III, Exhibit 1041, Heppner letter, at p.5), I agree with the Nebraska Supreme Court's assessment that "this is not the type of direct pecuniary interest" needed for a conclusive presumption of prejudice. *See Ryan III,* 257 Neb. at 655, 601 N.W.2d at 489. See, e.g. *Fero v. Kerby,* 39 F.3d 1462, 1479 (10th Cir.1994) (finding trial judge had no direct, pecuniary interest sufficient to require disqualification where prosecutor employed judge's son to work as a law clerk on defendant's case).

Further, Ryan has neither alleged nor proved that the probability of actual bias on the part of the judge is too high to be constitutionally tolerable because Judge Finn was " 'the target of personal abuse or criticism from a party before him.' " *Kinder,* 272 F.3d at 540 (quoting *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)).

The question is therefore "whether the state court unreasonably determined the facts when it declared that Judge [Finn] was not actually biased and that his impartiality could not reasonably be questioned." *Kinder,* 272 F.3d at 540. See also, *See Dyas v. Lockhart,* 705 F.2d 993, 996–97 (8th Cir.1983). In considering a claim of this nature, the court must at all times presume the judge's honesty and integrity. *Dyas,* 705 F.2d at 996 (citing *Withrow,* 421 U.S. at 47, 95 S.Ct. 1456). The due process test to determine if presumption of judicial bias is proper is whether, "realistically considering psychological tendencies and human weaknesses,

the judge would be unable to hold the proper balance between the state and the accused." *Id.* (citing *Tumey,* 273 U.S. at 532, 47 S.Ct. 437; *Withrow,* 421 U.S. at 47, 95 S.Ct. 1456; *Taylor,* 418 U.S. at 501, 94 S.Ct. 2697). Under the standards discussed above, disqualification of a judge is constitutionally required only in the most extreme cases of bias or prejudice. *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 821, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986)(cited in *Kinder,* 272 F.3d at 539).

Ryan has failed to prove entitlement to habeas relief under 28 U.S.C. § 2254(d)(1).

> To the extent that the issue of judicial bias may be a mixed question of law and fact, the state court's determination that [Ryan's] right to due process was not violated as the result of judicial bias or the appearance of bias is neither contrary to nor does it result from an unreasonable application of clearly established federal law.

*Kinder,* 272 F.3d at 541 n. 8. Ryan has also not proven that the Nebraska courts' finding was unreasonable under § 2254(d)(2). A federal court may independently find that a judge was biased or appeared to be biased, but "in evaluating the application of clearly established law, that a federal habeas court might believe the findings of the state court to be incorrect does not mean they are unreasonable under § 2254(d)(2)." *Kinder,* 272 F.3d at 541.

The issue of judicial bias arising from or evidenced by Judge Finn's meetings with the Stice and Thimm families prior to sentencing was raised, litigated, and decided in the second state postconviction hearing.[19] Although Judge Moran also found

---

19. Ryan alleged that he was not aware of Judge Finn's statements during the meetings between Judge Finn and the Thimm and Stice families until after obtaining "newly discovered" information (i.e., Ryan III, Exhibit 1041, Daneda Heppner letter), following the first state postconviction proceeding. See *Ryan III,* appeal transcript, "Defendant's Second

Amended Second Motion for Postconviction Relief at p. 6 ¶¶ 17, 23". (See also, filing 1, Petition for Writ of Habeas Corpus, Claim IV which alleges ineffective assistance of counsel for failing to investigate the ex parte meetings and develop the trial record). Ryan pursued and exhausted the claims in the second state postconviction proceeding.

that Ryan's claims arising form the ex parte meetings had previously been litigated and were not based on "newly discovered" information,[20] he nonetheless reviewed the merits of these claims. The factual determination made by a state court is entitled to the "presumption of correctness" so long as the material facts were adequately developed during a full, fair, and adequate due process hearing in the state court, and resulted in a "reliable and adequate written indicia," (*O'Rourke*, 153 F.3d at 567), of the opinion reached by the court.

Upon review of the record, I find that this standard has been met; Judge Moran's decision is presumptively correct; and Ryan has failed to rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Judge Moran held:

> The evidence in the record from the trial, presentence investigation, and sentencing proceeding, as reflected in the sentencing order in this case, in no way supports a contention that the trial judge was moved to impose a sentence of death for any reason other that a consideration of properly admissible and properly received evidence. The evidence reflects that the trial court extended the offer to meet the victim's family in an effort to answer procedural questions and provide information, as opposed to gaining information about Michael Ryan, James Thimm, or anything else connected with this case. The sentencing order findings are based upon documented evidence and the record before the trial court at the time of sentencing.
>
> Understand, the defendant's interpretation and the conclusions he draws from the May 9, 1986, meeting are that the presumption of prejudice has not been rebutted by the State beyond a reasonable doubt. However, the court finds to the contrary. The topics mentioned at the meeting, when examined in light of what point the case had reached (after the facts of the case had been presented in open court), convincingly demonstrate that the trial judge did not receive any input that prejudiced the defendant's due process rights at sentencing; nor did the trial judge invite, or receive, an ex parte communication as an extrajudicial source of information, concerning defendant's pending sentencing. I conclude, therefore, that no violation of *State v. Barker*, 227 Neb. 842, 420 N.W.2d 695 (1988), occurred. Accordingly, defendant is not entitled to any relief on this claim.

*Ryan III*, Memorandum and Order at p. 39–40.

Judge Moran thoroughly analyzed and outlined the evidence supporting his opinion. *Ryan III*, Memorandum and Order at p. 32–40. Judge Moran noted that "[t]here is little doubt that an improper ex parte meeting did occur on May 9, 1986," when Thimm and Stice family members entered the judge's chambers to ask ques-

---

**20.** Judge Moran determined that Ryan's claim of bias and resulting prejudice arising from the ex parte meetings had been previously litigated in *Ryan I* and *Ryan II* and was therefore barred from re-litigation in the second postconviction relief proceeding. *Ryan III*, Memorandum and Order at p. 36. However, in both *Ryan I* and *Ryan II* the Nebraska Court's analysis discussed the lack of prejudice arising from exparte meetings with the Luke Stice family, and noted that there was no evidence that Judge Finn had spoken with the family of the murder victim in that case, James Thimm, prior to the sentencing. See *Ryan I*, 233 Neb. at 121, 444 N.W.2d at 640 (holding law does not condone trial judge's ex parte communication with victim's family members, however, record showed meeting with Stice family but not Thimm family); *Ryan II*, 248 Neb. at 461, 534 N.W.2d at 800 (holding communication with Stice family did not prejudice Ryan in sentencing for death of Thimm).

tions, and that this meeting "immediately raises questions." *Ryan III,* Memorandum and Order at p. 37. He found, however, that Judge Finn had advised those present that Michael Ryan could not be discussed, (*Ryan III,* 300:19–301:10), and the trial evidence and sentence to be imposed on Ryan were not discussed. The meeting participants were not asked, and did not offer an opinion on what Ryan's sentence should be. The meeting focused on Dennis Ryan, and Judge Moran found that "the evidence demonstrates with absolute certainty that the trial judge did not receive any input or extrajudicial ex parte communication or information from any other person at the meeting on this subject." *Ryan III,* Memorandum and Order at p. 37–38. (See *Ryan III,* 221:23–222:14, 231:21–232:1, 240:17–242:2, 250:1–251:16, 254:15–255:17, 295:9–12, 297:20–23, 346:2–12 & Exhibit 1041, Heppner letter).

Ryan argues that judicial bias was evident in the following acts and comments by Judge Finn, and influenced his sentencing findings:

1) Actively concealing the May 1986 meeting and the substance of the conversations at that meeting; (Petitioner's Brief on the Merits at p. 29–31),

2) Hearing comments on the impact of James Thimm's death on his family; (Petitioner's Brief on the Merits at p. 31–32),

3) Commenting on a factor relevant to a statutory mitigating circumstance under Neb.Rev.Stat. § 29–2523(2)(b); (Petitioner's Brief on the Merits at p. 32–34), and

4) Expressing animosity toward Ryan, his family and counsel, while showing favoritism toward the prosecutor. (Petitioner's brief on the Merits at p. 34–36).

Based on Ryan's letter to his son, Judge Moran found that Ryan was informed of the ex parte meeting issue prior to his first postconviction proceeding. *Ryan III,* Exhibit 1047. Ryan's letter to his son establishes that Ryan knew Judge Finn had engaged in an ex parte meeting, but it does not establish that he knew the judge had met with members of the Thimm family. Nonetheless the alleged concealment of the details of the meeting is insufficient to defeat the presumption of judicial evenhandedness, honesty, and integrity, (*Dyas,* 705 F.2d at 996), especially when the record reveals that the aggravating factors found by Judge Finn, including the factors relevant to Luke Stice, were fully supported by the trial and sentencing evidence. See, *Ryan II,* Exhibit 2B at 410–11 (order of sentence); *Ryan I,* 1172:18–1176:15, 1645:11–24, 1878:10–1889:4, 3118:17–3129:12, 3975:13–3978:22; *Ryan I* (proceedings)[21], 1376:20–1400:25, 1452:22–1453:24, 1472:8–1478:17, 1528:8–1529:2, 1552:14–23, 1559:9–1562:19.

It is true that a statement by Ms. Heppner that her aunt and uncle had "received a life sentence too," (see, *Ryan III,* Exhibit 1041, Heppner letter), could be construed as a plea to find aggravating factors and impose a more severe sentence than life imprisonment. In light of the significant evidence to support the judge's findings, however, there is no evidence that the judge disregarded his obligation to consider only the evidence properly presented in reaching his sentencing decision.

Ryan further argues that Judge Finn obtained information in the ex parte meeting relevant to his denial of the mitigating circumstance set forth in Neb.Rev.Stat. § 29–2523(2)(b); whether the offender acted under unusual pressures or influences

**21.** This sentencing testimony is located in Volume VII of the blue-covered "proceedings" volumes of *Ryan I.*

or under the domination of another person. In finding no evidence to support this mitigating factor, Judge Finn concluded that "[t]he evidence would show, if anything, that other people on the Rulo farm acted under the domination of Michael W. Ryan." *Ryan II*, Exhibit 2B at 416 (order of sentence). According to Daneda Heppner's letter, Judge Finn had commented to the family before sentencing that he was baffled at "how Ryan could have such power over" the others on the Rulo farm. *Ryan III*, Exhibit 1041, Heppner letter, at p. 7. Karen Schmidt, Thimm's foster sister, testified that in that meeting, she stated that James Thimm had changed radically after moving to the Rulo farm. *Ryan III*, 330:6–332:6.

Noting the substantial evidence in the record that Ryan "was the unquestioned leader of the group on the Rulo farm." *Ryan III*, Memorandum and Order at p. 38, see, e.g., Ryan I, 1139:18–1164:15 (testimony of Cheryl Gibson), 4199:14–4203:16 (testimony of Dr. Logan), *Ryan I* (proceedings) [22], 1375:13–1400:25 (testimony of Ora Richard "Rick" Stice). Judge Moran found "no evidence even remotely suggesting that the trial judge received ex parte information ... which would elevate a 'Ryan's power over others' comment to the level of an extra-judicial source of information" that prejudiced Ryan and violated his due process rights. *Ryan III*, Memorandum and Order at p. 39. Having heard the overwhelming evidence of Ryan's domination at the Rulo farm, Judge Finn was fully aware of the testimony that Ryan was not the victim of domination by others, but had in fact influenced others to act on his command. There is no evidence to support a claim that any comments in the May 9, 1986 meeting influenced his decision.

Finally, petitioner argues that the judge showed a "deep and personal bias" against the petitioner, his family, and his counsel through the comments he made during the meeting. Judge Moran described Judge Finn's derogatory statements toward Ryan's ex-wife and his attorneys, and his statement of sympathy for the prosecutor as "idle musings" but not evidence that judicial bias influenced him to impose the death penalty. *Ryan III*, Memorandum and Order at p. 39. This finding is presumptively correct.

Judge Moran noted the several comments set forth in the letter of Daneda Heppner, *Ryan III*, Exhibit 1041, Heppner letter, including:

The judge's comment that none of the defendants were sorry for their crime, "because to be really sorry they would have to face what they have done, and how could they live with themselves then?" *Ryan III*, Exhibit 1041, Heppner letter, at p. 6;

His statement that "anyone who lets their religious convictions govern their actions is in trouble." *Ryan III*, Exhibit 1041, Heppner letter, at p. 7;

His expression of dislike for Ruth Ryan, petitioner's wife, when he declared that he was relieved when she declined to attend the meeting after the deputy clerk had mistakenly invited her. *Ryan III*, Exhibit 1041, Heppner letter, at p. 7;

His statement that he "was irate to see Ruth Ryan eating [seafood] in the bar [at the hotel] on the taxpayers' tab," and commented on her testimony by saying that "she's just switched from blaming Yahweh to blaming Satan." *Ryan III*, Exhibit 1041, Heppner letter, p. 5;

**22.** This sentencing testimony is located in Volume VII of the blue-covered "proceedings" volumes of *Ryan I*.

His comment that he would challenge defense counsels' fees all the way to the Supreme Court because "even though Dennis [Ryan] confessed to being guilty just days after being arrested, his lawyers still had to drive all over Kansas and Nebraska trying to find evidence to prove he was innocent." *Ryan III,* Exhibit 1041, Heppner letter, at p. 6.

Judge Moran had the opportunity to observe the witnesses at the second post-conviction hearing and gauge their demeanor. His evaluation of the evidence is supported by the record and is presumptively correct. Petitioner has not shown by clear and convincing evidence why it should be disregarded.

Were I to make an independent finding, I would agree that petitioner has not shown that his sentence resulted from any bias held by Judge Finn. I agree that the evidence of what transpired during the meeting with the Thimm family tends to show bias towards the petitioner, but I conclude it is insufficient to overcome the presumption that the judge was impartial and relied only on the evidence during sentencing. These comments were made after Judge Finn had heard graphic and extensive evidence of the brutal treatment inflicted on James Thimm and others on the Rulo farm. While his comments were not appropriate, even judges sometimes display "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women." *Liteky,* 510 U.S. at 555, 114 S.Ct. 1147. The "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* "Not *all* unfavorable disposition towards an individual (or his case) is proper-

ly described by the terms bias or prejudice." *White v. Luebbers,* 307 F.3d 722, 731 (8th Cir.2002)(quoting *Liteky,* 510 U.S. at 550, 114 S.Ct. 1147)(holding that a judge was not disqualified because he had formed and voiced tentative impressions of the merits on a habeas death penalty case). Although the judge's comments during the May 9 meeting were inappropriate and did evidence some personal bias against the petitioner, his family, and counsel, that does not mean the judge was not able to set aside that personal bias when he imposed his sentence.

Petitioner cites to *Walker v. Lockhart,* 763 F.2d 942 (8th Cir.1985), to support his argument that extrajudicial comments may establish a judge's bias against a defendant. However, there is no comparison between the comments made by the judge in this case and those made by the judge in *Walker.* In that case, having granted defendant's request to be allowed to be baptized, the judge told the deputy sheriff that if the defendant "made a move to shoot him down, because he didn't want him brought back to him because he intended to burn the S.O.B. anyway." *Walker,* 763 F.2d at 946. The Eighth Circuit held that those comments, along with a number of other comments adverse to the defendant during his retrial, deprived the defendant of a fair trial. *Id.* at 961. Clearly, the comments in this case were not so extreme, nor did they reveal such deep-rooted revulsion and hatred towards the petitioner to establish that the judge could not set aside his personal bias, and sentence petitioner in accordance with the evidence and applicable law.

Judge Moran's factual determinations are supported by the record and are not unreasonable. His ruling is not contrary to clearly established federal law. I therefore conclude that petitioner's claims II and III should be denied.

*Claim IV and V Ineffective Assistance of Counsel for Failure to Investigate Ex–Parte Meetings, and Abuse of Discretion*

■ Because petitioner has failed to discuss either claims IV or V in his brief on the merits, those claims are considered abandoned pursuant to Local Rule 39.2.[23] *See Norfolk v. Houston,* 941 F.Supp. 894 (D.Neb.1995).

*Claim VI Cumulative Trial Misconduct*

In this claim petitioner argues that even if the court were to find that none of the instances in claims I, II, or III standing alone would be sufficient to require a new trial or new sentencing hearing, the cumulative effect of those errors deprived the petitioner of his due process rights. I disagree.

■ Errors that are not unconstitutional individually cannot be added together to create a constitutional violation. *Wainwright v. Lockhart,* 80 F.3d 1226, 1233 (8th Cir.1996) (citing *United States v. Stewart,* 20 F.3d 911, 917–18 (8th Cir. 1994)). Neither the cumulative effect of trial errors nor the cumulative effect of attorney errors are grounds for habeas relief. *Id.* (citing *United States v. Stewart,* 20 F.3d 911, 917–18 (8th Cir.1994); *Wharton–El v. Nix,* 38 F.3d 372, 375 (8th Cir. 1994); *Griffin v. Delo,* 33 F.3d 895, 903–04 (8th Cir.1994)). "[E]ach habeas claim must stand or fall on its own." *Scott v. Jones,* 915 F.2d 1188, 1191 (8th Cir.1990). Therefore, I conclude petitioner's argument that the cumulative effect of the judge's misconduct entitles him to habeas relief lacks merit.

■ My analysis, however, does not end there. Petitioner also argues in this claim that the trial judge gratuitously disparaged his trial counsel and his defense before the jury and, thus, deprived him of his right to a fair trial. Respondent argues that this argument has not been properly presented to the Nebraska courts. Respondent, however, is incorrect. Petitioner raised a claim that was similar, legally and factually, to the present argument on his direct appeal to the Nebraska Supreme Court, *see Ryan I,* 233 Neb. at 94–96, 444 N.W.2d at 625–627, and has thus given the highest court of the state a "fair opportunity" to review this argument. Consequently, I address the merits of this argument.

The Eighth Circuit has held that comments by a trial judge may at times be sufficiently one-sided and distractive to a defendant's case that they may deprive him of a fair trial. *United States v. Van Dyke,* 14 F.3d 415, 418 (8th Cir.1994). However, judgment of conviction will rarely be disturbed "by reason of a few isolated, allegedly prejudicial comments of a trial judge, particularly in a long trial." *Id.* at 417 (quoting *United States v. Lueth,* 807 F.2d 719, 727 (8th Cir.1986)). The court must " 'balance and weigh the comments of the judge against the overall fairness of the trial ... [and conclude that] the balance is adversely tipped against the defendant in a criminal trial where the judge's role loses its color of neutrality and tends to accentuate and emphasize the prosecution's case.' " *Id.* at 417–18 (citations omitted).

In support of his argument, petitioner cites to the following four instances where the judge made disparaging remarks to his trial attorney:

**23.** Local Rule 39.2. provides in relevant part that "[w]hen a judge has set a time for submitting a brief, the failure to submit a brief or to discuss an issue in the brief submitted may be treated as an abandonment of that party's position on any issue not discussed." NELR 39.2(c)

(1) Judge stated during cross-examination of Richard Stice "Who gives a damn whether he was a high priest or not, for God's sake? ... [co-defendant's counsel] went at him for 45 minutes on the high priest deal. Are you going on for another 45 minutes?...That's enough on the high priest business." *Ryan I,* 3204:17–3205:7.

(2) During the same cross-examination the judge stated "Mr. Ligouri, [Stice is] making you look like a fool and the State is not going to bail you out, so just consider that when you keep going and going and going." *Ryan I,* 3268:14–16.

(3) During the cross-examination of Herbert Modlin the judge said to the attorneys, "I don't mean to laugh. I've got to apologize, first off." *Ryan I,* 3613:14–15.

(4) Finally, when petitioner's trial counsel tried to introduce into evidence audio tapes of speeches by James Wickstrom, the Judge said "[a]ren't you afraid that if you lock the jury with all of those tapes, they will come out seeing things and stuff?" *Ryan I,* 4341:4–6.

Reading these comments out of context, they certainly sound as prejudicial as the petitioner argues. It is critical to note, however, that each comment was made at side bar. *Ryan I,* 3204:17–3205:7, 3268:14–16, 3613:14–15, 4341:4–6. Thus, based on the evidence before me, it is unlikely the jury heard any of those comments, and Ryan has failed to prove that the jury's deliberations and decision were influenced by these comments. See, *U.S. v. Turner,* 975 F.2d 490 (8th Cir.1992) (finding no prejudice where, although trial judge was sarcastic and disparaging toward defense counsel, these comments and arguments were made outside the jury's presence). I conclude that Claim VI has no merit.

*Claim X Ineffective Assistance of Counsel for Failure to Properly Advise Petitioner Regarding a Joint Trial.*

■■■ In this claim petitioner argues that his trial counsel was ineffective for failing to adequately advise him of the adverse consequences of a joint trial with his son, for failing to provide him with an adequate assessment of how a joint trial could prejudice his defense, and for failing to timely or properly object to the joinder of his case with that of his son.

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court established a two-part test for evaluating ineffective assistance of counsel claims. In order to demonstrate that counsel was constitutionally ineffective, a petitioner must show that his counsel's performance was so deficient that it fell below an "objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. "[R]eview of counsel's performance is highly deferential and there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation." *Id.* at 687, 104 S.Ct. 2052. In addition to demonstrating that counsel's performance fell outside the "wide range of reasonable representation," petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

Trial counsel's advice to the defendant must be within the range of competence demanded from criminal lawyers. *McMann v. Richardson,* 397 U.S. 759, 770–71, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). Whether the advice given is erroneous "depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attor-

neys in criminal cases." *McMann,* 397 U.S. at 770, 90 S.Ct. 1441. Furthermore, an error in advice provided by counsel, "even if an unprofessional error, does not constitute ineffective assistance of counsel unless the defendant was prejudiced by the error." *Country v. Foster,* 806 F.2d 182, 184 (8th Cir.1986). (citing *Strickland v. Washington,* 466 U.S. 668, 691–92, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Holtan v. Parratt,* 683 F.2d 1163, 1167 (8th Cir. 1982)).

Following an evidentiary hearing on Ryan's first state motion for postconviction relief, Judge Wolf concluded that there was insufficient evidence to support a finding of ineffective assistance of counsel on the issue of failing to explain to Ryan the risks of a joint trial. *Ryan II,* Memorandum and Order at p. 10. Ryan's testimony contradicted that of his counsel on the issue, but Judge Wolf found:

> At the post-conviction hearing, defendant's counsel explained that defendant Michael W. Ryan asked to be tried with his son, Dennis. Defendant's counsel granted defendant's request, knowing there were other benefits from a joint trial, including no death qualification of the jury and precluding the State from trying the defendant Michael Ryan on both first degree murders at the same trial. Michael's hope for a warm relationship between father and son did not materialize, however. Dennis Ryan's counsel used the joinder for Dennis' benefit by physically separating the two and placing the blame on Michael. Although one of Michael's purposes of joinder failed, it did accomplish part of the goal. Choosing joinder, then, was a reasonable choice. Joinder or no joinder would not have changed the result.

*Ryan II,* Memorandum and Order at p. 10. This determination was supported by the record. See, *Ryan II,* 202:24–203:4, 254:12–257:24, 325:5–336:21. (Compare to Ryan's testimony at *Ryan II,* 44:19–51:13, 142:23–144:7). Judge Wolf assessed the witness' credibility and reached a conclusion. This finding was supported by evidence produced at a full and fair hearing at which Ryan testified and was represented by counsel. Judge Wolf's factual determination was not unreasonable.

Evidence on the issue was also received in the second state postconviction proceeding. At that hearing, although Ryan testified to the contrary, his trial counsel, Louie Ligouri, testified that he had discussed with Ryan whether he and his son should have a joint trial. *Ryan III,* 610:25–612:11. Ryan was aware that Dennis' counsel was preparing to prove that Dennis had acted under the commands of his father. Prior to trial Ryan was complaining to his son Dennis that Dennis' counsel, Rod Rehm, "was out to get him" by trying to show that Michael Ryan had control over his son. The petitioner nonetheless decided that he wanted to be tried with his son, stating to his lawyer that he could thereby assist Dennis at trial. *Ryan III,* 376:2–381:11. Upon review of the record, and assessing the credibility of the testifying witnesses, Judge Moran found that Ryan was a highly manipulative and competent man who was actively involved in his trial process.[24] As evidence of that behavior, Judge Moran found:

> Contrary to his later assertions on appeal that he wanted his and Dennis' trial to be severed, the record reflects that the defendant insisted that they be tried together. It is readily apparent to this court that defendant's motivation for

---

**24.** See extensive discussion and citations to the record supporting Judge Moran's decision herein at pages 34–49.

wanting to be tried together with his son was so that he could exert his influence over Dennis' testimony.

*Ryan III,* Memorandum and Order at p. 59. This finding of fact is supported by the record and is presumptively correct.

Petitioner's trial counsel, Richard Goos, also testified at the second postconviction hearing, and further explained the tactical reasons supporting a joint trial of Dennis and Michael Ryan. He testified that he believed a joint trial would preclude the state from death qualifying the jury. Goos further stated that a joint trial with Dennis Ryan would preclude the state from trying the petitioner for both the Luke Stice and the James Thimm murder at the same time because Dennis Ryan was charged only with the death of James Thimm and not the Luke Stice murder. Goos explained that a trial against Michael Ryan for both the Stice and Thimm murders would have probably prejudiced the jury against the petitioner and negatively affected his trial for the Thimm murder because the Stice murder involved the physical abuse and death of a five-year-old boy. Finally, Goos testified that he thought a joint trial would be beneficial because the jury would be able to see petitioner and his son interact. He explained that such interaction would serve to mitigate petitioner's negative image, namely that he was a brusque and forceful character. *Ryan III,* 196:7–199:12, 453:13–25.

Based on the foregoing it is clear the state courts' factual and legal conclusions are not unreasonable or incorrect. The performance of Ryan's counsel did not fall below an "objective standard of reasonableness." First, they acted in accordance with their client's statement that he wanted to be tried with his son. There is no showing that the motives for that decision, whether that was to assist his son or to influence his son to lie, would have been dispelled had Ryan received additional advice on the risks of a joint trial. Second, even assuming Ryan's counsel failed to thoroughly explain the pros and cons of a joint trial, all of the reasons stated by his counsel for not initially objecting to the joint trial were reasonable strategic decisions. *See e.g., Beran v. U.S.,* 580 F.2d 324, 327–28 (8th Cir.1978) (plausible strategic reasons to justify decision not to sever trial are generally not second guessed by a reviewing court, and absent evidence that the motion to sever would have likely been granted, defendant can show no actual prejudice); *McQueen v. Scroggy,* 99 F.3d 1302, 1316 (6th Cir.1996) (holding that an attorney's decision not to seek a separate trial was a reasonable tactical decision because it was based on the hope that a joint trial would cloud the issue of guilt by allowing the defendant to hide behind his less culpable half-brother).

In addition, petitioner has not established that he was prejudiced by his counsel's "unprofessional errors." It is established that "[a] habeas petitioner is not entitled to relief on the grounds that he was entitled to a severance unless he can show that a joint trial was fundamentally unfair." *Hood v. Helling,* 141 F.3d 892, 896 (8th Cir.1998) (citing *Jenner v. Class,* 79 F.3d 736, 741 (8th Cir.1996)). A petitioner establishes fundamental unfairness where the mutually antagonistic defense of his co-defendant "compromised a specific trial right or prevented the jury from making a reliable determination of guilt or innocence." *Id.* "Mutually antagonistic defenses are those which force the jury to disbelieve the core of one defense in order to believe the core of the other." *Id.* (citing *United States v. Gutberlet,* 939 F.2d 643, 645–46 (8th Cir.1991)). No such showing has been made here.

The core of petitioner's defense was that he was legally insane at the time of James

Thimm's murder. *Ryan II*, 171:7–18. Although Dennis Ryan's defense presented testimony that petitioner exerted control over Dennis and the other people in the farm, (see, e.g., *Ryan I*, 2869:7–11, 2885:6–14), his core defense was also insanity. While Dennis Ryan's trial strategy introduced evidence that was prejudicial to the petitioner, such as the physical abuse inflicted on Luke Stice by the petitioner and others on the farm, both defenses were not mutually antagonistic. The jury could have believed Dennis Ryan's defense without having to disbelieve petitioner's insanity defense. *See Hood*, 141 F.3d at 896. Claim X is meritless.

### *Claims XI and XII Constitutionality of Neb.Rev.Stat. § 29–2523(1)(d) and its Application*

In these claims petitioner challenges the constitutionality of the aggravating factor set forth in Neb.Rev.Stat. § 29–2523(1)(d), both on its face and as it was applied in this case.

Section 29–2523(1)(d) provides as follows:

> The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence.

Neb.Rev.Stat. § 29–2523(1)(d) (Reissue 1995). The Nebraska Supreme Court has interpreted § 29–2523(1)(d) to describe two separate circumstances in the disjunctive that may operate in conjunction with or independent of one another: (1) that the murder was especially heinous, atrocious, or cruel; and (2) that the murder manifested exceptional depravity by ordinary standards of morality and intelligence. *See State v. Moore*, 210 Neb. 457, 470, 316 N.W.2d 33, 41 (1982). Although the Supreme Court held in *Maynard v. Cart-*

*wright*, 486 U.S. 356, 363–64, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), that the words "heinous," "atrocious," and "cruel" are unconstitutionally vague, the Eighth Circuit has recognized that the first prong in this aggravating circumstance has been constitutionally limited by the Nebraska Supreme Court to mean "unnecessarily torturous to the victim." [25] *See Harper v. Grammer*, 895 F.2d 473, 478 (8th Cir. 1990).

The second prong, "exceptional depravity," has spawned a plethora of litigation. The Eighth Circuit held in *Moore v. Clarke*, 904 F.2d 1226 (8th Cir.1990) that the language is unconstitutionally vague on its face. *Id.* at 1229 (quoting *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). The question remains as to whether this prong, as subsequently interpreted by the Nebraska Supreme Court, is still unconstitutionally vague. See discussion in *Moore v. Kinney*, 119 F.Supp.2d 1022, 1032 (D.Neb.2000), overruled by, *Moore v. Kinney*, 278 F.3d 774 (2002) (vacated for rehearing en banc on March 29, 2002).

In this case petitioner specifically argues that he is entitled to a remand for a new sentencing hearing because the sentencing court made a series of findings of fact without specifying whether those findings applied to the constitutional first prong or the invalid second prong when it concluded that the § 29–2523(1)(d) aggravator applied to his case. See *Ryan II*, Exhibit 2B at 412–414 (order of sentence). I disagree.

The Eighth Circuit held in *Harper*, a case where the sentencing judge and the Nebraska Supreme Court had applied

---

**25.** This limited construction has been applied by the Nebraska Supreme Court since 1977, *see State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977). It therefore existed at the time petitioner was sentenced.

§ 29–2523(1)(d) based on both of its prongs, that there was no need to resentence the petitioner because the "unconstitutional vagueness of the second prong does not diminish the virility of the first prong." *Harper,* 895 F.2d at 479. The court explained that "[t]he two prongs are not separate factors [but that] each of the prongs simply purports to be justification for application of the aggravating factor." *Id.*

In this case, even if I were to conclude that at the time of petitioner's sentencing there was no constitutionally valid construction of the "exceptional depravity" language, the application of § 29–2523(1)(d) in this case was still proper because it was based not only on the invalid second prong, but also on the constitutionally valid first prong. As the Eighth Circuit concluded "the invalidity of the second portion of (1)(d) does not vitiate the efficacy of the first portion." *Id.*

### *Claim XIII Constitutionality of Application of NEB. REV. STAT. ANN. § 29–2523(1)(a)*

Petitioner also argues that his death sentence violated the Eighth and Fourteenth Amendments to the United States Constitution because it was based upon § 29–2523(1)(a),[26] which is an unconstitutionally vague and overbroad statutory aggravating circumstance. Specifically, petitioner argues that the second clause of 29–2523(1)(a) ("substantial history of serious assaultive or terrorizing criminal activity") is vague and overbroad, particularly as applied to his case.

 Addressing the constitutionality of this second clause of the 29–2523(1)(a) aggravating circumstance, the Eighth Circuit

held in *Moore v. Clarke,* 904 F.2d 1226 (8th Cir.1990) that "[t]he Nebraska Supreme Court [had] provided sufficient guidance to sentencing bodies, concerning this particular aggravating circumstance, to prevent the arbitrary and capricious infliction of the death penalty . . . ." *Id.* at 1234. In reaching this conclusion, the court accepted the Nebraska Supreme Court's construction that the "substantial history" clause refers to events and incidents that happened before and were not part of the events that gave rise to the charge under which the petitioner was tried, such as an earlier murder. *Id.* (citing *State v. Joubert,* 224 Neb. 411, 412–13, 426, 399 N.W.2d 237, 241, 248 (1986) (per curiam), *cert. denied,* 484 U.S. 905, 108 S.Ct. 247, 98 L.Ed.2d 205 (1987); *State v. Rust,* 197 Neb. 528, 535, 250 N.W.2d 867, 872–73 (1977)). The Nebraska Supreme Court has further specified that this clause applies "irrespective of whether the offender was convicted for the conduct creating the history." *State v. Bird Head,* 225 Neb. 822, 836, 408 N.W.2d 309, 318 (1987). The second clause of the 29–2523(1)(a) aggravating circumstance has a constitutionally valid narrowing construction.

 The next issue is whether it was applied constitutionally in this case. Under § 2254(d), the limited question before this court is whether the Nebraska court findings with regard to the existence of aggravating and mitigating factors constituted an unreasonable determination of the facts in light of the evidence presented to the state court. 28 U.S.C. 2254(d)(2). See also, *Kinder,* 272 F.3d at 538 (on death penalty habeas review, factual findings of court reviewed for clear error, while legal

---

**26.** Section 29–2523(1)(a) provides that the following may be considered an aggravating circumstance by a sentencing court:

The offender was previously convicted of another murder or a crime involving the

use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity.
Neb.Rev.Stat. § 29–2523(1)(a) (Reissue 1995).

issues or mixed questions of law and fact are reviewed de novo.)

In this case the sentencing court found that the following acts supported, beyond a reasonable doubt, its finding that Michael W. Ryan had a substantial history of serious assaultive or terrorizing criminal activity:

(a) Michael W. Ryan either spanked and beat Luke Stice, or directed others to do this;

(b) Michael W. Ryan either administered cold showers to Luke and held him under cold water or directed that this be done to Luke;

(c) Michael W. Ryan directed others to sexually abuse Luke Stice;

(d) Michael W. Ryan used Luke Stice as an ashtray;

(e) Michael W. Ryan rolled Luke around in the snow without any clothes on or directed others to do this to Luke;

(f) Michael W. Ryan spit in the mouth of Luke Stice;

(g) Michael W. Ryan shot chickens in the presence of Luke Stice to create in him a fear of guns or directed that this be done to Luke;

(h) Michael W. Ryan terrorized Luke Stice by placing a gun in his mouth and also by shooting him in the arm;

(i) Michael W. Ryan either shoved Luke against the wall on three different occasions or directed others to shove Luke against the wall, which acts ultimately resulted in the death of Luke Stice;

(j) Michael W. Ryan either held Luke off the ground with a belt around his neck or directed others to do this to Luke;

(k) Michael W. Ryan either shot cigarettes himself from Luke's mouth or directed others to do this; and

(*l*) Michael W. Ryan told Luke that he would be castrated, and that he would be placed on a brush pile and burned alive by him.

*Ryan II,* Exhibit 2B at 410–411 (order of sentence).

The sentencing court further found:

[D]efendant assaulted both Richard Stice and James Thimm leading up to, and prior to the time of, the events involving the death of James Thimm. These acts would further support the finding that the defendant had a substantial history of serious assaultive or terrorizing criminal acts prior to the death of James Thimm.

*Ryan II,* Exhibit 2B at 411 (order of sentence).

Finally, the sentencing court stated that the following additional facts supported "finding that the defendant had a substantial history of serious assaultive or terrorizing criminal activity."

(a) Shortly before Michael W. Ryan left high school, he assaulted a teacher;

(b) According to Michael W. Ryan's own testimony, he assaulted a principal at his high school;

(c) According to Michael W. Ryan's accounting to Dr. Logan, he was discharged from the military as a result of fighting with six [military police officers].

*Ryan II,* Exhibit 2B at 411 (order of sentence).

The record clearly supports all of the facts relied upon by the sentencing judge. See, *Ryan II,* Exhibit 2B at 410–11 (order of sentence); *Ryan I,* 1172:18–1176:15, 1645:11–24, 1878:10–1889:4, 3118:17–3129:12, 3975:13–3978:22; *Ryan I* (proceedings)[27], 1376:20–1400:25, 1452:22–

**27.** This sentencing testimony is located in Volume VII of the blue-covered "proceedings" volumes of *Ryan I.*

1453:24, 1472:8–1478:17, 1528:8–1529:2, 1552:14–23, 1559:9–1562:19. His findings are again presumed correct and petitioner has not shown by any clear and convincing evidence that they are unreasonable.

Petitioner further argues that the sentencing judge expanded the meaning of the 29–2523(1)(a) aggravator by attributing to him actions committed by others. *See* facts (a)-(c), (e), (g), and (i)-(k). The Nebraska Supreme Court's interpretation of this state law issue is binding on this court. The Nebraska Supreme Court rejected these arguments and that ruling is the final word on interpreting the statutes in the absence of a constitutional claim.

### Claim XVII Constitutionality of Method of Execution

Because petitioner failed to discuss this claim in his brief on the merits, I find he has abandoned this claim under Local Rule 39.2. *See* Discussion of Claims IV and V, *supra*.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, Chief United States District, pursuant to 28 U.S.C. § 636(b)(1)(B), that the petitioner's Petition for Writ of Habeas Corpus, filing 1, be denied in all respects.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.